No. 11-2281

# In The United States Court of Appeals
# For The First Circuit

STACEY HIGHTOWER,

Plaintiff-Appellant,

v.

CITY OF BOSTON; EDWARD DAVIS, Boston Police Commissioner; AND
COMMONWEALTH OF MASSACHUSETTS,

Defendants-Appellees.

Appeal from a Judgment of the United States District Court
for the District of Massachusetts, the Hon. Denise J. Casper
(08-CV-11955-DJC)

## APPELLANT'S BRIEF

Chester Darling
1st Cir. Bar No. 33273
9 Mayflower Drive
Andover, MA 01810
978.475.2520/978.475.1741
chesterdarling@comcast.net

Alan Gura
1st Cir. Bar No. 1148005
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665
alan@gurapossessky.com

February 7, 2012

*Counsel for Plaintiff-Appellant*

TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Reasons Why Oral Argument Should Be Heard. . . . . . . . . . . . . . . .  xvi

Jurisdictional Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      1.     *The Regulatory Framework.*. . . . . . . . . . . . . . . . . . . . . . . . 7

      2.     *Stacey Hightower's Background.* . . . . . . . . . . . . . . . . . . . . 12

      3.     *The Renewal, and Revocation, of*
             *Stacey Hightower's Handgun License.*. . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.     THE STANDARD OF REVIEW IS DE NOVO. . . . . . . . . . . . . . . . . . 19

II.    REVOCATION OF HIGHTOWER'S LICENSE TO POSSESS
       AND CARRY HER HANDGUN, AND THE SEIZURE OF
       HER HANDGUN AND AMMUNITION, CREATE A RIPE
       SECOND AMENDMENT CONTROVERSY.. . . . . . . . . . . . . . . . . . . 19

III.   THE SECOND AMENDMENT SECURES THE RIGHT TO
       CARRY ARMS IN PUBLIC FOR SELF-DEFENSE. . . . . . . . . . . . . . . 24

      A.    The Right to Bear Arms Has Traditionally
           Extended Beyond the Home. . . . . . . . . . . . . . . . . . . . . . . 25

B.    The Second Amendment's Original Public Meaning Confirms the Right to Publicly Carry Arms for Self-Defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.    Precedent Addressing Restrictions of the Right to Bear Arms Confirms Its Existence. . . . . . . . . . . . . . . . . . . . 35

     1.   *Concealed Carry Prohibitions.* . . . . . . . . . . . . . . . . . . 36

     2.   *Dangerous and Unusual Weapons.* . . . . . . . . . . . . . . . 40

IV.    "SUITABILITY" IS AN INVALID STANDARD FOR LICENSING THE ENJOYMENT OF FUNDAMENTAL SECOND AMENDMENT RIGHTS. . . . 45

A.    Prior Restraints Against the Exercise of Fundamental Rights Must Be Defined Objectively and Narrowly, Without Sanctioning Unbridled Discretion. . . . . . . . . . . . . . . . . . . 45

B.    Section 131's Discretionary Aspects Plainly Fail Prior Restraint Review. . . . . . . . . . . . . . . . . . . 51

V.    SECTION 131'S DISCRETIONARY ASPECTS CANNOT SURVIVE MEANS-ENDS SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.    Laws Generally Restricting the Right of Law Abiding, Responsible Individuals to Bear Arms Are Subject to Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B.    Barring Law-Abiding, Responsible Americans from Bearing Arms Serves No Government Interest. . . . . 59

VI.    DEFENDANTS DENIED HIGHTOWER DUE PROCESS. . . . . . . . . . . . . 60

A.    Hightower Enjoys A Liberty Interest In Keeping and Carrying Arms, and a Property Interest in Her License to Do So. . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B.    Defendants Failed to Provide Hightower with Adequate
      Pre- and Post-Deprivation Procedural Safeguards. . . . . . 62

      1.    *Hightower Has a Strong Private Interest
            in Her Right to Arms.* . . . . . . . . . . . . . . . . . . . . . . . . . 64

      2.    *Defendants' Process is Prone to a High Risk
            of Error that Could Be Significantly Alleviated
            by Additional Safeguards.* . . . . . . . . . . . . . . . . . . . . 65

      3.    *The Government Lacks a Justifiable Interest in
            Adhering to its Existing Procedure.* . . . . . . . . . . . . . 67

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

# TABLE OF AUTHORITIES

Cases

*754 Orange Ave., Inc.* v. *West Haven,*
    761 F.2d 105 (2d Cir. 1985) .................................. 47

*Adamson* v. *California,*
    332 U.S. 46 (1947) ........................................ 30

*Andrews* v. *State,*
    50 Tenn. 165 (1871) ....................................... 38

*Arnett* v. *Kennedy,*
    416 U.S. 134 (1974) ....................................... 62

*Aymette* v. *State,*
    21 Tenn. 154 (1840) ....................................... 38

*Bd. of Regents* v. *Roth,*
    408 U.S. 564 (1972) ....................................... 61

*Beal* v. *Stern,*
    184 F.3d 117 (2d Cir. 1999) ............................... 48

*Berger* v. *Rhode Island Bd. of Governors,*
    832 F. Supp. 515 (D.R.I. 1993) ............................ 46

*Bliss* v. *Commonwealth,*
    12 Ky. 90 (1822) .......................................... 33

*Cantwell* v. *Connecticut,*
    310 U.S. 296 (1940) ................................... 46, 48

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n,*
    447 U.S. 557 (1980) ....................................... 56

iv

*Charette* v. *Town of Oyster Bay*,
    159 F.3d 749 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 47

*Chesapeake B & M, Inc.* v. *Harford County*,
    58 F.3d 1005 (4th Cir. 1995) (en banc). . . . . . . . . . . . . . . . . . . . 48

*Chief of Police of Shelburne* v. *Moyer*,
    16 Mass. App. Ct. 543, 453 N.E.2d 461 (1983). . . . . . . . . . . 11, 67

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 52

*City of Las Vegas* v. *Moberg*,
    82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . 33

*Clark* v. *City of Lakewood*,
    259 F.3d 996 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Clark* v. *Jeter*,
    486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Cleveland Bd. of Educ.* v. *Loudermill*,
    470 U.S. 532 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63, 66

*Commonwealth* v. *Seay*,
    376 Mass. 735, 383 N.E.2d 828 (1978). . . . . . . . . . . . . . . . . . . . . 8

*Cronin* v. *Town of Amesbury*,
    81 F.3d 257 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*D&H Therapy Assocs., LLC* v. *Boston Mut. Life Ins. Co.*,
    640 F.3d 27 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dearth* v. *Holder*,
    641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*District of Columbia* v. *Heller*,
 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*English* v. *State*,
 35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Ezell* v. *City of Chicago*,
 651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 29, 56, 58

*Forsyth County* v. *Nationalist Movement*,
 505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 52

*FW/PBS* v. *City of Dallas*,
 493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*Godfrey* v. *Chief of Police*,
 35 Mass. App. Ct. 42, 616 N.E.2d 485 (1993) . . . . . . . . . . . . . . . 11

*Goldberg* v. *Kelly*,
 397 U.S. 254 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Guillemard-Ginorio* v. *Contreras-Gomez*,
 490 F.3d 31 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Hague* v. *Committee for Indus. Org.*,
 307 U.S. 496 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Heller* v. *District of Columbia*,
 2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) . . . 54, 55, 57

*Howard* v. *Chief of Police*,
 59 Mass. App. Ct. 901,794 N.E.2d 604 (2003) . . . . . . . . . . . . . . 10

*In re Application of McIntyre*,
 552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Brickey*,
    8 Idaho 597, 70 P. 609 (1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Johnson* v. *Eisentrager*,
    339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Jones* v. *Opelika*,
    316 U.S. 584 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kuck* v. *Danaher*,
    2011 U.S. Dist. LEXIS 111793 (D. Conn. Sept. 29, 2011). . . 52, 53

*Kuck* v. *Danaher*,
    600 F.3d 159 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 61, 64, 67

*Kunz* v. *New York*,
    340 U.S. 290 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Largent* v. *Texas*,
    318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Louisiana* v. *United States*,
    380 U.S. 145 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Lovell* v. *Griffin*,
    303 U.S. 444 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Malloy* v. *Hogan*,
    378 U.S. 1 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Marrero-Gutierrez* v. *Molina*,
    491 F.3d 1 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Mathews* v. *Eldridge*,
424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 64

*McDonald* v. *City of Chicago*,
130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . 6, 25, 28, 61

*Mincey* v. *Arizona*,
437 U.S. 385 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Minnesota* v. *Carter*,
525 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Muscarello* v. *United States*,
524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Myers* v. *United States*,
272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Nat'l Fed'n of the Blind* v. *FTC*,
420 F.3d 331 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Newman* v. *Massachusetts*,
884 F.2d 19 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63

*Nunn* v. *State*,
1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Oakes* v. *United States*,
400 F.3d 92 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Ortiz* v. *Burgos*,
807 F.2d 6 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Owen* v. *State*,
31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*O'Neill* v. *Baker*,
  210 F.3d 41 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*O'Neill* v. *State*,
  16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Parker* v. *District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 21, 26, 55

*Payton* v. *New York*,
  445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Peruta* v. *County of San Diego*,
  678 F. Supp. 2d 1046 (S.D. Cal. 2010).. . . . . . . . . . . . . . . . . . . . . 29

*Peruta* v. *County of San Diego*,
  758 F. Supp. 2d 1106 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . 36

*Rex* v. *Knight*,
  90 Eng. Rep. 330 (K.B. 1686). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Robertson* v. *Baldwin*,
  165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sch. Union No. 37* v. *United Nat'l Ins. Co.*,
  617 F.3d 554 (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Schubert* v. *De Bard*,
  398 N.E.2d 1339 (Ind. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . 33

*Scott* v. *Sandford*,
  60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Shuttlesworth* v. *City of Birmingham*,
  394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . 22, 45, 48, 49, 51

*Silverman* v. *United States*,
    365 U.S. 505 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Simpson* v. *State*,
    13 Tenn. 356 (1833) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 44

*Spinelli* v. *City of New York*,
    579 F.3d 160 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 64

*State ex rel. City of Princeton* v. *Buckner*,
    180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Bailey*,
    209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Blocker*,
    291 Ore. 255, 630 P.2d 824 (1981).. . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State* v. *Hogan*,
    63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Huntly*,
    25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 44

*State* v. *Jumel*,
    13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State* v. *Kessler*,
    289 Ore. 359, 614 P.2d 94 (1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Langford*,
    10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*State* v. *Lanier*,
    71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*State* v. *Reid*,
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 37

*State* v. *Rosenthal*,
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Schoultz*,
    25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 51

*Strasser* v. *Doorley*,
    432 F.2d 567 (1st Cir. 1970).. . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Baugh*,
    187 F.3d 1037 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Booker*,
    644 F.3d 12 (1st Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States* v. *Carter*,
    2012 U.S. App. LEXIS 1243 (4th Cir. Jan. 23, 2012) . . . . . . . . 57

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 54, 57

*United States* v. *Cruikshank*,
    92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*United States* v. *Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57

*United States* v. *Miller,*
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Reese,*
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States* v. *Rehlander,*
    2012 U.S. App. LEXIS 766 (1st Cir. Jan. 13, 2012). . . . . 60, 67, 68

*United States* v. *Rene E.*,
    583 F.3d 8 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*United States* v. *Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . 57

*United States* v. *Williams,*
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Verizon New Eng., Inc.* v. *IBEW,*
    651 F.3d 176 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Woollard* v. *Sheridan,*
    2010 U.S. Dist. LEXIS 137031 (D. Md. Dec. 30, 2010). . . . . . . . . 21

Federal Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S. Const. amend. VI.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

State Constitutional Provisions

Ala. Const. of 1819, art. I, § 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conn. Const. art. I, § 15 (1819). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Ky. Const. of 1799, art. XII, cl. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Mo. Const. of 1820, art. XIII, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

N.C. Declaration of Rights § 17 (1776). . . . . . . . . . . . . . . . . . . . . . . . . 33

Ore. Const. art. I, § 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tenn. Const. of 1796, art. XI, § 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Vt. Const. c. 1, art. 16 (1777) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Statutes

18 U.S.C. § 922(g)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Conn. Gen. Stat. § 29-28(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Conn. Gen. Stat. § 29-32b(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

D.C. Code § 22-4504(a) (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

M.G.L. c. 140, § 121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

M.G.L. c. 140, § 129D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

M.G.L. c. 140, § 131.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7-10

M.G.L. c. 269, § 10.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

M.G.L. c. 30A, § 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Tex. Gov't Code § 411.177(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Tex. Penal Code § 46.035(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Other Authorities

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . 31

Charles Alan Wright et al.,
    FEDERAL PRACTICE AND PROCEDURE (1998). . . . . . . . . . . . . . . . 20

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
    IN FORCE IN KENTUCKY (1822). . . . . . . . . . . . . . . . . . . . . . . . . 42

COLLECTED WORKS OF JAMES WILSON
    (K. Hall & M. Hall eds. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 32

David Caplan, *The Right of the Individual to Bear Arms:*
    *A Recent Judicial Trend*, 4 DET. L. C. REV. 789 (1982) . . . . . . . . 41

David Ramsay, HISTORY OF THE AMERICAN REVOLUTION (1789). . . . . . . 3

David Young, THE FOUNDERS' VIEW OF THE
    RIGHT TO BEAR ARMS (2007). . . . . . . . . . . . . . . . . . . . . . . . . . 3

EARLY CENSUS MAKING IN MASSACHUSETTS (1902). . . . . . . . . . . . . . . 3

Eugene Volokh, *Implementing the Right to Keep
    and Bear Arms for Self-Defense: An Analytic
    Framework and a Research Agenda*,
    56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . 39

James Wilson, WORKS OF THE HONOURABLE
    JAMES WILSON (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . 42

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . 42

Journals of Continental Congress (1905). . . . . . . . . . . . . . . . . . . . . . 3

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS:
    THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . 42

PAPERS OF THOMAS JEFFERSON (J. Boyd ed., 1950) . . . . . . . . . . . . . . 31

Richard Frothingham, HISTORY OF THE SIEGE OF BOSTON (1851). . . . . . 3

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed. 1884). . . . . . . . . 39

TREATISE ON THE PLEAS OF THE CROWN, (Leach ed., 6th ed. 1788). . . . 42

William Blackstone, COMMENTARIES ON THE
    LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

William Oldnall Russell, A TREATISE ON CRIMES AND
    INDICTABLE MISDEMEANORS (1826). . . . . . . . . . . . . . . . . . . . . . 43

xv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This case raises important constitutional questions directly implicating the ability of law-abiding, responsible people to use arms in self-defense. Given the emerging state of Second Amendment law, it may well prove a foundational precedent in this field. Oral argument could aid the Court's determination of this case.

APPELLANT'S BRIEF

JURISDICTIONAL STATEMENT

Plaintiff-Appellant Stacey Hightower seeks injunctive relief, pursuant to 42 U.S.C. § 1983, barring Boston's Police Commissioner from requiring she prove herself "suitable" to obtain and maintain a license to possess and carry handguns for self-defense per M.G.L. c. 140, § 131. Hightower also challenges the revocation of her handgun license, and the seizure of her handgun and ammunition, pursuant to M.G.L. c. 140, § 129D.[1] Application of these provisions by Defendants-Appellees Edward Davis and City of Boston violated Hightower's Second and Fourteenth Amendment rights.

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. On September 29, 2011, the lower court denied Hightower's summary judgment motion, granted the summary judgment motions of the municipal defendants and intervening Defendant Commonwealth of Massachusetts, and entered final judgment. Addendum ("Add.") 11-52.

_____

[1]Further statutory references are to the Massachusetts General Laws unless otherwise stated.

1

This Court has jurisdiction per 28 U.S.C. § 1291 in this appeal from a final judgment. Plaintiff timely noticed her appeal on October 26, 2011. Joint Appendix ("JA") 321.

## STATEMENT OF ISSUES

1. When the police revoke a license to possess and carry handguns, seize an individual's firearm and ammunition, and declare that the license would only be reissued upon a discretionary finding that she is "suitable," is the individual's claim for relief ripe?

2. May authorities condition permits to exercise the fundamental Second Amendment right to keep and bear arms, and classify applicants with respect to the exercise of that right, upon a discretionary assessment of "suitability?"

3. Where an individual poses no threat to public safety, can her license to purchase, possess and carry a handgun, and the handgun and ammunition held under that license, be seized without pre-deprivation hearing and review, and without full post-deprivation due process?

## STATEMENT OF THE CASE

Boston has a troubled history of gun confiscation. In the aftermath of the Battles of Concord and Lexington, General Thomas Gage, the

head of British forces in North America and Royal Governor of Massachusetts, offered Bostonians free passage from the city provided they would deliver their arms for safekeeping. The people voted agreement to Gage's terms, surrendering, among other arms, 634 pistols. Richard Frothingham, HISTORY OF THE SIEGE OF BOSTON 95 (1851); David Ramsay, 1 HISTORY OF THE AMERICAN REVOLUTION 176 (1789).[2] Gage quickly reneged on his promise of safe passage, enraging the colonists. David Young, THE FOUNDERS' VIEW OF THE RIGHT TO BEAR ARMS 52 (2007). Thomas Jefferson and John Dickinson drafted a "Declaration of the Causes and Necessity of Taking Up Arms," issued by the Second Continental Congress on July 6, 1775, in which the Boston gun confiscation figured prominently. 2 JOURNALS OF CONTINENTAL CONGRESS 136-37 (1905).

Today, Bostonians enjoy greater protection of their right to keep and bear arms. When individuals enjoy a constitutional "right" to engage in some activity, a license to engage in that activity might impose various regulatory limitations—but it cannot be conditioned on the

---

[2]Handguns were apparently quite common in revolutionary Boston. The city's 1765 population totaled 15,520. EARLY CENSUS MAKING IN MASSACHUSETTS, 1643-1765 102 (1902).

government's determination of one's "suitability" to exercise the right. Defendants must be enjoined from imposing this classic form of unconstitutional prior restraint against the fundamental right to keep and bear arms.

Of course, Defendants have an interest in regulating firearms in the interest of public safety. Hightower does not question the state's ability to license the possession and carrying of firearms. But whatever else the state may do, it cannot reserve for itself the power to arbitrarily decide whether individuals deserve to possess and carry guns for self-defense. That decision has already been made in the Constitution, which guarantees law-abiding individuals their right to keep and carry handguns for self-defense.

Moreover, once an individual acquires a license to possess and carry a handgun for self-defense, the Fourteenth Amendment's Due Process Clause limits the government's ability to revoke that license, and to seize any firearm or ammunition whose possession it secures. Exigent circumstances may justify immediate deprivation of one's possessory interest in the license and firearm, but disputes that do not implicate public safety cannot override the individual interest in pre-termination

hearing and review. And when a license to exercise fundamental rights is revoked, the Fourteenth Amendment generally requires the provision of a meaningful post-deprivation hearing.

Stacey Hightower lives in a high-crime neighborhood, where she occasionally comes into contact with individuals who do not appreciate her sixteen years of service as a police officer. Her home has been invaded and vandalized, and her vehicle sabotaged. Shortly after leaving the Police Department to pursue a career in education, Hightower received a letter demanding that she surrender her privately owned handgun and ammunition—and the unrestricted Class A license to possess and carry it.

Hightower complied, and on November 24, 2008, brought this action in pro se against the municipal defendants, challenging the revocation and seizure. On March 23, 2009, counsel appeared for Hightower, and filed the First Amended Complaint.

Defendants assert that Hightower made an untrue statement on her license renewal application form in denying that "charges" were "pending" against her, because the department had not yet determined what discipline she would face stemming from a three-year old finding

that she had violated department rules. That finding had never interfered with Hightower's ability to carry a gun as a police officer, nor had it caused the revocation or seizure of her handgun and carry license. Defendants insisted that upon re-application, Hightower would receive a license to possess her gun—but not, apparently, to carry it.

Although Hightower maintains that she completed the renewal form accurately, her essential claim is that the form dispute is irrelevant to her ability to safely exercise her right to bear arms for self-defense. Hightower asserts that the excessively discretionary aspect of licensing the right to keep and bear arms is unconstitutional, and that she was denied due process.

A threshold issue in the case was whether the Second Amendment applied to state and local officials via the Fourteenth Amendment. Accordingly, on October 16, 2009, the District Court held the case in abeyance pending the Supreme Court's determination of that issue in *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010).

On November 20, 2010, the District Court re-opened the matter following *McDonald*'s resolution. Hightower moved for summary judgment on January 31, 2011. JA 33. The Commonwealth of

Massachusetts intervened as a defendant on February 11, 2011, and
cross-moved for summary judgment on April 21, 2011. JA 84. The
municipal defendants followed suit the next day. JA 123.

On September 29, 2011, the District Court denied Hightower's
motion for summary judgment and granted the Defendants' motions for
summary judgment. Add. 11-52. Hightower timely noticed her appeal
from the final judgment on October 26, 2011. JA 321.

STATEMENT OF FACTS

1.    *The Regulatory Framework*

In Massachusetts, carrying a handgun outside the home without a
license is a criminal offense. M.G.L. c. 269, § 10. All handguns are
"firearms," M.G.L. c. 140, § 121, and may be carried only under a Class
A or Class B license issued pursuant to M.G.L. c. 140, § 131.

Class A licenses authorize the purchase, rent, lease, borrowing,
possession and carrying of "firearms, including large capacity firearms,
and feeding devices and ammunition therefor, for all lawful purposes . .
." M.G.L. c. 140, § 131(a). Class B licenses authorize those activities
with respect to "non-large capacity firearms and feeding devices and
ammunition therefor, for all lawful purposes," but do not authorize the

7

carrying or possession of "a loaded firearm in a concealed manner in any public way or place . . ." M.G.L. c. 140, § 131(b).[3]

"Carrying" a firearm, under Massachusetts law, does not necessarily mean walking about in public while armed for self-defense. "'[C]arrying' a firearm occurs when [an individual] knowingly has more than momentary possession of a working firearm and moves it from one place to another." *Commonwealth* v. *Seay*, 376 Mass. 735, 737, 383 N.E.2d 828, 830 (1978) (citations omitted). All Class A and Class B licenses are issued "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper . . ." M.G.L. c. 140, § 131(a) and (b).

Thus, a "restricted" license to "carry" is, essentially, a license to possess a firearm in one's home or business, or to use a gun at a range. To publicly carry a loaded handgun for self-defense, an individual must have an "unrestricted" license to carry. As Defendants offered,

> An unrestricted Class A license allows an individual to carry a concealed firearm on their person for any purpose. A Class A license

---

[3]A "large capacity weapon" includes, inter alia, any semi-automatic firearm "capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device," defined as including magazines capable of holding over ten rounds. M.G.L. c. 140, § 121.

with restrictions generally allows individuals to carry a firearm outside the home for sport and target practice or for employment purposes, such as traveling to and from employment as a security officer. Class A restricted and unrestricted licenses both allow for possession of a large-capacity firearm for home protection.

A Class A restricted license to carry for sport and target practice requires the individual to transport their firearm unloaded in a locked box, and when necessary, in the trunk of their vehicle.

JA 141.[4]

Licensing authorities may issue or renew Class A or B licenses to

carry if, in the absence of statutory disqualifications,

it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section . . .

M.G.L. c. 140, § 131(d).

---

[4]The statute's plain meaning, and Lt. Det. Harrington's accurate summary of the differences between restricted and unrestricted carry licenses, contradict the District Court's statement that license restrictions "*may* have *some marginal* impact on Hightower's ability to use a gun to defend herself outside her home." Add. 47 (emphasis added). As Hightower is law-abiding, a license restriction's impact on her ability to use a gun in self-defense outside the home would be total.

Moreover, although Section 131(b) withholds permission for publicly carrying firearms "in a concealed manner," the Boston police apparently do not issue unrestricted Class B licenses to *openly* carry revolvers and other non-large capacity handguns.

A license to carry a handgun "may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license . . ." M.G.L. c. 140, § 131(f). An individual whose license to carry a handgun has been revoked "shall without delay deliver or surrender, to the licensing authority where he resides, all firearms . . . and ammunition which he then possesses unless an appeal is pending." M.G.L. c. 140, § 129D.

> Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension . . .

M.G.L. c. 140, § 131(f).

Individuals may contest the revocation of a license to carry a handgun by filing a petition for review in their local District Court. M.G.L. c. 140, §131(f). However, consistent with the licensing authority's "considerable latitude" to find an individual "suitable," *Howard* v. *Chief of Police*, 59 Mass. App. Ct. 901, 902, 794 N.E.2d 604, 606 (2003) (citation omitted), and accordingly to impose restrictions the authority "deems proper," Section 131(a), (b), "[t]he burden is upon the applicant to produce substantial evidence that he is a proper person to

hold a license to carry a firearm." *Chief of Police of Shelburne* v. *Moyer*,

16 Mass. App. Ct. 543, 546, 453 N.E.2d 461, 464 (1983).

"To warrant a finding that a chief of police had no reasonable ground

for refusing to issue a license it must be shown that the refusal was

arbitrary, capricious, or an abuse of discretion." *Id.* (citation omitted).

At least as a matter of state law, there is no right to carry a firearm,

> nor is there any question of a property right or deprivation of liberty
> involved in the statutory procedures for obtaining a license to carry
> firearms. The full panoply of procedures usually available at a trial
> is not required in the review by a District Court in a case of this
> nature.

*Id.*, 16 Mass. App. Ct. at 547, 453 N.E.2d at 464; M.G.L. c. 30A, § 14.

> [T]he purpose of the hearing is [not] to allow for a reversal of the
> chief's decision on the basis of a difference of opinion as to how he
> should have exercised the broad discretion conferred upon him by §
> 131. The District Court proceedings are narrow in scope, and the
> question for determination is whether, on all the facts, "there was [a]
> reasonable ground for revoking said license." Neither the nature nor
> the purpose of a petition for judicial review under § 131 supports a
> claim of entitlement to de novo proceedings . . . .

*Godfrey* v. *Chief of Police*, 35 Mass. App. Ct. 42, 44-45, 616 N.E.2d 485,

487 (1993) (citations omitted).

2.    *Stacey Hightower's Background*

Stacey Hightower has a long record of military and police service. Throughout five years with the Air Force, including active combat duty during Operation Desert Shield, Hightower was qualified to handle a variety of firearms. JA 12, 25, 42, 77, 125. Upon her honorable discharge from the Air Force, Hightower served as a police officer for sixteen years—first for the Veterans Administration, and then, from June 1998 through August 15, 2008, for the City of Boston. *Id.*

Hightower was required to carry a firearm as a Boston Police Officer. JA 13, 25, 43, 77, 125. As a police officer, Hightower passed all firearm tests to carry semi-automatic handguns and revolvers. She was the second top shooter in her police academy class of over seventy individuals. JA 13, 25, 43, 78, 125.

Hightower's police duties included arresting and physically subduing numerous violent criminals, including murderers and members of drug cartels. She also intercepted narcotic shipments. JA 12, 12, 25, 43, 78, 125-26. Hightower testified in court against many felons who were convicted and incarcerated, and was repeatedly injured physically in altercations with violent felons. JA 13, 25, 43, 78, 126.

12

The Dorchester neighborhood where Hightower resides is a high crime area of the City of Boston. JA 43, 78, 126. Her neighbors know that Hightower used to work as a police officer. JA 43. Hightower's motorcycle was sabotaged, threatening her safety, and her home has been invaded. JA 14, 26, 43, 44, 78, 79, 126.

Hightower obtained an unrestricted Class A license to possess and carry a firearm for all lawful purposes in 1999, and had this license renewed in 2008. JA 13, 25, 26, 44, 79, 126.

3.   *The Renewal, and Revocation, of Stacey Hightower's Handgun License.*

Because Hightower was a sworn Boston police officer at the time she filed to renew her handgun license, she was required to fill out a "Form G 13-S" in addition to the ordinary renewal form. One of the questions on this form asks: "Are There Any Complaints Or Charges Pending Against You?" to which Hightower responded "No." JA 35, 44, 79, 126. Hightower interpreted the language of the question to refer to criminal or administrative charges, but was unaware of any pending investigations into her conduct. Hightower thus believed her answer to be accurate and truthful, and continues to believe this today. JA 44.

13

Hightower's Form G 13-S was initialed as "reviewed by IAD" (the Internal Affairs Division) on July 30, 2008, prior to being approved on August 1, 2008 by Defendant Davis. JA 35, 80, 126.

On July 31, 2008, Hightower submitted her notice of resignation to the Boston Police Department, effective August 15, 2008. The resignation notice form asked: "Is resignation presented while charges are pending?" to which Hightower answered "No." JA 36, 45, 81, 127. Hightower's superior reviewed the resignation, and recommended that it be accepted as submitted. JA 38, 45, 81, 127. Defendant Davis approved the resignation notice as submitted. JA 37, 45, 81, 127. Hightower's police employment was covered by a collective bargaining agreement between the city and its Patrolmen's Union. Under that agreement, no derogatory comments about Hightower's service could be placed in her personnel file absent her review and endorsement, and no material concerning an allegation of misconduct could be placed in her file unless verified by an affidavit and a hearing held regarding the allegations. JA 41.

On or about August 20, 2008, Defendant Davis sent Hightower a letter revoking her Class A license. The only reason Davis offered for

revoking the license was that Hightower allegedly "completed the application form untruthfully." JA 39, 81, 127. Hightower was ordered to immediately surrender her privately-owned handgun—a .38 caliber revolver—and ammunition to the police, which she did. JA 16, 27, 39, 45, 207. Unbeknownst to Hightower, a "Police Commissioner's Personnel Order" signed by Davis and dated August 18, 2008, was placed in her personnel file without her endorsement, stating that her resignation had been "presented with charges pending." JA 40, 45.

Defendants claim that charges were pending against Hightower from a 2005 investigation into allegations against another officer. No hearing regarding such charges ever occurred, and Hightower never endorsed the inclusion of any documents related to these alleged charges in her personnel file. Hightower did not believe that any charges relating to this investigation were pending against her at the time she filed her Class A license renewal application. JA 46.

Indeed, with respect to that investigation, Hightower had received a November 4, 2005 letter stating that the investigation was "completed," and that the Internal Affairs Division had "determined" that the

allegations against Hightower were "sustained." JA 150.[5] Hightower

never suffered any adverse firearms licensing action apart from the

revocation of her Class A license. JA 47. Defendants did not afford

Hightower a hearing prior to revoking her license and confiscating her

handgun and ammunition. JA 16, 27, 36.

Were she to reapply, Hightower "would receive a Class A *restricted*

license to carry for sport and target and for home protection." JA 142

(emphasis added). "If she desired a Class A unrestricted license to carry

[in public for self-defense]," a Lieutenant Detective would

> review her stated need to have an unrestricted license and make a
> determination based on her needs and the interests of the Boston
> police department in regulating Class A unrestricted licenses.

*Id.*

## SUMMARY OF ARGUMENT

Hightower is initially constrained to address the lower court's

finding that her Second Amendment claim is unripe. That

determination is untenable: Defendants have already seized

Hightower's gun, ammunition, and license, applying the standards she

---

[5]The department alleged Hightower wrongly denied  knowledge of
an incident, and that Hightower broke paddywagon transport rules.
Hightower disputes that account.

16

challenges as unconstitutional. Nothing more could be required to ripen this controversy.

Americans plainly enjoy a fundamental right to publicly carry handguns for self-defense. The state may regulate the right to bear arms in any number of ways not relevant here, but the Supreme Court has already held, with reference to the Second Amendment, that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *District of Columbia* v. *Heller*, 554 U.S. 570, 584 (2008) (citations omitted). Defendants can offer no alternative definition for the constitutional text, nor can they rebut the overwhelming weight of tradition and precedent that confirms Americans enjoy a fundamental right to carry arms for self-defense.

To the extent that Defendants' discretionary licensing implicates the Equal Protection Clause, by arbitrarily classifying individuals in the exercise of a fundamental right, the case might well be decided under some level of means-ends scrutiny. But a far simpler option exists to resolve this dispute. While courts are only starting to explore the application of means-ends scrutiny in the Second Amendment context, courts are highly experienced in applying standards for licensing the

17

exercise of constitutional rights—standards that account for the nature and function of licensing, without involving any balancing exercises.

To decide this case, it is enough to acknowledge what has long been established in our legal system: access to fundamental rights does not turn on some official's unlimited discretion. There is no need to debate what regulations of the right to bear arms may or may not be acceptable, as no such other regulations are at issue. Hightower claims only that the carrying of arms is her right, not a discretionary entitlement issued by balancing her needs against the police department's perceived self-interest.

Moreover, because Hightower already had a property interest in her license to possess and carry her handgun, the termination of that license and consequent seizure of the handgun and ammunition held under that license should have been accompanied with meaningful pre- and post-deprivation process.[6]

---

[6]Hightower argued separately below that Defendants had violated her substantive due process liberty interest in possessing and carrying a firearm. Those claims are not raised on appeal, as they are encompassed within her Second Amendment claim.

18

ARGUMENT

I.  THE STANDARD OF REVIEW IS DE NOVO.

"We review the district court's grant of summary judgment on cross-motions for summary judgment de novo. Cross-motions [for summary judgment] . . . require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Sch. Union No. 37* v. *United Nat'l Ins. Co.*, 617 F.3d 554, 558-59 (1st Cir. 2010) (citations, footnote, and internal quotation marks omitted). "When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *D&H Therapy Assocs., LLC* v. *Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011) (citation omitted).

II.  REVOCATION OF HIGHTOWER'S LICENSE TO POSSESS AND CARRY HER HANDGUN, AND THE SEIZURE OF HER HANDGUN AND AMMUNITION, CREATE A RIPE SECOND AMENDMENT CONTROVERSY.

The finding that Hightower's Second Amendment claim is unripe—notwithstanding the fact her license was revoked—lacks merit.

"There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability have already occurred. The court

is then merely being asked, as in any litigation, to determine the legal consequences of past events . . . ." *Verizon New Eng., Inc.* v. *IBEW*, 651 F.3d 176, 189 (1st Cir. 2011) (quoting 10B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2757, at 475 (1998)). Hightower had her gun, ammunition, and license seized pursuant to the discretionary standards she challenges. Hightower is not challenging what *might* happen to her were she to re-apply for a license; she is challenging what already was done to her. Hightower is not merely seeking declaratory relief; she is seeking an injunction, and a mandate that her property be returned. Hightower claims she has the right to carry a gun in public for self-defense. The only license available for that purpose was revoked.

Denying permission to purchase or possess a firearm plainly triggers Article III standing.

> Heller has invoked his rights under the Second Amendment to challenge the statutory classifications used to bar his ownership of a handgun under D.C. law, and the formal process of application and denial, however routine, makes the injury to Heller's alleged constitutional interest concrete and particular. He is not asserting that his injury is only a threatened prosecution, nor is he claiming only a general right to handgun ownership; he is asserting a right to a registration certificate, the denial of which is his distinct injury.

*Parker* v. *District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom Heller.*

"[T]he right to possess, not the right to a permit or license, was the substance of [Heller's] claim." *Dearth* v. *Holder*, 641 F.3d 499, 502 (D.C. Cir. 2011). Directly on point, the District of Maryland observed that it was "undisputed" that an individual denied renewal of his permit to carry a handgun "has standing to bring a facial challenge" to Maryland's similar licensing law. *Woollard* v. *Sheridan*, 2010 U.S. Dist. LEXIS 137031 at *2 n.1 (D. Md. Dec. 30, 2010).

Moreover, as the object of Hightower's complaint is that the licensing standards themselves are unconstitutional, she cannot be expected to (re)apply. "[O]ne need not apply for a benefit conditioned by a facially unconstitutional law." *United States* v. *Baugh*, 187 F.3d 1037, 1041 (9th Cir. 1999) (citations omitted). "The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 756 (1988) (*quoting Jones* v. *Opelika*, 316 U.S. 584, 602 (1942) (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319

U.S. 103, 104 (1943)). "As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it." *Id.* (quoting *Lovell* v. *Griffin*, 303 U.S. 444, 452-53 (1938)); *Shuttlesworth* v. *City of Birmingham*, 394 U.S. 147, 151 (1969); *Charette* v. *Town of Oyster Bay*, 159 F.3d 749, 757 (2d Cir. 1998).

Defendants cannot avoid constitutional review of their standards by claiming that they will act in good faith.

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows.

*Lakewood*, 486 U.S. at 770 (citation omitted). It does not matter that Hightower has not bothered re-applying, or that Defendants promise to be fair, or that on occasion, they might look favorably upon some applications. The issue here is the licensing standard itself, and neither standing nor ripeness can be issues at this point.

Finally, the lower court's ripeness reasoning was circular, premised as it was upon rejection of Hightower's substantive claim. The lower

court began its ripeness inquiry by holding that "the Second

Amendment cannot be interpreted to confer a right to an *unrestricted*

Class A license, which permits both concealed carrying and the

possession of high-capacity firearms." Add. 31 (emphasis original).

> The Second Amendment questions raised by Hightower would be
> more fit for review once the Municipal Defendants have . . . trenched
> upon Hightower's Second Amendment rights (and they have not yet
> done so by revoking her *unrestricted* Class A license) * * * [T]he
> gravamen of the hardship here does not turn solely on Hightower's
> Second Amendment claims, since the relief she seeks includes the
> return of her unrestricted license, and not the issuance of a new
> license tailored to the limits of the Second Amendment.

Add. 33 (citation omitted) (emphasis original).

This analysis both misstates and denies Hightower's claim on the

merits under the guise of ripeness. Whether an unrestricted Class A

license allows for concealed carry, or arms not at issue (Hightower's

revolver is not a "large-capacity weapon"), is irrelevant. An unrestricted

Class A license is the only sort of license issued by Defendants that

would allow Hightower to publicly carry, openly or concealed, any sort

of handgun, including her revolver, period. If Hightower has a Second

Amendment right to *some* form of carrying *her* gun in public for self-

defense, she has a Second Amendment interest in an unrestricted Class

A license. Defendants cannot deny Hightower's right to carry a gun by

creating only one type of over-inclusive license, and then relying on the license's over-inclusive aspects to deny claims to its lesser-included, but constitutionally-protected features. The case is plainly ripe.

III.    THE SECOND AMENDMENT SECURES THE RIGHT TO
        CARRY ARMS IN PUBLIC FOR SELF-DEFENSE.

Defendant's conditioning of handgun licenses on "suitability," and the procedures relating to license revocation, apply to all handgun licenses, including those issued for mere possession. Nonetheless, as Defendants offer that Hightower would obtain a restricted "carry" permit, the main controversy relates to Hightower's right to carry a handgun outside the home for self-defense—a right the existence of which Defendants dispute.

Assessing the constitutionality of the federal age limit for handgun possession, this Court looked to "longstanding tradition," and to "nineteenth-century state laws imposing similar restrictions, as the *Heller* Court did." *United States* v. *Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (citation omitted). This Court correctly asked "whether the Founders would have regarded [the prohibition] as consistent with the Second Amendment right." *Id.* at 12-13. The same analysis—of longstanding tradition, of the historical understanding of the right, and

24

most of all, of the Second Amendment's original public meaning, establishes the baseline principle that responsible, law-abiding Americans enjoy a right to publicly carry handguns for self-defense.

A.    The Right to Bear Arms Has Traditionally Extended Beyond the Home.

Although "the need for defense of self, family, and property is *most acute*" in the home, *Heller*, 554 U.S. at 628 (emphasis added), and the Second Amendment right is secured "*most notably* for self-defense within the home," *McDonald*, 130 S. Ct. at 3044 (emphasis added), the Second Amendment is no different in this respect than other rights. "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). Thus, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton* v. *New York*, 445 U.S. 573, 586 (1980) (citation omitted). "At the [Fourth Amendment's] very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman* v. *United States*, 365

U.S. 505, 511 (1961) (citations omitted). But that does not mean people enjoy no Fourth Amendment rights in public.

*Heller* "read the [Second Amendment's] operative clause to 'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Rene E.*, 583 F.3d at 11 (citation omitted). The Supreme Court has always accepted that the right to guard against confrontation extends beyond the threshold of one's home.[7]

As early as 1857, the infamous *Dred Scott* case reasoned that no Southern state would have adopted a constitution obligating it to respect privileges and immunities of citizenship held by African-Americans, including "the full liberty . . . to keep and carry arms wherever they went." *Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857) (emphasis added).

_____

[7]The Court's admonition that the District "must issue [Heller] a license to carry [his handgun] in the home," 554 U.S. at 635, must be read in proper context. Heller challenged, among other provisions, former D.C. Code § 22-4504(a) (2008), which had provided that carrying of handguns *inside one's home* without a permit was a misdemeanor offense. Heller did not seek a permit to publicly carry a handgun. *Parker*, 478 F.3d at 400. The reference to an in-home carry permit merely tracked Heller's prayer for relief. *Heller*, 554 U.S. at 630-31.

While *Scott*'s odious holding was never correct, the opinion's recognition of citizens' right to publicly carry arms was no aberration. Reviewing an indictment for violating the Second Amendment rights of individuals disarmed and murdered while guarding a courthouse, "[w]e described the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" *Heller*, 554 U.S. at 620 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876)) (footnotes omitted).

Seventy-five years later, the Court observed that "during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

The Supreme Court's first foray into Second Amendment law centered around the question of whether individuals had the right to transport a sawed-off shotgun between Claremore, Oklahoma and Siloam Springs, Arkansas—plainly, an activity that took place outside the home. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). Whatever

else it might have held, *Miller* indicated that the Second Amendment has operative relevance on the highways.

The Supreme Court has also extolled various traditional outdoor firearms activities. The right was valued "for self-defense *and hunting*." *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. "No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it*, and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (citation omitted) (emphasis added). Hunting and target practice, at least with firearms, are activities not typically pursued at home.

Justice Stevens foresaw the Second Amendment's application beyond the home:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting); *see also id.* at 677

n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting).[8]

"*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010). For example, the Seventh Circuit enjoined Chicago's ban on the operation of gun ranges upon recognizing a Second Amendment right to practice shooting. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell* v. *City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

B.     The Second Amendment's Original Public Meaning Confirms the Right to Publicly Carry Arms for Self-Defense.

The Second Amendment's reference to "keep and bear," U.S. Const. amend. II, describes two distinct concepts. *Cf.* U.S. Const. amend. VI ("speedy and public trial"); U.S. Const. amend. VIII ("cruel and unusual punishment"). "It cannot be presumed that any clause in the

---

[8]Justice Stevens offered that the Amendment "*does* encompass the right to use weapons for certain military purposes," *Heller*, 554 U.S. at 636 (Stevens, J., dissenting), presumably, outside the home.

29

constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

The Second Amendment's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576. "[A]n amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption, . . . For it was for public adoption that it was proposed.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J., concurring) (citation omitted), *overruled on other grounds by Malloy* v. *Hogan*, 378 U.S. 1 (1964).

Rejecting an argument that the term "bear arms" indicates an exclusively military undertaking, the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

> To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."

*Id*. (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)). Accordingly, the Court repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); *id.*, at 626.

This Court cannot overrule *Heller*'s definition of "bear arms," but it is worth noting that *Heller*'s definition comports with the term's original meaning. Perhaps the most instructive 18th-century usage of "bear arms" is that of Second Amendment author James Madison. In 1785, Madison introduced in Virginia's legislature a hunting bill drafted by Thomas Jefferson. Regarding offenders, it stated:

> [I]f, within twelve months after the date of the recognizance he shall *bear a gun* out of his inclosed ground, unless whilst performing military duty, it shall be deemed a breach of the recognizance, and be good cause to bind him a new, and every such *bearing of a gun* shall be a breach of the new recognizance. . . .

*A Bill for Preservation of Deer* (1785), in 2 PAPERS OF THOMAS JEFFERSON 443-44 (J. Boyd ed., 1950) (emphases added).

31

Numerous sources upon which the Supreme Court relied to interpret the Second Amendment likewise reflect the right's inclusion of public self-defense. Had *Heller* intended to limit "bear arms" to the home, it would have been most natural to do so when explaining "that 'bear arms' did not refer only to carrying a weapon in an organized military unit." *Heller*, 554 U.S. at 585. Instead, the Court offered that

> Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (citing 2 COLLECTED WORKS OF JAMES WILSON 1142, and n x (K. Hall & M. Hall eds. 2007)) (other citations omitted).

Indeed, *Heller* offered that "state constitutional provisions written in the 18th century or the first two decades of the 19th" were the examples "most prominent [and] most relevant to the Second Amendment" in defining the meaning of "bear arms." *Heller*, 554 U.S. at 584. None of these state constitutional provisions have been interpreted as relating solely to the home, but most, in addition to Pennsylvania's provision as noted by *Heller*, were held to secure the public carrying of arms in at least some manner. *State* v. *Reid*, 1 Ala.

32

612 (1840) (interpreting Ala. Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[9] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3 Ired.) 418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson* v. *State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry arms for self-defense—was also reached interpreting state constitutional arms-bearing provisions with predecessors dating to the early republic. *See State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App. 1980). Later state constitutional "bear arms" provisions are likewise understood. *See, e.g. State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*,

---

[9]Revised in 1956 to change "defence" to "defense."

82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re Brickey*, 8 Idaho 597, 599, 70 P. 609 (1902).

Particularly instructive is the Oregon Supreme Court's opinion in *State* v. *Blocker*, 291 Ore. 255, 630 P.2d 824 (1981). That court had earlier held that possession of a billy club was secured by the constitutional guarantee that "[t]he people shall have the right to bear arms for the defence of themselves . . ." Ore. Const. art. I, § 27; *see State* v. *Kessler*, 289 Ore. 359, 614 P.2d 94 (1980). In *Blocker*, prosecutors argued that the right should be confined to *Kessler*'s facts, relating to home possession of a billy club, and not to the public carrying of the same arm. The court disagreed:

> The text of the constitution is not so limited; the language is not qualified as to place except in the sense that it can have no effect beyond the geographical borders of this state . . . In *Kessler* we started from the premise that under § 27 a person has a right to bear arms for defense of self . . . We then moved from that general proposition to the more particular one that a person had the constitutional right to have a billy in his home for defense.

*Blocker*, 291 Ore. at 259, 630 P.2d at 825-26 (citation and footnote omitted).

Likewise, *Heller* announced a general proposition respecting constitutional protection for the possession of handguns, and applied it

to the home-bound facts of the case. That does not inform a limitation of the right itself.

C.      Precedent Addressing Restrictions of the Right to
        Bear Arms Confirms Its Existence.

Debate over the right to bear arms historically concerned not whether, but how and under what circumstances, the right could be exercised in public for self-defense. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *Heller*, 554 U.S. at 627 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 626, confirming that such "presumptions" may be overcome, and that carrying bans are not presumptively lawful in non-sensitive places.

Particularly illuminating is *Heller*'s discussion of prohibitions on the carrying of concealed weapons, and prohibitions on carrying dangerous and unusual weapons. Upon examination, each doctrine relates to a manner of regulating an established right.

*1.    Concealed Carry*

"[T]he right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added). Yet concealed carry bans are only "presumptively" constitutional. *Heller*, 554 U.S. at 627 n.26.

> [N]ot *all* concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it relied upon instruct that concealed weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme.

*Peruta* v. *County of San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal. 2010) (emphasis in original).

Surveying the history of concealed carry prohibitions, it appears time and again that concealed carry prohibitions have been upheld as mere regulations of the manner in which arms are carried—with the understanding that a complete ban on the carrying of handguns, openly and concealed, is unconstitutional. *Heller* discussed, with approval, four state supreme court opinions that referenced this rule.

Upholding a ban on the carrying of concealed weapons, Alabama's high court explained:

36

We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

Georgia's Supreme Court followed *Reid*, quashing an indictment for

publicly carrying a pistol that failed to specify how the gun was carried:

so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn* v. *State*, 1 Ga. 243, 251 (1846) (emphasis original).

Tennessee's Supreme Court held unconstitutional the application of

a weapons carrying ban to a man carrying a revolver, declaring:

If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We

only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871).[10]

Finally, as *Heller* observed*,*

the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)).

Other decisions reflected the rule of allowing concealed-carry prohibitions only as regulations on the manner of carrying guns. *See, e.g. State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (concealed carry prohibition "a measure of police, prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society") (emphasis original) (citation omitted)); *Owen* v. *State*, 31 Ala. 387, 388

---

[10]*Andrews* appeared to abrogate in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

(1858) (concealed carry ban "a mere regulation of the manner in which certain weapons are to be borne").

For supporting the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE 84 n.11 (G. Chase ed. 1884), *Heller*, 554 U.S. at 626, which provides:

> [I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

This understanding survives today. *See, e.g. In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed").

Legislatures might prefer one form of carrying over another. Precedent reveals an ancient suspicion of weapons concealment where social norms viewed the wearing of arms as virtuous. But today, openly carrying handguns may alarm individuals unaccustomed to firearms. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA

L. Rev. 1443, 1523 (2009). Defendants' apparent preference for concealed over open carrying is not unusual, and has been adopted by some jurisdictions where the public acceptance of gun rights is relatively high. For example, in Texas, where concealed handgun permits are readily available on a "shall issue" basis, Tex. Gov't Code § 411.177(a), a permit holder who "intentionally fails to conceal the handgun" commits a misdemeanor. Tex. Penal Code § 46.035(a).

*Heller*'s recognition of a right to carry a handgun does not force states to allow the carrying of handguns in a manner that may cause needless public alarm, so long as a more socially-conducive option exists to allow people to exercise the right to bear arms. But once a legislature determines that only a particular manner of carrying will be permitted, that choice must be honored.

    2.   *Dangerous and Unusual Weapons*.

*Heller* approvingly referenced "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citations omitted). This prohibition does not merely refer to types of weapons, but to types of *conduct* with weapons, reflecting the ancient common law offense of affray. That arms be used or carried in such

manner as to terrorize the population, rather than in a manner suitable for ordinary self-defense, was a required element of affray. Early cases, including some referenced by *Heller*, distinguished affrays from the legitimate public exercise of the right to bear arms.[11]

Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, had long been limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. L. C. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of

---

[11]*See also Heller*, 554 U.S. at 620 ("bearing arms for a lawful purpose").

an intention to commit an[ ] act of violence or disturbance of the peace." 1 TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s subsequent sources for the "dangerous and unusual" doctrine, 554 U.S. at 627, are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terror among the people*." 3 James Wilson, WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10 (quoting same).

"[T]here may be an affray . . . where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." 1 William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id.* at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or

43

innocent" depending on whether people alarmed); *State* v. *Langford*, 10

N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself

with dangerous and unusual weapons, *in such a manner as will*

*naturally cause a terror to the people*") (emphasis added); *English* v.

*State*, 35 Tex. 473, 476 (1871) ("terrifying the good people of the land").

Early courts took the view espoused in *Heller*, that securing a right

to bear arms in public is consistent with the prohibition on needlessly

provocative behavior with arms. "[N]either, after so solemn an

instrument hath said the people may carry arms, can we be permitted

to impute to the acts thus licensed, such a necessarily consequent

operation as terror to the people to be incurred thereby." *Simpson*, 13

Tenn. at 360. "A man may carry a gun for any lawful purpose, for

business or amusement, but he cannot go about with that or any other

dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63

Ohio St. at 219, 58 N.E. at 575-76.

> But although a gun is an "unusual weapon," it is to be remembered
> that the carrying of a gun per se constitutes no offence. For any
> lawful purpose--either of business or amusement--the citizen is at
> perfect liberty to carry his gun. It is the wicked purpose--and the
> mischievous result--which essentially constitute the crime.

*Huntly*, 25 N.C. (3 Ired.) at 422-23.

44

* * *

The question here is not whether Hightower has the right to carry handguns in some particular manner, but whether access to the state's only available handgun carry license may depend upon a police detective's balancing of her "needs and the interests of the Boston police department." JA 142.

IV.   "SUITABILITY" IS AN INVALID STANDARD FOR LICENSING THE ENJOYMENT OF FUNDAMENTAL SECOND AMENDMENT RIGHTS.

   A.     Prior Restraints Against the Exercise of Fundamental Rights Must Be Defined Objectively and Narrowly, Without Sanctioning Unbridled Discretion.

As the Second Amendment secures a fundamental right, a license to bear arms cannot be left to the government's unbridled discretion:

> It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted); *see also FW/PBS* v. *City of Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion); *Shuttlesworth*, 394 U.S. at 151; *Strasser* v. *Doorley*, 432 F.2d

567, 569 (1st Cir. 1970); *Berger* v. *Rhode Island Bd. of Governors*, 832 F. Supp. 515, 519 (D.R.I. 1993) ("the standards contain no guidelines or definite requirements to limit the reviewing officer or direct his scrutiny of submitted advertisements. This is the ultimate in unfettered discretion residing in an executive official.").

"While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing a heavy presumption against its constitutional validity." *Clark* v. *City of Lakewood*, 259 F.3d 996, 1005 (9th Cir. 2001) (citation omitted). In *Staub*, the Supreme Court struck down an ordinance authorizing a mayor and city council "uncontrolled discretion," *Staub*, 355 U.S. at 325, to grant or refuse a permit required for soliciting organizational memberships. Such a permit, held the Court,

> makes enjoyment of speech contingent upon the will of the Mayor and Council of the City, although that fundamental right is made free from congressional abridgment by the First Amendment and is protected by the Fourteenth from invasion by state action. For these reasons, the ordinance, on its face, imposes an unconstitutional prior restraint upon the enjoyment of First Amendment freedoms and lays "a forbidden burden upon the exercise of liberty protected by the Constitution."

*Staub*, 355 U.S. at 325 (quoting *Cantwell* v. *Connecticut*, 310 U.S. 296,

307 (1940)); *see also Largent* v. *Texas*, 318 U.S. 418, 422 (1943)

(striking down ordinance allowing speech permit where mayor "deems

it proper or advisable."); *Louisiana* v. *United States*, 380 U.S. 145, 153

(1965) ("The cherished right of people in a country like ours to vote

cannot be obliterated by the use of laws . . . which leave the voting fate

of a citizen to the passing whim or impulse of an individual registrar.");

*Charette*, 159 F.3d at 754 (rejecting licensing officer's assessment of

what inures to "welfare and benefit of the people of and visitors to the

city") (citation omitted).

    "Traditionally, unconstitutional prior restraints are found in the

context of judicial injunctions or a licensing scheme that places

'unbridled discretion in the hands of a government official or agency.'"

*Nat'l Fed'n of the Blind* v. *FTC*, 420 F.3d 331, 350 n.8 (4th Cir. 2005)

(quoting *FW/PBS*, 493 U.S. at 225-26); *754 Orange Ave., Inc.* v. *West

Haven*, 761 F.2d 105, 114 (2d Cir. 1985) ("discretion given the police

department (presumably the Chief of Police) . . . sets forth no standards

for the issuance or revocation of a license"). Yet

> [t]he existence of standards does not in itself preclude a finding of
> unbridled discretion, for the existence of discretion may turn on the
> looseness of the standards or the existence of a condition that

effectively renders the standards meaningless as to some or all persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Id.* (quoting *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc)).

Standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Cantwell*, 310 U.S. at 305).

Public safety is invoked to justify most laws, but where a fundamental right is concerned, the mere incantation of a public safety rationale does not save arbitrary licensing schemes.

> [W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places . . . . There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence.

*Kunz* v. *New York*, 340 U.S. 290, 294 (1951); *Shuttlesworth*, 394 U.S. at

153. "[U]ncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague* v. *Committee for Indus. Org.*, 307 U.S. 496, 516 (1937) (plurality opinion).

> Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

*Shuttlesworth*, 394 U.S. at 153.

For an example of these prior restraint principles applied in the Second Amendment context, the Court need look no further than *Heller*. Among other provisions, Heller challenged application of the District of Columbia's requirement that handgun registrants obtain a discretionary (but never issued) permit to carry a gun inside the home. The Supreme Court held that the city had no discretion to refuse issuance of the permit "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635.

Indeed, the notable absence of any controlling means-ends standard of review in *Heller* is instructive—however useful in some cases, means-ends scrutiny is not always the preferred avenue for adjudication. Means-ends levels of scrutiny provide a relatively poor method to test the constitutionality of a discretionary licensing system. Such levels of scrutiny, whatever they may be in a particular case, are only useful in evaluating laws that impose or depend upon the existence of some *specific* condition. In such cases, a court may examine the regulation and weigh it against the right at issue through whichever scrutiny-lens is most apt. In the Second Amendment context, a felon disarmament law, or some condition upon the purchase or sale of firearms, would fit comfortably into this sort of analysis.

But here, the issue is whether Defendants may bar individuals from exercising the right at all by use of a permitting scheme. This comes literally within the definition of a prior restraint—there is no better, indeed, there may be no other, logical interpretive tool.

The time to apply means-ends scrutiny is when a court is presented with an *objective* licensing standard. A court can evaluate objective standards by examining their purpose and impact under whichever

means-ends rubric should be applied. But it is difficult to tell exactly what public interest is being served by a policy of unbridled discretion. Since the activity being regulated is the exercise of a fundamental right, its general suppression cannot be in the public interest. And the idea of an official dispensing permission to exercise a "right" is inherently incongruent with the concept of rights.

B.     Section 131's Discretionary Aspects
       Plainly Fail Prior Restraint Review.

Massachusetts' requirement that handgun licensees be "suitable" to have licenses subject to whichever restrictions "the licensing authority deems proper," including restrictions abrogating core Second Amendment rights, fails as an impermissible prior restraint. So does Defendants' particular application of that requirement, balancing individual "needs" against the police department's "interest." JA 142.

The right to carry a firearm for self-defense is plainly among the "freedoms which the Constitution guarantees." *Staub*, 355 U.S. at 322. The government must bear the burden of proving that an applicant may not have a permit, for some constitutionally-compelling reason defined by application of standards that are "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Defendants may not engage

51

in the "appraisal of facts, the exercise of judgment, [or] the formation of an opinion." *Forsyth County*, 505 U.S. at 131.

"Suitability" is plainly among the impermissible "illusory 'constraints'" amounting to "little more than a high-sounding ideal." *Lakewood*, 486 U.S. at 769-70. Defendants' balancing of an individuals' self-defense "needs and the interests of the Boston police department," JA 142, is highly subjective, and quite beside the point—the Second Amendment is not located amongst a Bill of Needs, it is part of our Bill of Rights. The general public is entitled to Second Amendment rights. The interest in self-defense the amendment secures is held by all.

Massachusetts' "suitable person" prerequisite differs markedly from other licensing regimes providing some amount of discretion to deny or revoke handgun carry licenses. Connecticut, for example, licenses "suitable" individuals to carry guns, Conn. Gen. Stat. § 29-28(b), but discretion to determine "suitability" under that statute is not unbridled. *Kuck* v. *Danaher*, 2011 U.S. Dist. LEXIS 111793 (D. Conn. Sept. 29, 2011). Ten enumerated factors limit the term's construction, *id.* at *35-*36, and "denial or revocation decisions are subject to de novo review" to assess whether "there was 'just and proper cause' for the denial or

revocation." *Id.* at *36 (quoting Conn. Gen. Stat. § 29-32b(b)). Connecticut courts determine unsuitability by reference to an applicant's demonstrated conduct. *Id.* at *33-*35 (citing cases).

This differs starkly from Massachusetts' regulation, which places the burden on the applicant to prove entitlement to the license, and does not require the authorities to point to any specific act of the applicant that demonstrates reason to withhold the license. Defendants are the sole arbiters of "[Hightower's] needs and the interests of the Boston police department." JA 142.

Section 131, and Defendants' manner of implementing it, vest unbridled discretion in Defendants' authority to license the exercise of fundamental rights.

## V. SECTION 131'S DISCRETIONARY ASPECTS CANNOT SURVIVE MEANS-ENDS SCRUTINY.

Prior restraint law provides a superior approach to determining this case. But Section 131's discretionary aspect also fails any level of scrutiny, whether viewed as a direct infringement of the right to bear arms or as an equal protection violation insofar as it improperly classifies individuals in the exercise of a fundamental right. Because

Hightower challenges Defendants' discretionary classification as
violating her right to equal protection, means-ends scrutiny is relevant.

Where laws do not literally conflict with the Second Amendment's
core or trigger a specific test, courts frequently employ a two-step
approach to resolve cases. *Heller* v. *District of Columbia*, 2011 U.S.
App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) ("*Heller II*"); *United States* v.
*Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States* v. *Reese*, 627
F.3d 792, 800 (10th Cir. 2010). First, courts consider whether the
particular exercise of government power regulates conduct falling
within the Second Amendment's scope. *Heller II*, 2011 U.S. App. LEXIS
20310 at *16; *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir.
2010). If so, a means-ends level of scrutiny is applied to test the
regulation. *Heller II*, at *16-*17; *Chester*, 628 F.3d at 681-682;
*Marzzarell*a, 614 F.3d at 89; *Reese*, 627 F.3d at 800-801.

Regulations restricting handgun licenses to "suitable" individuals
plainly implicate the Second Amendment. The appropriate standard
here would be strict scrutiny. But demanding individuals prove their
entitlement to exercise a fundamental right cannot survive any
standard of review.

A.      Laws Generally Restricting the Right of Law Abiding, Responsible Individuals to Bear Arms Are Subject to Strict Scrutiny.

The prevailing trend holds that no single standard of review governs all Second Amendment cases. "As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Heller II*, 2011 U.S. App. LEXIS 20310 at *30 (citations omitted). "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Parker*, 478 F.3d at 399. "[A]s has been the experience under the First Amendment, we might expect that courts will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented." *United States* v. *Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011); *cf. Marzzarella*, 614 F.3d at 96; *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (declining to "adopt a level of scrutiny applicable to every disarmament challenge . . . ").

"Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703 (citations omitted).

> Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context. First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id.* at 708; *cf. Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980) (First Amendment: intermediate standard of review may apply to an enumerated right under circumstances where the right's exercise is "of less constitutional moment.").

Where the Second Amendment's standard of review depends on the nature of the claim, propensity for law-breaking may determine the standard. *United States* v. *Booker*, 644 F.3d 12, 25 (1st Cir. 2011). The Fourth Circuit applies strict scrutiny to cases implicating the Second Amendment's fundamental core. "[W]e assume that any law that would

burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at 470.[12] But that court applies intermediate scrutiny where the "claim is not within the core right identified in *Heller*—the right of a law- abiding, responsible citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 683. "[I]ntermediate scrutiny is more appropriate than strict scrutiny for [domestic violence misdemeanant] and similarly situated persons." *Id.*; *see also United States* v. *Carter*, 2012 U.S. App. LEXIS 1243 (4th Cir. Jan. 23, 2012) (same: marijuana user). The D.C. Circuit applied intermediate scrutiny to test the District's registration and "assault weapons" laws, as it found these did not substantially burden core Second Amendment rights. *Heller II*, 2011 U.S. App. LEXIS 20130 at *32 and *44.

Likewise, the Seventh Circuit applied intermediate scrutiny in reviewing the constitutionality of the federal firearms prohibition directed at domestic violence misdemeanants. *United States* v. *Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc). But enjoining Chicago's ban on

---

[12]*Masciandaro* declined to answer whether the Second Amendment extends beyond the home. Its framework of applying strict scrutiny to core Second Amendment rights is nonetheless instructive.

57

the operation and use of gun ranges, the Seventh Circuit concluded that "a more rigorous showing . . . should be required, if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708.

Here, the burden is substantial, implicating the core rights of responsible, law-abiding citizens to engage in an activity whose protection is literally enumerated. The challenged regulation does not function as one restricting the right as to time, place, or manner, but generally, at all times and places. Strict scrutiny is thus the most applicable standard. After all, the Second Amendment secures a fundamental right, and absent any of the foregoing reasons for reducing the standard of review, "classifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted).

Thus, to the extent that Section 131 classifies law-abiding, responsible citizens differently in the exercise of their fundamental right to bear arms, it must be narrowly tailored to a compelling governmental interest, leaving no less restrictive alternative.

B.      Barring Law-Abiding, Responsible Americans
        from Bearing Arms Serves No Government Interest.

Regardless of the standard utilized, a "suitable person" prerequisite to the exercise of a fundamental right fails for the simple reason that no legitimate governmental interest is at stake. To be sure, Defendants have a compelling governmental interest in regulating firearms in the interest of public safety. And many people sincerely believe that the carrying of handguns, even by responsible, law-abiding individuals, is a social evil.

Yet as far as the law is concerned, individuals enjoy a right to carry handguns "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (citations omitted). The right to self-defense at the Second Amendment's core is enjoyed by everyone, not just those whom officials believe are more likely to require it, and the state cannot have a general interest in suppressing a fundamental right—even if some people deeply oppose the right's existence.

Nor is the arbitrary licensing practice even rationally tailored to any interest in public safety. Lieutenant Detective Harrington is not capable of predicting Hightower's need for self-defense, nor does his

59

department guarantee Hightower's safety. And numerous less restrictive regulatory options are open to Defendants to ensure that only law-abiding, responsible people have and carry guns, and that they do so safely.

## VI.    DEFENDANTS DENIED HIGHTOWER DUE PROCESS.

"[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews* v. *Eldridge*, 424 U.S. 319, 333 (1976) (citation and internal quotation marks omitted). Establishing a due process violation is logically-straightforward: a plaintiff must first identify a liberty or property interest protected by the Due Process Clause, and then show "that the defendants, acting under color of state law, deprived [her] of that [protected] interest without constitutionally adequate process." *Marrero-Gutierrez* v. *Molina*, 491 F.3d 1, 8 (1st Cir. 2007). The due process violations in this case are manifest.

A.    Hightower Enjoys A Liberty Interest In Keeping and Carrying Arms, and a Property Interest in Her License to Do So.

*Heller* "implicates the Supreme Court's earlier due process precedents." *United States* v. *Rehlander*, 2012 U.S. App. LEXIS 766 at

60

*14 (1st Cir. Jan. 13, 2012). As discussed, Hightower has a protected liberty interest in her Second Amendment right to keep and bear arms. Although *McDonald*'s five Justice majority reached this conclusion in different ways, under either the Due Process Clause or Privileges or Immunities Clause, a majority nonetheless confirmed that "the Second Amendment right is fully applicable to the States." *McDonald*, 130 S. Ct. at 3026. Where "a fourteenth amendment liberty interest is implicated . . . the state therefore must adhere to rigorous procedural safeguards." *Ortiz* v. *Burgos*, 807 F.2d 6, 8 (1st Cir. 1986); *see also Kuck* v. *Danaher*, 600 F.3d 159, 165 (2d Cir. 2010) (same).

"Property interests that are protected by the Due Process Clause of the Fourteenth Amendment are not created by that amendment" but are instead "defined by 'existing rules or understandings that stem from an independent source such as state law.'" *Spinelli* v. *City of New York*, 579 F.3d 160, 168-69 (2d Cir. 2009) (protected property interest in a firearms dealer license) (*quoting Bd. of Regents* v. *Roth*, 408 U.S. 564, 573 (1972)). To establish a property interest in a government-conferred benefit such as a license, a plaintiff must simply demonstrate "a legitimate claim of entitlement" to such interest that is grounded in

established law. *Roth*, 408 U.S. at 577. The requirements of procedural

due process prohibit "the deprivation of such an interest, once

conferred, without appropriate procedural safeguards." *Arnett* v.

*Kennedy*, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part). A

Class A handgun license having been conferred to her, Hightower has a

property interest in that license barring Defendants from revoking it

without meeting due process requirements.

B.    Defendants Failed to Provide Hightower with Adequate Pre-
      and Post-Deprivation Procedural Safeguards.

"[T]he concept of due process is equivalent to 'fundamental

fairness.'" *Newman* v. *Massachusetts*, 884 F.2d 19, 23 (1st Cir. 1989)

(citation omitted)."In general, the state must provide some kind of

hearing before depriving an individual of a protected property interest."

*Guillemard-Ginorio* v. *Contreras-Gomez*, 490 F.3d 31, 40-41 (1st Cir.

2007) (citation omitted). Due process requires that impacted individuals

are "entitled to the constitutional minimum of 'some kind of hearing'

and 'some pretermination opportunity to respond.'" *O'Neill* v. *Baker*,

210 F.3d 41, 47-48 (1st Cir. 2000) (*quoting Cleveland Bd. of Educ.* v.

*Loudermill*, 470 U.S. 532, 542 (1985)) (footnote omitted). "The ubiquity

of the 'notice and opportunity to be heard' principle as a matter of fundamental fairness is deeply engrained in our jurisprudence." *Oakes* v. *United States*, 400 F.3d 92, 98 (1st Cir. 2005) (citations omitted).

"The hearing, to be fair in the due process sense, implies that the person adversely affected was afforded the opportunity to respond, explain, and defend. Whether the hearing was fair depends upon the nature of the interest affected and all of the circumstances of the particular case." *Newman*, 884 F.2d at 23 (citation omitted). For example, an interest in public employment warrants only minimal pre-deprivation process, provided that adequate post-deprivation process is available. *Loudermill*, *supra*. However, an interest in continuing to receive vital public benefits warrants a more robust, full evidentiary hearing as a pre-deprivation process. *Goldberg* v. *Kelly*, 397 U.S. 254 (1970). And under some circumstances, for example, where the deprivation is only occasioned by "random and unauthorized" conduct, the existence of a post-deprivation remedy sufficiently satisfies constitutional requirements. *Cronin* v. *Town of Amesbury*, 81 F.3d 257, 260 (1st Cir. 1996) (citation omitted).

"[Firearms permit] renewal applicants are entitled to basic due process protections, including a meaningful opportunity to be heard after a denial or revocation." *Kuck*, 600 F.3d at 165 (citing *Spinelli*, 579 F.3d at 169).

The constitutional adequacy of any process offered by the government is evaluated under the Supreme Court's three-factor test set out in *Mathews*, 424 U.S. at 335, which requires a court to consider: (1) the private interest that will be affected by the government's action; (2) the risk of an erroneous deprivation of such interest through the existing procedure and the probable utility of additional or substitute procedural safeguards; and (3) the government's interest in adhering to the existing procedure, including fiscal and administrative burdens that additional procedures might entail. *Id.*

### 1. *Hightower Has a Strong Private Interest in Her Right to Arms.*

Hightower has a strong liberty interest in the exercise of her fundamental right to arms. The interest at stake is deeply rooted in the inherent, natural right of self-defense. *Heller*, 554 U.S. at 599. Moreover, Hightower's interest is particularly elevated. She is a former

police officer who has testified against numerous violent felons, she lives in a high-crime neighborhood, and she has already been targeted by serious crime (including home invasion). Hightower additionally has a property interest in her Class A license, as well as in her confiscated firearm and ammunition, the possession and carry of which were authorized by that license.

> ### 2. Defendants' Process is Prone to a High Risk of Error that Could Be Significantly Alleviated by Additional Safeguards.

As this case aptly demonstrates, Defendants' current regulatory scheme allows for a high risk of erroneous deprivation that could be significantly alleviated by the simple provision of a pre-deprivation hearing. The parties may forever dispute whether "charges" were "pending" against Hightower, but it is clear that Hightower answered the question in good faith, that she had been informed in writing that the relevant investigation was "completed" and allegations "sustained," JA 150, that the form revealed her personnel records would be reviewed in any event, and that she had nothing to gain by lying because the Defendants apparently agree that the alleged pendency of "charges" against Hightower are not disqualifying. Defendants were

plainly aware of any "charges" that might have been "pending" against Hightower, and took no action to disarm her for three years.

Had this revelation been made in an appropriate pre-deprivation hearing, it is highly unlikely that Hightower would ever have been deprived of her right to her firearm—a right that could prove critical to her safety and well-being. Indeed, the facts of this case are quite similar to those which constituted a due process violation in *Loudermill*, where the defendant terminated plaintiff for allegedly failing to report a felony conviction on his employment application. Loudermill had not forgotten about the conviction, but claimed that he believed it was for a misdemeanor offense. Because the alleged dishonesty, not the fact of the conviction or Loudermill's job performance, was the cause for termination, Loudermill was entitled to a pre-deprivation opportunity to clear himself. *Id*. at 545 n.10.

The post-deprivation remedies for handgun license revocation are also inadequate. Since Defendants presume that individuals are not entitled to a permit, and the individual carries the burden of proof in any administrative appeal, the individual effectively has the burden of disproving the negative proposition that she is not entitled to a permit.

As noted supra, "[t]he full panoply of procedures usually available at a trial is not required," because the system proceeds from the assumption that no rights are at stake. *Shelburne*, 16 Mass. App. Ct. at 547, 453 N.E.2d at 464.

### 3. The Government Lacks a Justifiable Interest in Adhering to its Existing Procedure.

"[T]he state's ability to regulate firearms does not extinguish the liberty interest at stake or eliminate the need to afford due process." *Kuck*, 600 F.3d at 165. The government certainly has an interest in public safety, but it does not have a valid interest in denying Hightower—a law-abiding citizen and former law enforcement officer—the benefit of a simple hearing before revoking her Class A license and confiscating her firearm. While in theory, immediate revocation of a license to carry a handgun should be permitted under limited exigent circumstances, *cf. Mincey* v. *Arizona*, 437 U.S. 385 (1978), those are not the facts of this case—nor do Defendants offer an adequate post-deprivation remedy.

The current state of affairs is in significant tension with this Court's recent decision in *Rehlander*, holding emergency psychiatric

hospitalizations did not trigger the firearm disability leveled against those who had been "committed to a mental institution." 18 U.S.C. § 922(g)(4). "[T]o avoid serious constitutional doubts," *Rehlander*, at \*10, this Court interpreted the prohibition to refer only to full adjudicatory commitments, excluding emergency ex parte admissions.

> the right to possess arms (among those not properly disqualified) is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process. Ordinarily, to work a permanent or prolonged loss of a constitutional liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required. It is evidently doubtful that [an ex parte] commitment provides the necessary process for a permanent deprivation.

*Rehlander*, at \*6 (footnote omitted).

The time has arrived for Massachusetts to treat the right to keep and bear arms like the fundamental right that it is.

CONCLUSION

The Second Amendment plainly secures a right to carry handguns for self-defense. Massachusetts has opted to regulate this right by allowing the licensed carrying of concealed handguns. It follows that such licensing must satisfy constitutional standards.

Section131's discretionary aspect constitutes a classic form of unconstitutional prior restraint, conditioning the exercise of a

fundamental right upon a licensing official's unbridled discretion. It also fails to satisfy any means-ends level of scrutiny appropriate to the security of fundamental rights, as Defendants have no interest in preventing the exercise of constitutional rights—regardless of their opinions as to the right's utility—and they cannot predict when someone might need to exercise their right of self-defense.

Finally, handgun licensees must be afforded meaningful pre- and post-deprivation review. The current system, premised on the absence of any interests in possessing and carrying arms, is inadequate in the post-*McDonald* reality.

The judgment below should be reversed, and the case remanded with instructions to enter summary judgment for Hightower.

Dated: February 7, 2012                Respectfully submitted,

Chester Darling                        Alan Gura
1st Cir. Bar No. 33273                 1st Cir. Bar No. 1148005
9 Mayflower Drive                      Gura & Possessky, PLLC
Andover, MA 01810                      101 N. Columbus Street, Suite 405
978.475.2520/978.475.1741             Alexandria, VA 22314
chesterdarling@comcast.net             703.835.9085/703.997.7665
                                       alan@gurapossessky.com

                              By:   /s/ Alan Gura
                                    Alan Gura

                              Counsel for Appellant

CERTIFICATE OF COMPLIANCE
TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R.
   App. P. 32(a)(7)(B) because this brief contains 13,904 words,
   excluding the parts of the brief excluded by Fed. R. App. P.
   32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App.
   P. 32(a)(5) and the type style requirements of Fed. R. App. P.
   32(a)(6) because this brief has been prepared in proportionately
   spaced typeface using WordPerfect X4 in 14 point Century
   Schoolbook font.

/s/ Alan Gura
Alan Gura
Counsel for Appellant

Dated: February 7, 2012

**<u>CERTIFICATE OF SERVICE</u>**

On this, the 7th day of February, 2012, I served the foregoing Brief by electronically filing it with the Court's CM/ECF system, which generated a Notice of Filing and effects service upon counsel for all parties in the case. Accordingly, the following counsel were served electronically:

| | |
|---|---|
| Lisa Skehill Maki | Kenneth W. Salinger |
| Assistant Corporation Counsel | Assistant Attorney General |
| City of Boston Law Department | Office of the Attorney General |
| One City Hall Plaza, Room 615 | One Ashburton Place |
| Boston, MA 02201 | Boston, MA 02108 |
| (617) 635-4022 | 617.963.2075/617.727.5785 |
| lisa.maki@cityofboston.gov | ken.salinger@state.ma.us |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 7th day of February, 2012

/s/ Alan Gura_____
Alan Gura

ADDENDUM

## TABLE OF CONTENTS

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 1

M.G.L. c. 140, § 129D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 1

M.G.L. c. 140, § 131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 2

District Court Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 11

District Court Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 52

**U.S. Const. amend. II**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**M.G.L. c. 140, § 129D**

§ 129D.  Surrender of Firearms upon Revocation, Suspension or Denial of Application for License or Firearm Identification Card; Rights of Owners; Disposition; Regulations.

  Upon revocation, suspension or denial of an application for a firearm identification card pursuant to the conditions of section one hundred and twenty-nine B, or of any firearms license if said firearms identification card is not then in force or of any machine gun license, the person whose application was so revoked, suspended or denied shall without delay deliver or surrender, to the licensing authority where he resides, all firearms, rifles, shotguns and machine guns and ammunition which he then possesses unless an appeal is pending. Such person, or his legal representative, shall have the right, at any time up to one year after said delivery or surrender, to transfer such firearms, rifles, shotguns and machine guns and ammunition to any licensed dealer or any other person legally permitted to purchase or take possession of such firearms, rifles, shotguns and machine guns and ammunition and upon notification in writing by the purchaser or transferee and the former owner, the licensing authority shall within ten days deliver such firearms, rifles, shotguns and machine guns and ammunition to the transferee or purchaser and due care shall be observed by the licensing authority in the receipt and holding of any such firearm, rifle, shotgun or machine gun and ammunition.

The licensing authority, after taking possession of any firearm, rifle, shotgun, machine gun or ammunition by any means, may transfer possession of such weapon for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse on the licensed premises that is equipped with a safe for the secure storage of firearms and a weapon box or similar container for the secure storage of other weapons and ammunition; provided, however, that the licensing authority shall not transfer to such dealer possession of any weapon that is or may be evidence in any current or pending criminal case concerning a violation of any general or special law, rule or regulation governing the use, possession or ownership of such weapon. Any such dealer that takes possession of a weapon under the provisions of this section shall: (i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section. The owner shall be liable to such dealer for reasonable storage charges and may dispose of any such weapon as provided under this section by transfer to a person lawfully permitted to purchase or take possession of such weapon.

Firearms, rifles, shotguns or machine guns and ammunition not disposed of after delivery or surrender according to the provisions of this section shall be sold at public auction by the colonel of the state police to the highest bidding person legally permitted to purchase and possess said firearms, rifles, shotguns or machine guns and ammunition and the proceeds shall be remitted to the state treasurer. Any such weapon that is stored and maintained by a licensed dealer as provided under this section may be so auctioned at the direction of: (i) the licensing authority at the expiration of one year following initial surrender or delivery to such licensing authority; or (ii) the dealer then in possession, if the storage charges for such weapon have been in arrears for 90 days; provided, however, that in either case, title shall pass to the licensed dealer for the purpose of transferring ownership to the auctioneer; and provided further, that in either case, after deduction and payment for storage charges and all necessary costs associated with such surrender and transfer, all surplus proceeds, if any, shall be immediately returned to the owner of such weapon.

The secretary of the executive office of public safety may make and promulgate such rules and regulations as are necessary to carry out the provisions of this section.

**M.G.L. c. 140, § 131**

§ 131. License to Carry Firearm; Penalty for Violation.

All licenses to carry firearms shall be designated Class A or Class B, and the issuance and possession of any such license shall be subject to the following conditions and restrictions:

(a) A Class A license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper. A violation of a restriction imposed by the licensing authority under the provisions of this paragraph shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

The colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery, which club is incorporated under the laws of the commonwealth for the possession, storage and use of large capacity weapons, ammunition therefor and large capacity feeding devices for use with such weapons on the premises of such club; provided, however, that not less than one shareholder of such club shall be qualified and

suitable to be issued such license; and provided further, that such large capacity weapons and ammunition feeding devices may be used under such Class A club license only by such members that possess a valid firearm identification card issued under section 129B or a valid Class A or Class B license to carry firearms, or by such other persons that the club permits while under the direct supervision of a certified firearms safety instructor or club member who, in the case of a large capacity firearm, possesses a valid Class A license to carry firearms or, in the case of a large capacity rifle or shotgun, possesses a valid Class A or Class B license to carry firearms. Such club shall not permit shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties.

No large capacity weapon or large capacity feeding device shall be removed from the premises except for the purposes of: (i) transferring such firearm or feeding device to a licensed dealer; (ii) transporting such firearm or feeding device to a licensed gunsmith for repair; (iii) target, trap or skeet shooting on the premises of another club incorporated under the laws of the commonwealth and for transporting thereto; (iv) attending an exhibition or educational project or event that is sponsored by, conducted under the supervision of or approved by a public law enforcement agency or a nationally or state recognized entity that promotes proficiency in or education about semiautomatic weapons and for transporting thereto and therefrom; (v) hunting in accordance with the provisions of chapter 131; or (vi) surrendering such firearm or feeding device under the provisions of section 129D. Any large capacity weapon or large capacity feeding device kept on the premises of a lawfully incorporated shooting club shall, when not in use, be secured in a locked container, and shall be unloaded during any lawful transport. The clerk or other corporate officer of such club shall annually file a report with the colonel of state police and the commissioner of the department of criminal justice information services listing all large capacity weapons and large capacity feeding devices owned or possessed under such license. The colonel of state police or his designee, shall have the right to inspect all firearms owned or possessed by such club upon request during regular business hours and said colonel may revoke or suspend a club license for a violation of any provision of this chapter or chapter 269 relative to the ownership, use or possession of large capacity weapons or large capacity feeding devices.

(b) A Class B license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper; provided, however, that a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place; and provided further, that a Class B license shall not entitle the holder thereof to possess a large capacity firearm, except under a Class A club license issued under this section or under the direct supervision of a holder of a valid Class A license at an incorporated shooting club or licensed shooting range; and (ii) rifles and shotguns, including large capacity rifles and shotguns, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as he deems proper. A violation of a restriction provided under this paragraph, or a restriction imposed by the licensing authority under the provisions of this

paragraph, shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

A Class B license shall not be a valid license for the purpose of complying with any provision under this chapter governing the purchase, sale, lease, rental or transfer of any weapon or ammunition feeding device if such weapon is a large capacity firearm or if such ammunition feeding device is a large capacity feeding device for use with a large capacity firearm, both as defined in section 121.

(c) Either a Class A or Class B license shall be valid for the purpose of owning, possessing, purchasing and transferring non-large capacity rifles and shotguns, and for purchasing and possessing chemical mace, pepper spray or other similarly propelled liquid, gas or powder designed to temporarily incapacitate, consistent with the entitlements conferred by a firearm identification card issued under section 129B.

(d) Any person residing or having a place of business within the jurisdiction of the licensing authority or any law enforcement officer employed by the licensing authority or any person residing in an area of exclusive federal jurisdiction located within a city or town may submit to such licensing authority or the colonel of state police, an application for a Class A or Class B license to carry firearms, or renewal of the same, which such licensing authority or said colonel may issue if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section, unless the applicant:

(i) has, in any state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (a) a felony; (b) a misdemeanor punishable by imprisonment for more than two years; (c) a violent crime as defined in section 121; (d) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; or (e) a violation of any law regulating the use, possession or sale of controlled substances as defined in section 1 of chapter 94C;

(ii) has been confined to any hospital or institution for mental illness, unless the applicant submits with his application an affidavit of a registered physician attesting that such physician is familiar with the applicant's mental illness and that in such physician's opinion the applicant is not disabled by such an illness in a manner that should prevent such applicant from possessing a firearm;

(iii) is or has been under treatment for or confinement for drug addiction or habitual drunkenness, unless such applicant is deemed to be cured of such condition by a licensed physician, and such applicant may make application for such license after the expiration of five years from the date of such confinement or treatment and upon presentment of an affidavit issued by such physician stating that such physician knows the applicant's history of treatment and that in such physician's opinion the applicant is deemed cured;

(iv) is at the time of the application less than 21 years of age;

(v) is an alien;

(vi) is currently subject to: (A) an order for suspension or surrender issued pursuant to section 3B or 3C of chapter 209A or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to chapter 209A or a similar order issued by another jurisdiction; or

(vii) is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction.

(e) Within seven days of the receipt of a completed application for a license to carry or possess firearms, or renewal of same, the licensing authority shall forward one copy of the application and one copy of the applicant's fingerprints to the colonel of state police, who shall within 30 days advise the licensing authority, in writing, of any disqualifying criminal record of the applicant arising from within or without the commonwealth and whether there is reason to believe that the applicant is disqualified for any of the foregoing reasons from possessing a license to carry or possess firearms. In searching for any disqualifying history of the applicant, the colonel shall utilize, or cause to be utilized, files maintained by the department of probation and statewide and nationwide criminal justice, warrant and protection order information systems and files including, but not limited to, the National Instant Criminal Background Check System. The colonel shall inquire of the commissioner of the department of mental health relative to whether the applicant is disqualified from being so licensed. If the information available to the colonel does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law, he shall certify such fact, in writing, to the licensing authority within said 30 day period.

The licensing authority may also make inquiries concerning the applicant to: (i) the commissioner of the department of criminal justice information services relative to any disqualifying condition and records of purchases, sales, rentals, leases and transfers of weapons or ammunition concerning the applicant; (ii) the commissioner of probation relative to any record contained within the department of probation or the statewide domestic violence record keeping system concerning the applicant; and (iii) the commissioner of the department of mental health

relative to whether the applicant is a suitable person to possess firearms or is not a suitable person to possess firearms. The director or commissioner to whom the licensing authority makes such inquiry shall provide prompt and full cooperation for that purpose in any investigation of the applicant.

The licensing authority shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing; provided, however, that no such license shall be issued unless the colonel has certified, in writing, that the information available to him does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law.

(f) A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or suspension of a license shall be in writing and shall state the reasons therefor. Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension. Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system. A revoked or suspended license may be reinstated only upon the termination of all disqualifying conditions, if any.

Any applicant or holder aggrieved by a denial, revocation or suspension of a license, unless a hearing has previously been held pursuant to chapter 209A, may, within either 90 days after receiving notice of such denial, revocation or suspension or within 90 days after the expiration of the time limit during which the licensing authority is required to respond to the applicant, file a petition to obtain judicial review in the district court having jurisdiction in the city or town wherein the applicant filed for, or was issued, such license. A justice of such court, after a hearing, may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same.

(g) A license shall be in a standard form provided by the executive director of the criminal history systems board in a size and shape equivalent to that of a license to operate motor vehicles issued by the registry of motor vehicles pursuant to section 8 of chapter 90 and shall contain a license number which shall clearly indicate whether such number identifies a Class A or Class B license, the name, address, photograph, fingerprint, place and date of birth, height, weight, hair color, eye color and signature of the licensee. Such license shall be marked "License to Carry

Firearms" and shall clearly indicate whether the license is Class A or Class B. The application for such license shall be made in a standard form provided by the executive director of the criminal history systems board, which form shall require the applicant to affirmatively state under the pains and penalties of perjury that such applicant is not disqualified on any of the grounds enumerated above from being issued such license.

(h) Any person who knowingly files an application containing false information shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a house of correction, or by both such fine and imprisonment.

(i) A license to carry or possess firearms shall be valid, unless revoked or suspended, for a period of not more than 6 years from the date of issue and shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years but not more than 6 years from the date of issue, except that if the licensee applied for renewal before the license expired, the license shall remain valid for a period of 90 days beyond the stated expiration date on the license, unless the application for renewal is denied if the licensee is on active duty with the armed forces of the United States on the expiration date of his license, the licensee shall remain valid until the licensee is released from active duty and for a period of not less than 90 days following such release. Any renewal thereof shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years but not more than 6 years from the effective date of such license. Any license issued to an applicant born on February 29 shall expire on March 1. The fee for the application shall be $100, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $25 of the fee; $50 of the fee shall be deposited into the general fund of the commonwealth and not less than $50,000 of the funds deposited into the General Fund shall be allocated to the Firearm Licensing Review Board, established in section 130B, for its operations and that any funds not expended by said board for its operations shall revert back to the General Fund; and $25 of the fee shall be deposited in the Firearms Fingerprint Identity Verification Trust Fund. For law enforcement officials, or local, state, or federal government entities acting on their behalf, the fee for the application shall be set at $25, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $12.50 of the fee, and $12.50 of the fee shall be deposited into the general fund of the commonwealth. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit such portion of the license application fee into the Firearms Record Keeping Fund quarterly, not later than January 1, April 1, July 1 and October 1 of each year. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit quarterly such portion of the license application fee as is to be deposited into the General Fund, not later than January 1, April 1, July 1 and October 1 of each year. For the purposes of section 10 of chapter 269, an expired license to carry firearms shall be deemed to be valid for a period not to exceed 90 days beyond the stated date of expiration, unless such license to carry firearms has been revoked.

Any person over the age of 70 and any law enforcement officer applying for a license to carry firearms through his employing agency shall be exempt from the requirement of paying a renewal fee for a Class A or Class B license to carry.

(j)  (1) No license shall be required for the carrying or possession of a firearm known as a detonator and commonly used on vehicles as a signaling and marking device, when carried or possessed for such signaling or marking purposes.

(2) No license to carry shall be required for the possession of an unloaded large capacity rifle or shotgun or an unloaded feeding device therefor by a veteran's organization chartered by the Congress of the United States, chartered by the commonwealth or recognized as a nonprofit tax-exempt organization by the Internal Revenue Service, or by the members of any such organization when on official parade duty or during ceremonial occasions. For purposes of this subparagraph, an "unloaded large capacity rifle or shotgun" and an "unloaded feeding device therefor" shall include any large capacity rifle, shotgun or feeding device therefor loaded with a blank cartridge or blank cartridges, so-called, which contain no projectile within such blank or blanks or within the bore or chamber of such large capacity rifle or shotgun.

(k) Whoever knowingly issues a license in violation of this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a jail or house of correction, or by both such fine and imprisonment.

(l) The executive director of the criminal history systems board shall send electronically or by first class mail to the holder of each such license to carry firearms, a notice of the expiration of such license not less than 90 days prior to such expiration and shall enclose therein a form for the renewal of such license. The taking of fingerprints shall not be required in issuing the renewal of a license if the renewal applicant's fingerprints are on file with the department of the state police. Any licensee shall notify, in writing, the licensing authority who issued said license, the chief of police into whose jurisdiction the licensee moves and the executive director of the criminal history systems board of any change of address. Such notification shall be made by certified mail within 30 days of its occurrence. Failure to so notify shall be cause for revocation or suspension of said license. The commissioner of criminal justice information services shall provide electronic notice of expiration only upon the request of a cardholder. A request for electronic notice of expiration shall be forwarded to the department on a form furnished by the commissioner. Any electronic address maintained by the department for the purpose of providing electronic notice of expiration shall be considered a firearms record and shall not be disclosed except as provided in section 10 of chapter 66.

(m) Notwithstanding the provisions of section 10 of chapter 269, any person in possession of a firearm, rifle or shotgun whose license issued under this section is invalid for the sole reason that it has expired, meaning after 90 days beyond the stated expiration date on the license, but who shall not be disqualified from renewal upon application therefor under this section, shall be

subject to a civil fine of not less than $500 nor more than $5,000 and the provisions of section 10 of chapter 269 shall not apply; provided, however, that the exemption from the provisions of said section 10 of said chapter 269 provided herein shall not apply if: (i) such license has been revoked or suspended, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; (ii) revocation or suspension of such license is pending, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; or (iii) an application for renewal of such license has been denied. Any law enforcement officer who discovers a person to be in possession of a firearm, rifle or shotgun after such person's license has expired, meaning after 90 days beyond the stated expiration date on the license, has been revoked or suspended, solely for failure to give notice of a change of address, shall confiscate such firearm, rifle or shotgun and the expired or suspended license then in possession and such officer, shall forward such license to the licensing authority by whom it was issued as soon as practicable. The officer shall, at the time of confiscation, provide to the person whose firearm, rifle or shotgun has been confiscated, a written inventory and receipt for all firearms, rifles or shotguns confiscated and the officer and his employer shall exercise due care in the handling, holding and storage of these items. Any confiscated weapon shall be returned to the owner upon the renewal or reinstatement of such expired or suspended license within one year of such confiscation or may be otherwise disposed of in accordance with the provisions of section 129D. The provisions of this paragraph shall not apply if such person has a valid license to carry firearms issued under section 131F.

(n) Upon issuance of a license to carry or possess firearms under this section, the licensing authority shall forward a copy of such approved application and license to the executive director of the criminal history systems board, who shall inform the licensing authority forthwith of the existence of any disqualifying condition discovered or occurring subsequent to the issuance of a license under this section.

(o) No person shall be issued a license to carry or possess a machine gun in the commonwealth, except that a licensing authority or the colonel of state police may issue a machine gun license to:

(i) a firearm instructor certified by the municipal police training committee for the sole purpose of firearm instruction to police personnel;

(ii) a bona fide collector of firearms upon application or upon application for renewal of such license.

(p) The executive director of the criminal history systems board shall promulgate regulations in accordance with chapter 30A to establish criteria for persons who shall be classified as bona fide collectors of firearms.

(q) Nothing in this section shall authorize the purchase, possession or transfer of any weapon, ammunition or feeding device that is, or in such manner that is, prohibited by state or federal law.

(r) The secretary of the executive office of public safety or his designee may promulgate regulations to carry out the purposes of this section.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| Stacey Hightower, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| The City of Boston, | ) |
| Boston Police Commissioner Edward Davis, | ) |
| and the Commonwealth of Massachusetts, | ) |
| | ) |
| **Defendants.** | ) |

Civil Action No. 08-11955-DJC

_____

## MEMORANDUM AND ORDER

**CASPER, J.**                                                     September 29, 2011

### I.  Introduction

Plaintiff Stacey Hightower ("Hightower") has brought this suit alleging that the Massachusetts statutory scheme for determining whether to issue a license to carry a firearm, Mass. Gen. L. c. 140, § 131, both on its face and as applied by Defendants, the City of Boston and Boston Police Commissioner Edward Davis ("BPD Commissioner") (collectively, "Municipal Defendants"), violates her rights under the Second and Fourteenth Amendments to the United States Constitution. The Commonwealth of Massachusetts intervened to defend the constitutionality of the statute. Hightower, the Municipal Defendants and the Commonwealth have now all moved for summary judgment.  For the reasons discussed below, Hightower's motion for summary judgment is DENIED and the Defendants' motions for summary judgment are GRANTED.

1

## II. Burden of Proof and Standard of Review

A party moving for summary judgment bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific evidence showing that there is a genuine, triable issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). The Court shall grant summary judgment if, after viewing the record in this light, it determines that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. Background

Because Hightower challenges not only the Municipal Defendants' specific decision regarding her license to carry but also the Commonwealth's statutory scheme regarding such licenses, the Court shall begin with the background facts concerning revocation of Hightower's firearm license as well as a discussion of the statutory scheme at issue and the constitutional backdrop for Hightower's claims.

### A.     The Statutory Scheme

#### 1.  Classification of Firearms

Under Massachusetts law, the terms "firearm," "shotgun" and "rifle" each have distinct statutory definitions; a firearm is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." Mass. Gen. L. c. 140, § 121.  Additionally, Massachusetts law classifies as a "large capacity weapon" any firearm, rifle or shotgun that either is semiautomatic (i.e., "capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and requiring a separate pull of the trigger to fire each cartridge") and has a fixed large-capacity feeding device or can be readily modified to accept such a device, or "employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm," or is defined under federal law as an assault weapon.  Mass. Gen. L. c. 140, § 121.

#### 2.  Classification of Licenses to Carry:  Class A and Class B

Massachusetts law sets forth two categories of licenses to carry firearms:  Class A and Class B.  See Mass. Gen. L. c. 140, § 131(a)-(b).  Each type of license is issued by a "licensing authority," defined as either the local police chief or the State Police colonel.  Id. at §§ 121, 131(d).

A Class B license to carry authorizes the holder to possess and carry rifles and shotguns of any capacity, provided that the licensing authority "may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as he deems proper."  Mass. Gen. L. c. 140, § 131(b).  A Class B license also authorizes the holder to possess and carry non-large-

capacity firearms, "subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper," but "a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place." Id.

A Class A license to carry provides the same authorization as a Class B license, plus authorization to possess and carry large capacity firearms and authorization to carry or possess a loaded firearm in a concealed manner, "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. L. c. 140, § 131(a); Stavis v. Carney, 2000 WL 1170090, at *3 (Mass. Super. Ct. Aug. 1, 2000). "A Class A license with restrictions generally allows individuals to carry a firearm outside the home for sport and target practice or for employment purposes, such as traveling to and from employment as a security officer," and typically "requires the individual to transport their firearm unloaded in a locked box, and when necessary, in the trunk of their vehicle." Decl. of Lieutenant Detective Mark Harrington, D. 40-3 at ¶¶ 7-8. An unrestricted Class A license allows an individual to carry a concealed firearm on their person for any purpose. Id.; Stavis, 2000 WL 1170090, at *3. Just under 60% of the Class A licenses in Boston are unrestricted.[1]

Whether to grant an application for either a Class A or a Class B license to carry is in the bounded discretion of the local licensing authority; here, the BPD Commissioner. A license cannot be issued to an applicant who is statutorily disqualified by virtue of: (i) a conviction for a felony, a misdemeanor punishable by more than two years in prison, a violent crime, a gun crime, or a drug

---

[1]Specifically, as of Febraury 22, 2011, there were 3,798 active Class A licenses in Boston, of which 2,239 (or 59%) were unrestricted, 1,257 (or just over 33%) were restricted to sporting activities, 291 (or just under 8%) were restricted for employment purposes, 10 (or less than 1%) were restricted to home protection, and 1 (much less than 1%) was restricted for film production or theater use. Second Affidavit of Jason Guida, Director of the Commonwealth of Massachusetts Criminal Justice Information Services Firearms Records Bureau, D. 40-15 at ¶ 8.

4

crime, (ii) a mental illness, (iii) an alcohol or drug addiction, (iv) being less than 21 years of age, (v) being an alien, (vi) being the subject of a restraining order, or (vii) being the subject of an arrest warrant.  Mass. Gen. L. c. 140, § 131(d)(i)-(vii).  If an applicant does not fall into one of the prohibited categories, the licensing authority may still only "issue [a license] if it appears that the applicant is a suitable person to be issued such license."  Mass. Gen. L. c. 140, § 131(d). Massachusetts courts have interpreted this "suitability" standard as a requirement that the applicant be "a sufficiently responsible person to be entrusted with a license to carry firearms."  Wetherbee v. Costerus, 2001 WL 716915, at *7 (Mass. Super. Ct. May 1, 2001).[2]

### 3. Application, Revocation and Appeals Processes

Massachusetts offers a single form application, Form FA-25/26, to individuals applying for a license to carry (Class A or Class B) or a F.I.D. card.  See, e.g., Hightower's Form FA-25/26, D. 40-12.  The form inquires as to the applicant's citizenship, aliases, age, criminal history, mental health, history of drug or alcohol abuse, history of domestic violence or restraining orders and arrest warrants, and history with regard to previous licenses to carry or F.I.D. cards and requests that the applicant provide two character references.  Id.  The form must be signed under penalty of perjury. Id.

Under Massachusetts law, within forty days of receiving an application for a license to carry, the licensing authority must "either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing."  Mass. Gen. L. c. 140, § 131(e).  In recent years, approximately 98% of applications have been granted statewide, with just

---

[2]Massachusetts law also provides for a Firearm Identification Card ("F.I.D. card").  Mass. Gen. L. c. 140, § 129B.  A F.I.D. card "allows the holder to own or possess a firearm within the holder's residence or place of business, but not to carry it to or in any other place." Commonwealth v. Powell, 459 Mass. 572, 587-88 (2011).

over 1% rejected because the applicant is categorically disqualified from receiving a license and the

remaining 1% rejected because the licensing authority deems the applicant unsuitable.[3]

In Boston, sworn officers of the Boston Police Department who seek a license for a personal

firearm (separate and apart from any department-issued firearm) are required to go through an

additional step in the license to carry application process:  completing a License to Carry Firearms

Worksheet - BPD Sworn Only, also known as a G 13-S Form.  Harrington Decl., D. 40-3 at ¶ 10;

see Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed G 13-S Form).  The form

requires information regarding the applying police officer's rank, assignment, date of appointment,

queries whether the officer has any "complaints or charges pending" against her, whether she is

currently under suspension, and whether she is currently subject to any abuse or restraining orders

and indicates that the applying officer must submit to an interview and a criminal history check.  See

id.[4]  The form is reviewed by the BPD Internal Affairs Division and provides space for the licensing

authority - i.e., the BPD Commissioner or his designee, the Commander of the Boston Police

Department's Licensing Unit, see Harrington Decl., D. 40-3 at ¶ 3 - to approve the license without

restrictions, to list restrictions and approve the license as restricted, or to deny the license.

---

[3]Specifically, from 2008 through 2010, 92,765 applications for licenses to approve were
submitted, and 90,865 applications were granted.  First Guida Aff., D. 35-6 at ¶ 7.  Of the 1,900
applications that were denied, 969 were denied on the ground that the applicant was statutorily
disqualified to hold a license, and 931 were denied on the ground that the applicant was deemed
unsuitable by the licensing authority.  Id.

[4]See also Transcript of Motion Hearing, D. 51 at 48 (counsel for Municipal Defendants,
in response to the Court's inquiry as to why sworn BPD officers are required to complete a Form
G 13-S in addition to the civilian Form FA-25/26, stated that the focus is on Internal Affairs
Division matters:  "the only real difference between [a] civilian application and the application
for a Boston police officer in applying or renewing [a] firearm license is the question of whether
there are internal affairs charges pending.  So I think it's just another check on the suitability of
the individual looking for the gun").

Hightower Decl., Exh. A, D. 28-2.

Licenses may be suspended or revoked.  A licensing authority must revoke or suspend a license "upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed," and may revoke or suspend a license "if it appears that the holder is no longer a suitable person to possess such license." Mass. Gen. L. c. 140, § 131(f).  "Any revocation or suspension of a license shall be in writing and shall state the reasons therefor." Id.  "[T]he person whose application was so revoked, suspended or denied shall without delay deliver or surrender, to the licensing authority where he resides, all firearms, rifles, shotguns and machine guns and ammunition which he then possesses unless an appeal is pending." Id. at § 129D.[5]

If a license is denied, revoked or suspended by the licensing authority, the aggrieved party may "file a petition to obtain judicial review" in the appropriate state district court within "90 days after receiving notice of such denial, revocation or suspension." Id. at § 131(f).  "No appeal or post-judgment motion shall operate to stay such revocation or suspension." Id.

The "[state district] court, after a hearing, may direct that a license be issued or reinstated to the petitioner if [the court] finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same." Id. The statute "contemplates an evidentiary hearing" and a decision made "on all the facts." Godfrey v. Chief of Police of Wellesley, 35 Mass. App. Ct. 42, 44-45 (1993).  The petitioner is entitled to

---

[5]It appears that revocation is uncommon.  For example, in calendar year 2007, the year before Hightower's license was revoked, the Boston Police Department revoked 50 licenses. Second Guida Aff., D. 40-15 at ¶ 6.  Assuming for the moment that the number of licenses in Boston was similar in both 2007 and 2011, and given that in 2011 there were 3,798 active Class A licenses (and that the record does not reflect the number of active Class B licenses), it appears that roughly 1% of the active licenses in Boston are revoked annually.  Id. at ¶¶ 6, 8.

relief if the licensing authority's denial, revocation or suspension "was arbitrary, capricious, or an abuse of discretion."  Id. at 46 (quoting Chief of Police of Shelburne v. Moyer, 16 Mass. App. Ct. 543, 546 (1983)).  Further judicial review is available in Superior Court pursuant to certiorari review per Mass. Gen. L. c. 249, § 4, see Godfrey at *46, and the Superior Court's determination may be appealed as of right.  Mass. R. App. P. 4.

### B. The Constitutional Backdrop

The Second Amendment states:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guaranteed an "individual right to possess and carry weapons in case of confrontation." Id. at 592.  The First Circuit has discussed Heller at length on two occasions:  in United States v. Rene E., 583 F.3d 8 (1st Cir. 2009), a case involving a seventeen-year-old defendant who violated a federal prohibition on the possession of handguns by juveniles, and in United States v. Booker, 644 F.3d 12 (1st Cir. 2011), which involved a challenge to a federal law prohibiting individuals convicted of a "misdemeanor crime of domestic violence" from possessing firearms. Id. at 13.

In Rene E., the First Circuit observed that Heller read the Second Amendment "to 'guarantee the individual right to possess and carry weapons in case of confrontation' [and that] this right included a right to 'self-defense,' which the [Supreme] Court described as 'the central component of the right itself[,]' [and noted further that] 'the inherent right of self-defense has been central to the Second Amendment right.'"  Rene E., 583 F. 3d at 11 (quoting Heller, 554 U.S. at 592, 599, 628).  Accordingly, some of the statutes at issue in Heller, including a local ban on handgun

8

ownership, "were unconstitutional because they 'prohibit[ ] . . . an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense],' and 'make[] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense.'" Id. (quoting Heller, 554 U.S. at 630).[6] But "[t]he Heller Court did not identify a standard of review for regulations that restrict Second Amendment rights, apart from rejecting rational basis review and 'interest-balancing,'" id. at 11 n.4 (quoting Heller, 554 U.S. at 628 n. 27, 634-35), and "[t]he Heller Court was careful to note that the rights guaranteed by the Second Amendment were 'not unlimited.'" Id. at 12 (quoting Heller, 554 U.S. at 626). Indeed, many gun-control regulations "were left intact by the Second Amendment and by Heller," including "'(1) laws prohibiting the carrying of concealed weapons, (2) laws prohibiting the possession of firearms by felons and the mentally ill, (3) laws prohibiting the carrying of firearms 'in sensitive places such as schools and government buildings,' (4) laws imposing conditions and qualifications on the commercial sale of arms, and (5) laws prohibiting the carrying of 'dangerous and unusual weapons.'" Id. (quoting Heller, 554 U.S. at 626-27 and n. 26).

In Booker, the First Circuit noted that Heller "expressly left for 'future evaluation' the precise level of scrutiny to be applied to laws trenching upon Second Amendment rights." Booker, 644 F.3d at 12 (quoting Heller, 554 U.S. at 626, 634-35). It noted further that Heller "'tell[s] us that statutory prohibitions on the possession of weapons by some persons are proper.' . . . That is, the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case

---

[6]Heller also "held that a provision of D.C. law requiring gun-owners to secure their guns with a trigger-lock or keep the guns disassembled unquestionably infringes upon Second Amendment rights." Booker, 644 F.3d at 22 n.12 (citing Heller, 544 U.S. at 630).

basis." Id. at 23 (quoting <u>United States v. Skoien</u>, 614 F.3d 638, 640 (7th Cir. 2010)).  In its efforts

to develop a standard of review to be applied to a statute that included such a categorical ban, the

First Circuit explained that "[w]hile we do not attempt to discern the 'core' Second Amendment

right vindicated in <u>Heller</u>, we note that <u>Heller</u> stated that the Second Amendment 'elevates above

all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and

home,'" <u>id.</u> at 25 n. 17 (quoting <u>Heller</u>, 554 U.S. at 635).  Further, "[w]e think it sufficient to

conclude, as did the Seventh Circuit, that a categorical ban on gun ownership by a class of

individuals must be supported by some form of 'strong showing,' necessitating a substantial

relationship between the restriction and an important governmental objective." <u>Id.</u> at 25 (quoting

<u>Skoien</u>, 614 F.3d at 641).

     In 2010, the Supreme Court made clear that the Second Amendment's right to bear arms

applies to the states as well as to the federal government.  <u>McDonald v. City of Chicago</u>, 130 S.Ct.

3020, 3050 (2010) (Alito, J., plurality opinion) (holding Second Amendment right is incorporated

against the states through Fourteenth Amendment).  "In so doing, however, the <u>McDonald</u> Court

reiterated the affirmation by the [Supreme] Court in <u>Heller</u> that the right to bear arms is not without

restrictions."  <u>Yohe v. Marshall</u>, 2010 WL 4027797, at *3 (D. Mass. Oct. 14, 2010).  Indeed,

<u>McDonald</u> explained that "it is important to keep in mind that <u>Heller</u>, while striking down a law that

prohibited the possession of handguns in the home, recognized that the right to keep and bear arms

is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose.'"  <u>McDonald</u>, 130 S.Ct. at 3047 (quoting <u>Heller</u>, 554 U.S. at 626).  The court explained

further that "[w]e made it clear in <u>Heller</u> that our holding did not cast doubt on such longstanding

regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,'

10

'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms,'" id. (quoting Heller, 554 U.S. at 626-27), and "[w]e repeat those assurances here." Id. "Thus, incorporating the right to bear arms in the Second Amendment as a fundamental right applicable to the states through the Fourteenth Amendment 'does not imperil every law regulating firearms.'" Yohe, 2010 WL 4027797, at *3 (quoting McDonald, 130 S.Ct. at 3047).

### C.    Factual Background

The following facts are undisputed unless otherwise noted.  Hightower is a resident of Dorchester.  Hightower Decl., D. 28-7 at ¶¶ 1, 11.  She joined the Boston Police Department ("BPD") in June 1998. Id. at ¶ 3.  In 1999, Hightower sought a Class A license "to carry concealed, large capacity firearms," Am. Compl., D. 3 at ¶ 15, and applied for and received an unrestricted Class A license granted "for all lawful purposes."  Hightower Decl., D. 28-7 at ¶ 15.  Pursuant to this license, in addition to her BPD-issued gun, she kept a privately-owned Smith & Wesson ".38 Special" five-round revolver, which is a non-large-capacity firearm.  Hightower Deposition, D. 35-1 at 16; Exh. N to Mun. Def.'s Statement of Material Facts, D. 40-14 (BPD Incident Report).

Hightower sought to renew her unrestricted Class A license in July 2008.  As a sworn BPD officer, she was required to fill out a Form G 13-S.  Hightower Decl., D. 28-7 at ¶ 17; Harrington Decl., D. 40-3 at ¶ 10.  She completed and submitted the form on July 9, 2008.  Hightower Decl., D. 28-7 at ¶ 18.  In response to the form's query "Are There Any Complaints Or Charges Pending Against You?," Hightower answered "No."  Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed Form G 13-S).[7]

--------

[7]The parties vigorously dispute whether Hightower's response to this question was accurate, although they do not dispute the facts underlying Hightower's response.  On July 28,

11

Thereafter, the processing of Hightower's application overlapped with the conclusion of her service with the BPD. On July 30, 2008, Hightower's application was reviewed by BPD's Internal Affairs Division. Id. The next day, July 31, Hightower submitted her resignation to BPD, effective August 15, and responded "no" to that form's query "Is resignation presented while charges are pending?" Exh. B to the Hightower Decl., D. 28-3 at 1 (Hightower's completed Resignation Form). On August 1, the day after Hightower submitted her resignation, the BPD Commissioner approved Hightower's application for an unrestricted Class A license. Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed Form G 13-S). On August 5, Hightower's superior, Acting Commander Luis Cruz, recommended to Commissioner Davis that Hightower's resignation "be accepted as

_____

2004, an incident occurred at a BPD booking desk that resulted in an individual claiming that he had been assaulted by a BPD officer. Exh. D to Mun. Def.'s Statement of Material Facts, D. 40-4 at ¶¶ 3-5 (Declaration of BPD Superintendent of Internal Affairs Kenneth Fong). Hightower was involved in the arrest of the complainant and was interviewed during the subsequent BPD Internal Affairs investigation. Id. at ¶ 4-5. BPD Internal Affairs investigators found Hightower to be in violation of various BPD rules. Id. at ¶ 6. Hightower appealed these findings through her union representative. Hightower Deposition, D. 40-7 at 13-15. Hightower also hired an attorney who engaged in settlement negotiations with BPD in connection with the findings. Id. at 16-21. Neither Hightower's appeal of the findings nor her settlement negotiations were resolved at the time Hightower resigned from BPD on July 31, 2008, some twenty-two days after she applied for renewal of her Class A license. Id. at 21-22. Hightower was aware of her dispute with the Internal Affairs findings, id. at 9-10, 15-16, and that the dispute had not been resolved by the time of her resignation, id. at 22, but she asserts that she was "unaware at that time [of her renewal application] of any pending investigations in my Internal Affairs record. . . ." Hightower Decl., D. 28-7 at ¶ 19.

Hightower asserts that she interpreted the question "Are There Any Complaints Or Charges Pending Against You?" on the BPD Form G 13-S to refer only to criminal complaints or charges, Hightower Deposition, D. 40-7 at 25, and thus asserts that the answer was accurate when she submitted her form on July 9, 2008 and continues to be true. Id. The Municipal Defendants argue that because Form FA-25/26, the standard civilian application, specifically asks about criminal history, see Hightower's Form FA-25/26, D. 40-12, it is clear that the phrase "complaints or charges" on the supplemental Form G 13-S for sworn officers refers to internal affairs investigations, Mun. Def.'s Statement of Material Facts, D. 40 at ¶ 20, and thus Hightower's answer was and remains inaccurate.

Both parties assert that this case can be resolved on summary judgment without resolving this dispute. Pl. Memo, D. 29 at 8; Mun. Def. Memo, D. 41 at 14-15.

12

submitted," Exh. B to the Hightower Decl., D. 28-3 at 3 (Cruz letter), and the BPD Commissioner

accepted Hightower's resignation on August 15.  Exh. B to the Hightower Decl., D. 28-3 at 2

(Hightower's completed Resignation Form).

On August 18, 2008, a "Police Commissioner's Personnel Order," signed by the BPD

Commissioner, was placed in Hightower's personnel file.  Exh. D to the Hightower Decl., D. 28-5

(Police Commissioner's Personnel Order).  The order stated that "the resignation of Police Officer

Stacey Hightower, [], assigned to the Bureau of Field Services / District B-2, [] after being presented

with charges pending is hereby effective, Friday, August 15, 2008."  Id.

On August 20, 2008, the BPD Commissioner sent Hightower a letter stating that her license

to carry was revoked pursuant to the provisions of Mass. Gen. L. c. 140, § 131.  Exh. C to the

Hightower Decl., D. 28-4 (revocation letter).  The letter stated that "the reason[] for this revocation

is [that] you completed the application form untruthfully."  Id.[8]  The letter stated further that:

> As a result of this revocation you shall, in accordance with M[ass]. G[en]. L. c. 140,
> § 129D, without delay, deliver or surrender to the licensing authority where you
> reside your licenses to carry, and all firearms, large capacity feeding devices, rifles,
> shotguns and ammunition which you have in your possession, or which are owned
> by you.  Failure to do so is a criminal offense. . . . You have the right to appeal this
> decision within 90 days to the District Court with appropriate jurisdiction.  Please
> contact us at any time if you have any questions concerning this matter.

Id.  Shortly thereafter, Hightower surrendered her handgun and ammunition to the police.

Hightower Decl., D. 28-7 at ¶ 24.  She did not appeal the revocation and did not reapply for a Class

B or restricted Class A license.  Hightower Deposition, D. 35-1 at 20.

In the course of this litigation, BPD has taken the position that since Hightower is no longer

---

[8]The Commissioner's designee has declared that, as a general matter, he has both denied
and revoked license applications when a sworn BPD officer has answered questions on the Form
G 13-S untruthfully.  See Harrington Decl., D. 40-3 at ¶ 15.

13

a sworn BPD officer and the G 13-S requirement no longer applies to her, if Hightower "truthfully

completes a civilian License to Carry form, and no other disqualification applies, her right to carry

a firearm will be restored."  Mun. Def.'s Am. Answer, D. 16 at ¶ 37; see also Harrington Decl., D.

40-3 at ¶ 19.

      Nonetheless, Hightower testified at her deposition that she believes that even if she reapplied

for a Class A unrestricted license that would allow her to carry a concealed firearm, her application

would be denied and, accordingly, she has refrained from reapplying.  See Hightower Deposition,

D. 35-1 at 16-18.[9]  Nor has she applied as a civilian for a Class B or restricted Class A license to

---

    [9]The parties differ as to the best way to characterize the deposition testimony on this
point.  The relevant portion of Hightower's deposition reads as follows:

| | |
|---|---|
| Q: | . . . Since the revocation of your class A license, have you ever reapplied for a gun license? |
| A: | No. |
| Q: | Why is that? |
| A: | Reapplied where? |
| Q: | To the City of Boston. |
| A: | They revoked my license. |
| Q: | Do you know you have a right to reapply? |
| A: | Yeah, sure. |
| Q: | You're aware that you can reapply? |
| A: | Sure, I can reapply. |
| Q: | So you know that, why haven't you done that? |
| A: | Why would I?  They revoked my license. |
| Q: | But you understand that you can go reapply for another one, right? |
| A: | Sure. |
| Q: | Okay.  Why haven't you done that? |
| A: | Because they revoked my license. |
| Q: | Okay. |
| A: | It's a waste of time.  Why would I go apply when they revoked my license? |
| Q: | So you believe that because they revoked your license you'll be denied if you reapply? |
| A: | It's not my belief that I would be necessarily denied to car[ry] a firearm.  It's my belief that I would be denied a Class A. |
| Q: | A Class A, unrestricted license to carry a concealed - - |
| A: | That's right. |

carry.  Hightower Deposition, D. 35-1 at 20.

The 90-day window within which Hightower was allowed to seek judicial review of the

revocation of her unrestricted Class A license on August 20, 2008, closed on November 18, 2008.

Mass. Gen. L. c. 140, § 131(f).

## D.    Procedural Background

---

Q:      You don't want your gun license if you can't carry it concealed?
A:      That's not necessarily true.
Q:      Okay.
A:      I would like to have my gun license and be able to carry it concealed. . . . I've
        lived a very dangerous life and I've arrested some dangerous people, and I would
        feel a lot more comfortable if I could have a Class A unrestricted license. . . .
Q:      So back to my original question, which was why you have not applied for your
        Class A unrestricted license.
A:      Because I don't feel I'm going to get my Class A unrestricted license.
Q:      But you haven't tried?
A:      No, I haven't.
Q:      And what makes you feel that you wouldn't get it?
A:      Because of the simple fact that they revoked it already.  I mean, if they wanted me
        to have the license, they would have let me keep the license.  I mean, what was all
        this craziness of taking my license and take my firearm and leaving me
        unprotected in a house that already had been broken into while I was a police
        officer?  It's scary.
Q:      You didn't file an appeal to get your gun license unrevoked?
A:      No.
Q:      And you haven't reapplied to get your Class A unrestricted license again?
A:      No.
Q:      And you haven't applied to get a Class A restricted license?
A:      No.
Q:      Do you have a gun, at least in your home, to protect yourself?
A:      No.
Q:      And the reason you haven't done that is why again?
A:      Because they already revoked it.  They already revoked it.  I applied, they
        revoked it.
Q:      Okay.  But you're aware of the fact that you can still reapply regardless of the fact
        that it's been revoked, right?
A:      Sure.  If it will make you happy, I will go down there today and reapply.

Hightower Deposition, D. 35-1 at 16-18.  There is no suggestion in the record that Hightower
has actually reapplied.

On November 24, 2008, six days after the closure of Hightower's window for seeking judicial review in state court, Hightower filed the instant lawsuit against the Municipal Defendants. On March 23, 2009, she filed an amended complaint, which remains the operative complaint, that raises four claims, each brought under 42 U.S.C. § 1983 and the Second and Fourteenth Amendments: first, that "[b]y requiring Ms. Hightower to turn over her handgun," the Defendants violated her right to bear arms, Am. Compl., D. 3 at 9; second, that by "forc[ing] Ms. Hightower to turn over her handgun without first conducting a hearing of any sort," the Defendants violated her right to procedural due process, id. at 9-10; third, that "[b]y requiring Ms. Hightower to maintain her Class A License at [the Commissioner's] discretion," the Defendants have subjected her to an "unconstitutional licensing requirement," id. at 10-11; and finally, that by "prevent[ing] Ms. Hightower from exercising her fundamental individual right to keep and bear arms for the purpose of self-defense," the Defendants are "denying law abiding citizens like Ms. Hightower the equal protection of the laws," id. at 11-12 - and seeks declaratory and injunctive relief.  Id. at 9-12.

On July 24, 2009, in accordance with Fed. R. Civ. P. 5.1, Hightower filed a notice of claim of unconstitutionality, stating that her complaint calls into question the constitutionality of Mass. Gen. L. c. 140, § 131, and served such notice on the Attorney General of Massachusetts.

On September 30, 2009, the Supreme Court granted certiorari in McDonald v. City of Chicago, see 130 S.Ct. 48 (Mem) (2009), and Hightower and the Municipal Defendants jointly moved to stay this case pending the outcome of McDonald.  D. 20-2.  The Court granted the motion, stayed the case, and ordered Hightower to move to reopen after the Supreme Court issued its opinion in McDonald.

On June 28, 2010, the Supreme Court issued McDonald.  130 S.Ct. 3020, 3020 (2010).  On

Hightower's motion, the Court reopened the case on November 20, 2010.

On January 31, 2011, Hightower moved for summary judgment. On February 14, 2011, the Court allowed the Commonwealth to intervene in the case for the limited purpose of defending the constitutionality of Mass. Gen. L. c. 140, § 131. On April 21, 2011, the Commonwealth cross-moved for summary judgment and the Municipal Defendants filed their own cross-motion for summary judgment the next day. After transfer of the case to this session, the Court held a hearing on the summary judgment motions and took the matter under advisement.

## IV. Discussion

### A. Ripeness of Hightower's Second Amendment Claims

The Commonwealth argues that Hightower's claims are unripe, at least inasmuch as they rely on the Second Amendment or on a Fourteenth Amendment right to substantive due process derivative of her Second Amendment rights.[10] "Ripeness is an Article III jurisdictional requirement," and turns upon the existence of "an 'actual' controversy," which "is a sine qua non of any assumption of federal jurisdiction." Verizon New England, Inc., v. Int'l Bhd. of Elec. Workers, Local No. 2322, 2011 WL 2568008, at *9 (1st Cir. June 30, 2011) (quoting 28 U.S.C. § 2201(a) (Declaratory Judgment Act)). Ripeness doctrine protects against "premature adjudication," keeps courts "from entangling themselves in abstract disagreements," "avoid[s] unnecessary constitutional decisions," and reflects "the recognition that, by waiting until a case is fully developed before deciding it, courts benefit from a focus sharpened by particular facts." Doe v. Bush, 323 F.3d

---

[10]The Commonwealth does not dispute the ripeness of the Hightower's procedural due process claim (Claim II), her substantive due process claim (Claim III) or her equal protection claim (Claim IV) to the extent they can be based solely on the Fourteenth Amendment. The Municipal Defendants echo the Commonwealth's ripeness argument. Mun. Def. Memo, D. 41 at 22-23.

133, 138 (1st Cir. 2003) (citations omitted).

"There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability have already occurred.  The court is then merely being asked, as in any litigation, to determine the legal consequences of past events." Verizon New England, 2011 WL 2568008, at *10 (quoting 10B Charles Alan Wright et al., Federal Practice and Procedure § 2757, at 475 (1998)). The situation is more complicated when "a declaration is sought on the legal consequences of a hypothetical act that may or may not occur in the future." Id.  "[W]here challenges are asserted to government actions and ripeness questions arise, a court must consider both 'fitness' for review and 'hardship." Id. at *9 (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995)).  "The 'fitness' inquiry concerns questions of finality, definiteness, and the need for further factual development." Id.  The "hardship" inquiry requires courts to "consider whether the challenged action creates a direct and immediate dilemma for the parties." Id. (quotations omitted). The "hardship" inquiry "should focus on the judgment's usefulness . . . . [R]ather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in putting the underlying controversy to rest." Id. (quoting State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685 (1st Cir. 1994)).  "Both prongs of the test ordinarily must be satisfied in order to establish ripeness." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995).[11]

---

[11]The First Circuit has held open "the possibility that there may be some sort of sliding scale under which, say, a very powerful exhibition of immediate hardship might compensate for questionable fitness (such as a degree of imprecision in the factual circumstances surrounding the case), or vice versa," Ernst & Young, 45 F.3d at 535, although it has not explicitly held whether or when district courts should rely on such a sliding scale.  Id. at 535 n.9 ("We need not probe this final point").

The Commonwealth's argument proceeds as follows.  First, the Second Amendment neither creates nor preserves any right to carry a handgun in a concealed manner, nor any right to large-capacity firearms; indeed, it is permissible for a legislature to ban such conduct outright, never mind restrict it, without running afoul of the Second Amendment.  Rene E., 583 F.3d at 12 (citing Heller, 554 U.S. at 626-27).[12]  Second, the deprivation suffered by Hightower at issue in this case is the revocation of her unrestricted Class A license, which allowed her to carry concealed, large-capacity firearms.  Mass. Gen. L. c. 140, § 131(a); Hightower Decl., D. 28-7 ¶ 15.  Third, although Hightower asserts that all she wants to be able to do is carry her .38 caliber revolver, a regular-capacity firearm, either concealed or unconcealed, for self-defense purposes, Pl. Opp. Memo 45 at 7-9 ("Hightower wants a permit that would allow her to carry a handgun - the one she had seized from her - for self defense . . . Hightower might prefer carrying concealed, but her testimony flatly rejects [an] attempt to convert this case into one that turns on concealment.  It does not"),[13] she has never sought and has never been denied a narrower license, such as a restricted Class A license or a Class B license, that would allow her to do so.  Hightower Deposition, D. 35-1 at 16, 20; Harrington Decl., D. 40-3 ¶ 18.  Accordingly, the Commonwealth argues that because the unrestricted Class A license Hightower had revoked is not subject to the protections of the Second Amendment, and because Hightower has not yet sought and has not been denied the type of license which is protected by the Second

_____

[12]Hightower concedes the former.  See Pl. Opp. Memo, D. 48 at 7 ("It is also not contested that the concealed carrying of handguns may be banned").  She disputes the latter, but repeatedly asserts that the issue is not before the Court.  See Pl. Opp. Memo, D. 45 at 7-8.

[13]But see Hightower Deposition, D. 35-1 at 17-18 ("Q:  You don't want your gun license if you can't carry it concealed?  A:  That's not necessarily true.  Q:  Okay.  A:  I would like to have my gun license and be able to carry it concealed. . . . I've lived a very dangerous life and I've arrested some dangerous people, and I would feel a lot more comfortable if I could have a Class A unrestricted license").

Amendment, her Second Amendment claims amount to no more than an unripe inquiry into the "legal consequences of a hypothetical act that may or may not occur in the future."  Verizon New England, 2011 WL 2568008, at *10.

Hightower responds that "there is no need to engage in futile, ritualistic acts to ripen a claim - and the idea that a license revocation does not present a live, justiciable controversy is untenable." Pl. Opp. Memo, D. 45 at 9.  The Court finds neither part of Hightower's reply in this regard persuasive.  Taking the second part of that response first, the Court notes that the Commonwealth does not dispute that the revocation of Hightower's unrestricted Class A license presents a justiciable controversy with reference to Hightower's Fourteenth Amendment rights. Commonwealth's Reply Memo, D. 50 at 1-4.  Nor does it argue that Hightower's Fourteenth Amendment claims are unripe.  Id.

The first part of Hightower's response requires a more thorough discussion.  Hightower's reference to "futile, ritualistic acts" presumably alludes to the language the First Circuit has used to describe the "futility exception" to the requirement of ripeness review, see Gilbert v. City of Cambridge, 932 F.2d 51, 60 (1st Cir. 1991) ("the law should not be construed idly to require parties to perform futile acts or to engage in empty rituals") (quoting Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988)).  A fuller reading of Gilbert makes clear that the futility exception is quite narrow:

> [T]here are circumstances in which a party, on grounds of futility, might bypass a permit process and go directly to court seeking judicial review of a law's constitutionality . . . .  Futility may be found, for example, where special circumstances exist such that a permit application is not a 'viable option,' or where the granting authority has dug in its heels and made it transparently clear that the permit, application or no, will not be forthcoming. . . .
>
> The futility exception is far easier to conceptualize than to define.  Since obtaining

20

a final municipal decision should be the rule, however, the burden of establishing futility must lie with the party seeking to bypass the permit procedure - and any reasonable doubt ought to be resolved against that party. Thus, although futility can excuse a plaintiff's eschewal of a permit application, the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).

Gilbert, 932 F.2d at 60-61 (quotations and citations omitted). Nothing in the record supports Hightower's assertion that it would be so futile for her to apply for the type of permit that is protected by the Second Amendment as to justify the application of this narrow exception. As Hightower herself notes, "Defendants admit . . . that if Hightower completes a civilian License to Carry form, they will approve it provided that 'no other disqualification applies,'" and "Defendants admit that Hightower has no criminal or drug history that would disqualify her from carrying a gun." Pl. Statement of Material Facts, D. 30 ¶¶ 36-37.[14] This is confirmed by the Harrington Declaration. See Harrington Decl., D. 40-3 at ¶ 19.

Hightower asserts that the Commonwealth's position "unravels," Pl. Opp. Memo, D. 43 at 14, because Lieutenant Detective Harrington states that if Hightower "desired a Class A unrestricted license to carry, I would review her stated need to have an unrestricted license and make a determination based on her needs and the interests of the [BPD] in regulating Class A unrestricted licenses." Harrington Decl., D. 40-3 at ¶ 19. Hightower's assertion fails for three reasons. First, as a matter of law, Rene E. makes clear that post-Heller the Second Amendment cannot be interpreted to confer a right to an unrestricted Class A license, which permits both concealed carrying and the possession of high-capacity firearms; accordingly, even if it were futile for

---

[14]The Municipal Defendants confirm that, at least as of July 2008, Hightower had no disqualifying criminal history; the City asserts that "the facts essential to [determine whether or not Hightower has disqualifying drug history] are unavailable at this time." Mun. Def.'s Statement of Material Facts, D. 40 ¶ 37.

21

Hightower to reapply for an unrestricted Class A license, such futility would not ripen her Second Amendment claims.  Second, as a matter of fact, the Harrington Declaration does not establish that Hightower would not receive an unrestricted Class A permit if she reapplied, and it certainly does not show that this is a case "where the granting authority has dug in its heels and made it transparently clear that the permit, application or no, will not be forthcoming."  Gilbert, 932 F.2d at 61.  Finally, and most importantly, the statement in the Harrington Declaration upon which Hightower focuses in no way suggests that it would be futile for her to apply for any type of restricted permit that would clearly fall within the protections of the Second Amendment, which the question upon which the futility analysis turns.  Again, record evidence suggests, and Hightower herself concedes, that such an application is likely to be granted.  Pl. Statement of Material Facts, D. 30 ¶¶ 36-37.

Having rejected the application of the futility exception here, the Court turns to the two prongs of the ripeness analysis:  fitness for review and hardship.

When determining fitness, "the critical question . . . is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  Ernst & Young, 45 F.3d at 536 (quoting Mass. Ass'n of Afro-Am. Police, Inc v. Boston Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992) (per curiam)).  Here, the Second Amendment issues Hightower raises are not yet fit for review.  First, as discussed at length above, it is not clear that the Massachusetts statutory scheme, either on its face or as applied by the Municipal Defendants, would prevent or infringe on Hightower's ability to acquire a license to carry so limited or restricted as to come within the ambit of the Second Amendment.  Second, in order to deny such a license - indeed, to deny any type of license to carry - the licensing authority must "notify the applicant of the reason for such denial in

writing." Mass. Gen. L. c. 140, § 131(e). The Second Amendment questions raised by Hightower would be more fit for review once the Municipal Defendants have not only trenched upon Hightower's Second Amendment rights (and they have not yet done so by revoking her <u>unrestricted</u> Class A license) but also once they have provided its reasons for doing so, subjecting those reasons for judicial review. At this point, the Court need not and will not surmise if, let alone why, the Municipal Defendants would pursue such a course of conduct in the future. The Court does note, however, that the reason that the BPD Commissioner <u>has</u> provided for his decision to revoke Hightower's unrestricted Class A license - that she "completed the application form [G 13-S] untruthfully," Exh. C to the Hightower Decl., D. 28-4 (revocation letter) - would <u>not</u> apply to any such future course of conduct, because Hightower has retired from her position as a sworn BPD officer and thus any future application she files will not include a Form G 13-S.

As to hardship, the issue of "whether the sought-after declaration would be of practical assistance in putting the underlying controversy to rest," <u>Verizon New England</u>, 2011 WL 2568008, at *9 (quoting <u>State of R.I. v. Narragansett Indian Tribe</u>, 19 F.3d 685 (1st Cir. 1994)), tips somewhat in Hightower's favor. The Defendants do not dispute that the order Hightower seeks, which would not only enjoin the Defendants from continuing their current method of enforcing Mass. Gen. L. c. 140, § 131 but also compel them to restore Hightower's unrestricted Class A license and return her handgun, Am. Compl., D. 3 at 12, would resolve the dispute between Hightower and the Commonwealth. The Court notes, however, that the gravamen of the hardship here does not turn solely on Hightower's Second Amendment claims, since the relief she seeks includes the return of her unrestricted license, <u>id.</u>, and not the issuance of a new license tailored to the limits of the Second Amendment.

Because Hightower's Second Amendment claims are not fit for review at this time, and because the hardship inquiry here is not so unequivocal as to compel the Court to reach those claims, the Court agrees with the Commonwealth's argument that Hightower's Second Amendment claims are unripe.[15]

### B.  Evaluation of Hightower's Ripe Claims

#### 1.  Claim I:  Violation of the Individual Right to Keep and Bear Arms

Hightower bases her first claim on both the Second and Fourteenth Amendments, but it is the Second Amendment that provides the sole source of the right to keep and bear arms; the Fourteenth Amendment merely incorporates that right against the states.  McDonald, 130 S.Ct. at 3050.  Accordingly, in the absence of a ripe Second Amendment basis, there is no independent legal

---

[15]The Municipal Defendants argue not only that Hightower's Second Amendment claims are unripe (as the Commonwealth does), but also that Hightower lacks standing entirely.  Mun. Def. Memo, D. 41 at 15-23.  Their argument rests primarily on their position that McDonald's holding that the Second Amendment is incorporated against the states cannot be applied retroactively and thus the Defendants cannot be held liable for their revocation of Hightower's unrestricted Class A license, which took place roughly a year before the Supreme Court decided McDonald.  Id.

The Court rejects this argument since it is well settled that "[i]f a new rule is applied to the parties in the rule-creating case, then it must be applied retroactively to similarly situated parties in all pending cases."  Crowe v. Bolduc, 365 F.3d 86, 93 (1st Cir. 2004) (citing Harper v. Dep't of Taxation, 509 U.S. 86, 97 (1993)).  Chicago, the defendant in the original action underlying McDonald, repealed the city code at issue in McDonald, mooting the Supreme Court's remand, see Pl. Opp. Memo, D. 43 at 18, but there was no reason to question that any subsequent proceedings would apply the holding in McDonald to the parties in that case.  See, e.g., Exh. H to Pl. Opp. Memo., D. 43-3 at 2 (Testimony of Chicago Corporation Counsel Mara Georges to the City of Chicago Comm. on Police and Fire on June 18, 2010); Exh. I to Pl. Opp. Memo, D. 43-4 at 3 (Georges Testimony to the City of Chicago Comm. on Police and Fire on June 29, 2010).  Because the McDonald court intended the rule in McDonald to be applied to the parties in McDonald, McDonald must be applied retroactively.  Crowe, 365 F.3d at 93.

basis for Hightower's first claim.

### 2. Claim II: Violation of Procedural Due Process

"The basic guarantee of procedural due process is that, 'before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'" González-Droz v. González-Colón, 2011 WL 4346673, at *8 (1st Cir. Sept. 16, 2011) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) (quotations and citations in Amsden omitted)). Accordingly, to establish a procedural due process violation, a plaintiff "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [her] of that interest without constitutionally adequate process." Id. (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)). "No rigid taxonomy exists for evaluating the adequacy of state procedures in a given case; rather, 'due process is flexible and calls for such procedural protections as the particular situation demands.'" Id. (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

Hightower asserts that she has a property interest in her revoked unrestricted Class A license. To establish a property interest in a government-conferred benefit such as a license, a plaintiff must demonstrate "a legitimate claim of entitlement" under state law to the benefit. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). The Commonwealth does not dispute that Hightower has a property interest in her license. Def. Commonwealth's Memo, D. 36 at 19-21. Interestingly, the Municipal Defendants argue that given the scope of the BPD Commissioner's discretion to issue and revoke firearms licenses, Hightower cannot reasonably consider herself entitled to her license. Mun. Def. Memo, D. 41 at 36-39. But the statutory scheme does not invest local licensing

authorities with "unbridled discretion"; it instead requires the authority to disqualify any applicant who falls within certain categories, Mass. Gen. L. c. 140, § 131(d)(i)-(vii), permits the authority to issue a license to anyone outside those categories only if the applicant is "suitable," Id. at § 131(d), and requires the authority to submit a written statement of reasons, subject to judicial review, to any applicant who is denied a license. Id. at § 131(e)-(f). In any event, the Court sees no reason to depart from the holding in Medina v. Rudman, 545 F.2d 244 (1st Cir. 1976) - the case the Municipal Defendants cite as the primary support for their argument with regard to the import of the BPD Commissioner's discretion, see Mun. Def. Memo, D. 41 at 36-37 - that "[d]oubtless once a license, or the equivalent, is granted, a right or status recognized under state law would come into being, and the revocation of the notice would require notice and hearing as" required by due process. Medina, 545 F.2d at 250.[16]

Having established Hightower's interest in her unrestricted Class A license, the next question is whether the Defendants provided Hightower with constitutionally adequate process when revoking her unrestricted Class A license. The constitutional adequacy of any process offered by the government is evaluated under the three-factor test set out in Mathews v. Eldridge, 424 U.S. 319 (1976), which requires courts to consider: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335.

---

[16]Hightower also asserts that she has a Fourteenth Amendment liberty interest in her unrestricted Class A license through the Fourteenth Amendment's incorporation of the Second Amendment against the states. Pl. Memo, D. 29 at 21. This position fails in the absence of a ripe Second Amendment basis.

Because "due process is flexible and calls for such procedural protections as the particular situation demands," González-Droz, 2011 WL 4346673, at *8 (quoting Morrissey, 408 U.S. at 481), it is worth reiterating the particulars of Hightower's challenge. Hightower had her unrestricted Class A license revoked when the BPD Commissioner concluded that she completed her Form G 13-S untruthfully. The only license applicants who complete a Form G 13-S are sworn BPD officers. The revocation letter the BPD Commissioner sent Hightower instructed her to surrender her license and her firearm without delay "in accordance with M[ass]. G[en]. L. c. 140, § 129D," and apprised her of her right to appeal. Exh. C to the Hightower Decl., D. 28-4 (revocation letter). Hightower, however, chose not to appeal. Against this backdrop, Hightower alleges that the process she was accorded was inadequate because (i) "[t]he Defendants forced Ms. Hightower to turn[] over her handgun without first conducting a hearing of any sort, (ii) the statutory scheme "used by the Defendants to confiscate Ms. Hightower's handgun are inadequate and pose an unacceptable risk of erroneous deprivation," and (iii) "the Defendants lack substantial interest for preventing Ms. Hightower . . . [from] keeping and bearing handguns for the purpose of self-defense." Am. Compl., D. 3 at ¶¶ 58-60.[17]

Turning to the first of the three Mathews factors - Hightower's interest in her unrestricted Class A license - Hightower asserts that her interest in self-defense gives her a "strong" interest that is "particularly elevated" given that she is a "former police officer who has testified against numerous violent felons." Pl. Memo, D. 29 at 23. Even separated from any general right to self-defense inherent in the Second Amendment, which for reasons already discussed are unripe at this

_____

[17]Hightower also alleges that the scheme inadequately respects her Second Amendment rights. Am. Compl., D. 3 at ¶¶ 59, 61. For the reasons discussed above, these specific allegations are unripe.

point, Hightower's specific general interest in self-defense is not insignificant. Of course, revoking Hightower's unrestricted Class A license does not completely erode her interest in self-defense, or even her more specific interest in using a gun to augment her self-defense; even with her unrestricted Class A license revoked, Hightower was and is still free to apply for a restricted Class A license, a Class B license, or a F.I.D. card. Mass. Gen. L. c. 140, § 131. Hightower's interest is thus best described as the added margin of self-defense she would receive from an unrestricted Class A license over and above the what she would receive from a restricted Class A license.

The risk of erroneous deprivation under the processes challenged by Hightower is low. Under the statutory scheme, a license to carry applicant should not receive a license if she is either categorically disqualified or is deemed unsuitable by the licensing authority. Mass. Gen. L. c. 140, § 131(d). Hightower does not identify a structural problem in the statutory scheme or administrative process at issue that would lead to systematic error; her only argument is that she herself suffered an erroneous deprivation because, as she alleges, she completed her Form G 13-S form accurately, the BPD Commissioner mistakenly concluded otherwise and this mistake could have been avoided had Hightower received a pre-deprivation hearing. Pl. Memo, D. 29 at 23-24. But whether Hightower's own completed Form G 13-S was in fact accurate is both (i) hotly disputed by the parties and thus a fact unfit for use in summary judgment and (ii) beside the point. Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) (noting that "[w]hen a procedural due process claim is advanced, the proper focus must be on the manner in which the state has acted: 'how and when' the alleged deprivation was effected. . . . Whether the deprivation (e.g., license revocation) was itself erroneous is beside the procedural due process point") (citations omitted). Given the record presently before the Court - including the fact that under the current statutory scheme, roughly 98%

of license to carry applications are granted and only 1% are denied on the basis of unsuitability, First Guida Aff., D. 35-6 at ¶ 7 - the risk of erroneously classifying a suitable applicant as unsuitable appears quite low, and it is difficult to fathom what errors of this kind a pre-revocation hearing would prevent that the written application process and course of judicial review under Mass. Gen. L. c. 140, § 131(f) would not.[18]

The government interest here, on the other hand, is high. The government interest here is preserving public safety by keeping firearms out of the hands of individuals who are not "sufficiently responsible . . . to be entrusted with a license to carry firearms," Wetherbee, 2001 WL 716915, at *7. The Supreme Court "ha[s] traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety." Mackey v. Montrym, 443 U.S. 1, 17 (1979) (affirming against a due process challenge a Massachusetts law mandating summary revocation of driver's licenses for refusing breathalyzer test, with opportunity for post-revocation hearing). The "paramount interest" of a city or state is "protecting the safety of its people," id., and it is beyond dispute that gun violence is a threat to the people of Massachusetts, particularly in Boston. From January 1, 2005 until March 1, 2011 there were 1,876 shootings in Boston alone, 301 of which were fatal homicides. Declaration of Boston Regional Intelligence Center Deputy Director / Street Violence Supervisor Clifford Goodband, D. 40-20 at 4.[19] In the first nine months of 2011, over 80% of Boston's homicides were the result of gun violence. Map of 2011 Murders in Boston,

---

[18]Hightower objects to the fact that hearsay is admissible in judicial proceedings pursuant to Mass. Gen. L. c. 140, § 131(f). But "nothing in the due process clause precludes the use of hearsay evidence in administrative proceedings." Toribio-Chavez v. Holder, 611 F.3d 57, 66 (1st Cir. 2010).

[19]These numbers appear to exclude suicides committed by shooting. See generally Goodband Decl., D. 40-20.

http://www.boston.com/news/local/massachusetts/2011_murders_in_boston/ (last visited September 29, 2011) (based on information from the BPD, the Suffolk County District Attorney's Office, and the Boston Globe). The current statutory scheme as applied by Boston, which allows the BPD Commissioner to revoke pending appeal the gun and gun license of an individual who appears to be unsuitable to handle guns - as opposed to a scheme where an individual deemed to be unsuitable would be allowed to keep their gun pending appeal - is wholly consonant with the state's paramount interest in public safety and combating gun violence.[20]

In sum, given the scope of Hightower's interest, the limited risk of erroneous deprivation under the current scheme and the strength of the relevant governmental interest, the statutory scheme allowing for the revocation of an unrestricted Class A license followed by statutorily-guaranteed judicial review of that revocation satisfies the constitutional requirement of procedural due process both on its face and as applied by the Defendants.

### 3. Claim III:  Violation of Substantive Due Process

The third claim in Hightower's complaint is titled "Unconstitutional Licensing Requirement," and asserts that "the Defendants have prevented [Hightower] from keeping and

---

[20]The parties in this case appear to be proceeding under the understanding that the Massachusetts statutory scheme requires that an individual whose license to carry is revoked or denied must surrender her license and firearm to the local licensing authority in all circumstances of revocation. The Court, accordingly, is resolving this case based on that understanding and that was certainly the case for Hightower, who did not appeal the revocation of her license. But see Mass. Gen. L. c. 140, § 129D ("Upon revocation, suspension or denial of an application for a firearm identification card . . . the person whose application was so revoked, suspended or denied shall without delay deliver or surrender, to the licensing authority where he resides, all firearms, rifles, shotguns and machine guns and ammunition which he then possesses unless an appeal is pending.") (emphasis added); Exh. C to the Hightower Decl., D. 28-4 (revocation letter) (instructing Hightower to surrender her license and firearm "in accordance with M[ass]. G[en]. L. c. 140, § 129D"). Since Hightower chose not to appeal the revocation of her unrestricted Class A license, whether immediate surrender of her firearm would have been required if she had an appeal pending pursuant to § 129D is not before the Court.

bearing handguns for the lawful purpose of self-defense" by requiring her to "maintain her Class A license at their discretion," that "[t]he statutes enforced by the Defendants are unconstitutional as written or as applied," and that "[t]he Defendants currently maintain and actively enforce a set of laws, customs, practices, and policies under the color of state law that deprive individuals, including Ms. Hightower, of their right to keep and bear arms." Am. Compl., D. 3 at ¶¶ 63-67. This claim, which initially appeared to be a general as-applied constitutional challenge to the statutory scheme that is somewhat undifferentiated from Hightower's other claims, has been treated in the various briefs filed by both Hightower and the Defendants as a substantive due process challenge to the statutory scheme as applied to Hightower, see Pl. Memo, D. 29 at 25; Def. Commonwealth's Memo, D. 36 at 17-19; Mun. Def. Memo, D. 41 at 39-40; Pl. Opp. Memo, D. 45 at 23-24, and the Court now construes it as such.

"[T]he threshold question" in analyzing a substantive due process claim "is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." González-Fuentes v. Molina, 607 F.3d 864, 880 (1st Cir. 2010), cert. denied, 131 S.Ct. 1568 (2011) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). This "test is primarily concerned with 'violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" Id. at 881 (quoting Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (ellipses in Moran). There are no allegations in Hightower's complaint, let alone any evidence in the record, that shocks the contemporary conscience; instead, the main thrust of Hightower's complaint and subsequent briefing is that the Defendants' revocation

of her unrestricted Class A license was arbitrary.  Even if Hightower is correct, though, the "denial

of [a] permit, even if arbitrary, d[oes] not constitute a substantive due process violation unless it [i]s

a 'truly horrendous situation.'"  Collins v. Nuzzo, 244 F.3d 246, 250 (1st Cir. 2001) (quoting Néstor

Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992)).  The Court concludes

that this is not the case here.

### 4.  Claim IV:  Violation of Equal Protection

Hightower's final claim is that the Defendants have violated her right to equal protection of

the laws by classifying her as "unsuitable" to possess an unrestricted Class A license, because "the

classification of some individuals as 'suitable' and others as 'unsuitable' is completely arbitrary and

irrational."  Pl. Memo, D. 29 at 27.

Although Hightower acknowledges that "[t]he Equal Protection Clause 'is essentially a

direction that all person[s] similarly situated should be treated alike,'" id. at 25 (quoting City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citation omitted)), she has neither

alleged nor shown that there is a similarly situated person or type of person who has received

treatment differently than Hightower has, nor that there is a differently situated person or type of

person who has been treated similarly to Hightower.  Instead, her only argument is that she and

(presumably) others like her have all been subjected equally to a process Hightower finds arbitrary

and unfair.  Pl. Opp. Memo, D. 45 at 18 ("[t]he correct category for Hightower is simply, 'law-

abiding Bostonian fully qualified to possess firearms.'  All people in this category should expect to

have their applications treated equally.  Yet instead, all are subjected to a classification that is

inherently arbitrary, depending upon the unbridled discretion of the licensing official"); Pl. Memo,

D. 29 at 27 ("the classification of some individuals as 'suitable' and others as 'unsuitable' is

32

completely arbitrary and irrational"). However, the equal protection clause protects against unequal treatment, not against the equal application of a statute that a plaintiff finds uncongenial or arbitrary, and, therefore, Hightower's claim fails.

Even if Hightower's fourth claim could be construed as an allegation that the "suitability" standard enshrined in Mass. Gen. L. c. 140, § 131(d) is so empty of meaning that there is no meaningful difference between "suitable" and "unsuitable" applicants for unrestricted Class A licenses, and thus applicants deemed unsuitable, like Hightower, are denied equal application of the laws when they have their licenses denied or revoked while their similarly situated "suitable" peers have their licenses granted, the claim would fail. Were Hightower to raise a challenge of this sort,[21] the statutory scheme's "suitability" standard would be subjected to rational basis review, since Hightower alleges neither that she is the member of a suspect class nor that the statutory scheme burdens any fundamental right other than her Second Amendment rights (which the Court has found unripe for review at this point). González-Droz, 2011 WL 4346673, at *4 ("the plaintiff does not allege either that he is a member of a suspect class or that the Regulation infringes a fundamental right. Consequently, we take the measure of the Regulation under rational basis review"). Under rational basis review, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." Id. (quoting Cleburne Living Ctr., 473 U.S. at 440). "The challenger has the devoir of persuasion and must negate any and all conceivable bases upon which the challenged regulation might appropriately rest. If any such ground exists to support the classification employed, the regulation must be upheld

---

[21]For this sort of claim to prevail at the summary judgment stage, Hightower would need to show (rather than merely allege) that there are in fact individuals situated similarly to Hightower who were found "suitable."

even if it is drawn from 'rational speculation unsupported by evidence or empirical data.'" Id. (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)) (internal citations removed).

The statutory scheme's "suitability" standard as applied to applicants for unrestricted Class A licenses certainly survives rational basis review. The paramount general state interest in promoting public safety extends to the state's specific interest preventing guns from falling into the hands of individuals who are deemed to be unsuitable to be entrusted with a license to carry firearms. It is rational to commit the initial suitability determination to the expertise of each locality's lead public safety officer, subject to judicial review. The Court understands Hightower's concern that the statutory guidance available to local licensing authorities as to how to apply the suitability standard is imprecise, but the statutory scheme's differentiation between license-to-carry applicants who appear suitable and those who do not is more than merely rational - it is prudent, even if the distinction itself is only raggedly drawn. Accordingly, the statutory scheme "must be upheld." González-Droz, 2011 WL 4346673, at *4.

For the aforementioned reasons, the claims in Hightower's complaint cannot be sustained and the Defendants are entitled to summary judgment.

### C. The Court Would Reach the Same Conclusion Even If Hightower's Second Amendment Claims Were Treated As Ripe

The parties have thoroughly briefed and argued the question of how, assuming Hightower's complaint included ripe Second Amendment concerns, her individual claims should be resolved. See Pl. Memo, D. 29 at 1-28; Def. Commonwealth's Memo, D. 36 at 9-20; Mun. Def.'s Memo, D. 41 at 16-35; Pl. Opp. Memo, D. 43 at 11-24; Pl. Opp. Memo, D. 45 at 1-20. Although the Court's holding on ripeness is contrary to such an assumption, "in the interest of completeness," Rosado v. Allen, 482 F.Supp.2d 94, 101 (D. Mass. 2007); Raso v. Lago, 958 F.Supp. 686, 696 (D. Mass.

34

1997), and assuming no further guidance from the First Circuit or the Supreme Court, the Court notes that the analysis of the individual claims in Hightower's complaint would change in some respects if the Second Amendment questions raised by Hightower's complaint were treated as ripe, but, for the reasons discussed briefly below, the Court would nonetheless still hold that the Defendants are entitled to summary judgment.

### 1. Claim I:  Violation of the Individual Right to Keep and Bear Arms

First, if the Second Amendment basis underlying Hightower's claims was treated as ripe, the Court's analysis of Hightower's first claim, as set forth as Section IV(B)(i) above, would change. Resolving Hightower's first claim, which is at heart a pure Second Amendment claim, would require subjecting the statutory scheme in question to some sort of "Second Amendment review" - and as the First Circuit has noted, the Supreme Court has not yet provided clear guidance to the lower courts about how to perform such review.  Booker, 644 F.3d at 23 ("[t]he full significance of [the Supreme Court's Second Amendment] pronouncements is far from self-evident.  Indeed, the Court itself acknowledged that it had not left the law 'in a state of utter certainty'") (quoting Heller, 554 U.S. at 635).

The Court gleans the following guidance from Heller, McDonald, and the First Circuit's rulings in Rene E. and Booker applying same:

First, the central component of the Second Amendment is the right to self-defense, especially the defense of hearth and home.  Rene E., 583 F.3d at 11 (citing to Heller, 554 U.S. at 599, 628); Booker, 644 F.3d at 25 n.17 (citing to Heller, 554 U.S. at 635).[22]

---

[22]See United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) (describing "self-defense in the home by a law-abiding citizen" as the Second Amendment's "fundamental, core right," and noting that "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense").

Second, the Second Amendment permits categorical prohibitions on the possession of certain types of weapons or on the possession of weapons by certain categories of people and does not necessarily require that governments limit themselves to narrower restrictions on Second Amendment rights applied on a case-by-case basis. Rene E., 583 F.3d at 12 (citing to Heller, 554 U.S. at 626-27 and n.26); Booker, 644 F.3d at 23 (citing to Heller, 554 U.S. at 626).

Third, there are some boundaries as to both what "Second Amendment review" is (and what it is not), and what it will permit (and what it will not permit). Second Amendment review is not "rational basis review" nor is it "interest balancing." Rene E., 583 F.3d at 11 n.4 (citing Heller, 554 U.S. at 628 n.27, 634-35). Whatever Second Amendment review is, it must permit both laws that flatly prohibit the carrying of concealed weapons and laws that flatly prohibit the carrying of dangerous and unusual weapons; these types of laws are "left intact" by both the Second Amendment and Heller. Rene E., 583 F.3d at 12. On the other hand, it must not permit a statute that prohibits an entire class of arms that has been overwhelmingly chosen by American society for self-defense. Id. at 11 (citing Heller, 554 U.S. at 630). It must not permit a requirement that firearms in the home be kept inoperable - for example, by requiring that guns kept in the home be stored in a disassembled state or fitted with trigger-locks - because such a requirement makes it impossible to use such guns for self-defense in the home. Booker, 644 F.3d at 22 and 22 n.12 (citing Heller, 554 U.S. at 630). The development of the content of Second Amendment review beyond these parameters is left for "future evaluation," presumably by district and circuit courts and, ultimately by the Supreme Court. Id. (citing Heller, 554 U.S. at 626, 634-35).

Fourth, the Second Amendment allows legislatures to adopt new categorical limits on Second Amendment rights, such as prohibiting misdemeanor offenders convicted of domestic violence (as

opposed to felons) from possessing guns.  Booker, 644 F.3d at 25 (citing United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010)).  A categorical ban of this sort "must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."  Id. (quoting Skoien, 614 F.3d at 641).[23]

Taken together, this guidance provides a rough but incomplete roadmap for the type of review the statutory scheme at issue in this case should be subjected to when analyzing Hightower's Second Amendment claim.

Following the guidance that this Court has been able to discern from Heller and its progeny, and in the absence of any further guidance from the Supreme Court or the First Circuit, this Court's analysis would proceed as follows.  First, the Massachusetts licensing statutory scheme does not strike at the heart of the Second Amendment:  while the difference between a restricted Class A license (which Hightower has not applied for) and an unrestricted Class A license (which Hightower has had revoked) may have some marginal impact on Hightower's ability to use a gun to defend herself outside her home, it has no impact on her ability to defend hearth and home or to defend herself at home, which she can do adequately with a restricted Class A license or Class B license.  Further, because the statutory scheme at issue here imposes only case-by-case restrictions, it creates a narrower restraint than the categorical prohibitions that, under certain circumstances, survive Second Amendment review.  Mass. Gen. L. c. 140, § 131(d).

------

[23]See Kachalsky v. Cacace, 2011 WL 3962550, at *25 (S.D.N.Y. Sept. 2, 2011) (citing Booker and the standard applied therein in support of the proposition that "[m]ost circuit courts" to have considered the question "reject a one-size-fits-all framework in favor of a variable approach whereby the level of scrutiny to be applied is determined on a case-by-case basis depending on the proximity of the right burdened by the statute at issue to the core Second Amendment right recognized in Heller") (citing also to Masciandaro, 638 F.3d at 469-71; Ezell v. City of Chicago, 2011 WL 2623511, at *13-17 (7th Cir. July 6, 2011); United States v. Reese, 627 F.3d 792, 801-02 (10th Cir. 2010)).

Because the statutory scheme at issue here is less categorical and imposes less of a burden on the right to protect oneself in one's home than, for example, the prohibition on gun ownership by domestic violence misdemeanor offenders at issue in <u>Booker</u>, it stands to reason that the scheme at issue here might be subject to a slightly less exacting standard than <u>Booker</u>'s 'strong showing' and its requirement of a "substantial relationship between the restriction and an important governmental objective." <u>Booker</u>, 644 F.3d at 25.[24]  What would be a sufficient standard below <u>Booker</u>'s "strong showing" is unclear, but at a minimum, would likely require a meaningful relationship between the restriction and a legitimate governmental objective.  This type of standard is neither rational basis review nor interest balancing, and at first blush it does not seem to compel any of the results forbidden by the Second Amendment as interpreted by <u>Heller</u>, <u>Rene E.</u> or <u>Booker</u>.

It appears that both the statutory scheme at issue and its application to Hightower would survive such review.  Assuming <u>arguendo</u> that Hightower's complaint raised a ripe Second Amendment (as the Court has concluded it has not) and that the appropriate level of analysis would resemble something like the review discussed above, the Court would acknowledge that although Hightower's Second Amendment rights are burdened by the requirement that as part of the process of applying for a unrestricted Class A license she submit herself to a "suitability" determination by the BPD Commissioner, the fact that such a determination could lead to a pre-hearing revocation of her license, and a possible further requirement that she surrender her license and firearm at least until she proceeds with the statutorily-guaranteed appeals process.  But the Court would find that the government has a legitimate interest in protecting public safety, especially in light of the

---

[24]Of course, there may be a much stronger interest in preventing gun possession by domestic violence misdemeanor offenders than in restricting the types of gun possession available to "unsuitable" individuals - but while such interest balancing carries intuitive appeal, it appears to be foreclosed as a mode of analysis by <u>Heller</u>.  <u>Heller</u>, 554 U.S. at 628 n.27.

prevalence of gun violence in Massachusetts and especially in Boston, would find further that this interest extends to an interest in removing, at least temporarily, guns from the hands of individuals initially deemed unsuitable for gun possession, and would find further still that these interests bear a meaningful relationship to the enforcement mechanism requiring local licensing authorities like the BPD Commissioner to determine whether an individual applicant appears unsuitable based on the content of her application materials, subject to judicial review.[25]

Before concluding its analysis of Hightower's first claim, the Court makes one final observation regarding the unusual context of this case, which is essentially a request by Hightower that the federal courts constrict the scope of discretion that the BPD Commissioner exercised in determining in the first instance whether a sworn BPD officer in his employ is suitable to carry a weapon to the extent permitted by an unrestricted Class A license.  Harrington Decl., D. 40-3 at ¶ 10; see also Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed G 13-S Form).  To be sure, sworn police officers have the same Second Amendment rights in the same measure as any civilian, and it is not clear to the Court how the relationship between a sworn officer and her Commissioner should affect Second Amendment analysis.[26]  But given the amount of and sensitivity of information police forces have (and must have) about the sworn officers in their employ, and

_____

[25]Because the Court is hesitant to place too much reliance on anything like the less exacting standard than Booker's "strong showing," the Court notes that it would hold that the instant scheme, both on its face and as applied, would also survive the "strong showing" analysis discussed in Booker.  Booker, 644 F.3d at 25.

[26]The Court recognizes that the plaintiff in Heller was a District of Columbia Special Police Officer, Heller, 554 U.S. at 575, but the relationship between Officer Heller and the D.C. Police Department was not an issue in Heller, which addressed only the District's blanket ban on the possession of handguns and its requirement that firearms kept in the home be kept unloaded and disassembled or bound by a trigger lock when not in use, not the individual application of the District's licensing law or the D.C. Police Department's administration thereof, either on its face or as applied to Heller.  Id. at 575, 631.

given the importance of well-run, efficient police forces to the paramount state interest of public safety, <u>Mackey</u>, 443 U.S. at 17, perhaps the federal courts ought to proceed even more deliberately when scrutinizing the discretionary determinations made by local police chiefs as to whether and under what restrictions individual police officers in their employ are suitable to carry firearms. <u>See Plummer v. Town of Somerset</u>, 601 F.Supp.2d 358, 366-67 (D. Mass. 2009) (stating, with regard to a police officer's conduct outside the workplace, that "[a] police department is a highly regimented organization that must, in the interests of morale, efficiency, and public safety, place restrictions on the constitutional rights of its rank-and-file that exceed those permitted with regard to civilian employees"); <u>see also</u> note 4 above (counsel for Municipal Defendants stating that Form G 13-S inquires about matters that are unique to police officers and bear upon the BPD Commissioner's determination of suitability).

## 2.  Claims II, II and IV:  Due Process and Equal Protection

Finally, even if the Second Amendment basis underlying Hightower's claims was treated as ripe, the Court would not significantly alter its conclusions with regard to Hightower's procedural due process, substantive due process and equal protection claims.  As to procedural due process, Hightower's interest under the first prong of the <u>Mathews</u> test, 424 U.S. at 335, would carry slightly more gravity assuming her Second Amendment rights were implicated than they would otherwise, but the difference would be marginal - the Court takes Hightower's interest in self-defense seriously regardless of whether it is seen as "constitutionalized" or "extra-constitutional," <u>see</u> Section IV.B.ii above - and the final two prongs of the Court's <u>Mathews</u> analysis, as well as the ultimate outcome of that analysis, would remain the same.  As to the substantive due process claim, the presence of a valid Second Amendment claim would preclude the Court from engaging in a substantive due

40

process analysis.  <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994) (holding that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims'") (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)).  Likewise, the Court would compress Hightower's equal protection claim into her Second Amendment claim.  <u>See</u> <u>Rosenfeld v. Egy</u>, 346 F.3d 11, 15 (1st Cir. 2003) (stating that "we see little basis or justification for applying equal protection analysis" in a situation where an equal protection claims substantially overlaps with a stronger Bill of Rights claim); <u>see also</u> <u>Néstor Colón Medina & Sucesores,</u>, 964 F.2d at 44-45 (same); <u>Nordyke v. King</u>, 644 F.3d 776, 794 (9th Cir. 2011) (rejecting an equal protection claim brought in conjunction with Second Amendment concerns by noting that "although the right to keep and bear arms is a fundamental right, that right is more appropriately analyzed under the Second Amendment") (citation omitted).

Accordingly, for the reasons discussed above, the Court would grant Defendants' motions for summary judgment even if the Second Amendment claim raised by Hightower's complaint was treated as ripe.

## V.  Conclusion

For the reasons discussed above, Hightower's motion for summary judgment is DENIED, and the Defendants' motions for summary judgment are GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

41

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**STACEY HIGHTOWER**
　　　　Plaintiff(s)

　　　　v.　　　　　　　　　　　　CIVIL ACTION NO. **08-11955-DJC**

**CITY OF BOSTON, ET AL**
　　　　Defendant(s)

## JUDGMENT IN A CIVIL CASE

CASPER, D.J.

☐　　**Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

X　　**Decision by the Court**.  In accordance with the Memorandum and Order dated September 29, 2011;.

　　**IT IS  ORDERED AND ADJUDGED**

　　Judgment for the defendants, City of Boston, Edward Davis and the Commonwealth of Massacchusetts.

　　　　　　　　　　　　　　　　Sarah A. Thornton, Clerk

Dated:　9/29/11　　　　　　　　　　　　　/s/ Lisa M. Hourihan
　　　　　　　　　　　　　　　　　　( By )  Deputy Clerk

NOTE:  The post judgment interest rate effective this date is ____%.

(judgciv.frm - 10/96)　　　　　　　　　　　　　　　　[jgm.]