# United States Court of Appeals
## for the First Circuit

No. 11-2281

———————————

STACEY HIGHTOWER,
PLAINTIFF-APPELLANT,

v.

CITY OF BOSTON, EDWARD DAVIS, BOSTON POLICE COMMISSIONER,
AND COMMONWEALTH OF MASSACHUSETTS,
DEFENDANTS-APPELLEES,

———————————

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————

# Brief of the Commonwealth of Massachusetts.

———————————

MARTHA COAKLEY
  *ATTORNEY GENERAL OF MASSACHUSETTS*

Kenneth W. Salinger, *Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, MA  02108
617.963.2075
ken.salinger@state.ma.us
First Circuit Bar No. 24380

April 11, 2012

# Table of Contents.

**Page**

Issues Presented.....................................................................1

Statement of the Case. ..........................................................2

Statement of Legal and Factual Background. .........................5

    (1)   The Massachusetts Firearms Licensing Laws. ......................5

    (2)   After Hightower's License to Carry Concealed, Large Capacity Weapons in Public Was Revoked for Submitting an Untruthful Application, She Never Sought Judicial Review of that Decision. ...............................8

    (3)   Hightower Never Applied for a Class B or restricted Class A License, Even After Resigning as a Police Officer. ........................................................ 11

Summary of Argument..........................................................12

Argument..............................................................................14

    I.   Hightower's Second Amendment Claim Is Not Ripe, and Would Have No Merit If It Were Ripe...........................14

        A.   This Case Does Not Turn on Whether the Second Amendment Applies Outside the Home..........14

        B.   The Second Amendment Claim Is Not Ripe................17

            1.   The Second Amendment Does Not Protect Carrying Concealed or Large Capacity Firearms...............................................................17

            2.   Hightower Never Sought and Was Never Denied a License to Carry an Unconcealed, Regular Capacity Firearm. ..................................20

        C.   Even If the Second Amendment Were Implicated, It Would Not Forbid the Commonwealth's Firearm Licensing Requirements. ................................26

**Page**

1.  Rules that Only Permit Responsible Persons To Carry Guns Are Not Unconstitutional "Prior Restraints." ................................................. 26

    a.  The First Amendment Prior Restraint Doctrine Does Not Apply. ......................... 26

    b.  The Suitable Person Standard Does Not Create "Unbridled Discretion." ........... 29

2.  At Most, Intermediate Scrutiny Would Apply If the Second Amendment Were Implicated. ................................................ 34

3.  The Suitable Person Standard Furthers the Strong Public Interest In Keeping Irresponsible Persons From Carrying Firearms. ................................................ 36

II.  The Post-Deprivation Judicial Review Available To Hightower Satisfies Procedural Due Process. ...................... 40

    A.  Hightower Had No Constitutional Right to a Pre-Revocation Hearing. ............................... 41

    B.  The Evidentiary Hearing Available to Hightower in State Court Was More Than Adequate. .................. 44

III.  Hightower Waived Her Substantive Due Process and Equal Protection Claims. ...................................... 47

    A.  Substantive Due Process. ........................... 48

    B.  Equal Protection ................................... 49

Conclusion. ................................................. 51

Certificate of Compliance with FRAP 32(a) ................. 52

Certificate of Filing and Service ........................ 53

Addendum

Mass. Gen. L. c. 140, § 131 ............................. Addendum 1

# Table of Authorities.

**Page**

## Cases

*Action Alliance of Senior Citizens of Greater Philadelphia*
  *v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) ..........................25

*Advocates for Arts v. Thomson*,
  532 F.2d 792 (1st Cir. 1976) ............................................26

*Ahmed v. Holder*,
  611 F.3d 90 (1st Cir. 2010) .........................................46, 47

*Amsden v. Moran*,
  904 F.2d 748 (1st Cir. 1990) ............................................43

*Asociacion de Educacion Privada de Puerto Rico, Inc.*
  *v. Garcia-Padilla*, 490 F.3d 1 (1st Cir. 2007) ...................35

*Cafeteria & Restaurant Workers v. McElroy*,
  367 U.S. 886 (1961) .......................................................40

*Camuglia v. City of Albuquerque*,
  448 F.3d 1214 (10th Cir. 2006) .......................................44

*Chief of Police of Shelburne* v. *Moyer*,
  16 Mass. App. Ct. 543, 453 N.E.2d 461 (1983).................30

*City of Cambridge v. Civil Serv. Comm'n*,
  43 Mass. App. Ct. 300, 682 N.E.2d 923,
  *rev. denied*, 426 Mass. 1102, 687 N.E.2d 642 (1997)...........30, 46

*Clark v. Jeter*,
  486 U.S. 456 (1988) .......................................................34

*Coletti v. Department of State Police*,
  64 Mass. App. Ct. 222, 832 N.E.2d 8, *rev. denied*, 445 Mass.
  1103, 835 N.E.2d 254 (2005).............................................33

*Collins v. Nuzzo*,
  244 F.3d 246 (1st Cir. 2001) ............................................49

*Commissioner of Public Safety v. Board of Firearms Permit*
  *Examiners*, 129 Conn. App. 414, 21 A.3d 847,
  cert. denied, 302 Conn. 918, 27 A.3d 369 (2011) ...............32

**Page**

*Commonwealth v. Loadholt*,
460 Mass. 723, 954 N.E.2d 1128 (2011) ...........................................28

*Commonwealth v. Powell*,
459 Mass. 572, 946 N.E.2d 114 (2011),
*cert. denied*, No. 11-6580 (2012) ........................................................5

*Cox v. New Hampshire*,
312 U.S. 569 (1941)...........................................................................28

*DeLuca v. Chief of Police of Newton*,
415 Mass. 155, 612 N.E.2d 628 (1993) .............................................33

*Dialysis Access Ctr. LLC v. RMS Lifeline, Inc.*,
638 F.3d 367 (1st Cir. 2011) .............................................................18

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................. passim

*Doe v. Bush*,
323 F.3d 133 (1st Cir. 2003) .............................................................22

*Dupont v. Chief of Police of Pepperell*,
57 Mass. App. Ct. 690, 786 N.E.2d 396 (2003)...........................37, 42

*Dwyer v. Farrell*,
193 Conn. 7, 475 A.2d 257 (1984) .....................................................36

*Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*,
386 F.3d 344 (1st Cir. 2004) .............................................................50

*Ewing v. Mytinger & Casselberry, Inc.*,
339 U.S. 594 (1950)...........................................................................43

*Fall River v. Federal Energy Regulatory Comm'n*,
507 F.3d 1 (1st Cir. 2007) .................................................................22

*Ford v. Cristadoro*,
13 Mass. L. Rptr. 102,
2001 WL 543194 (Mass. Super. Ct. 2001) .........................................38

*Gemme v. Ricciardi*,
25 Mass. L. Rptr. 65,
2008 WL 5505485 (Mass. Super. Ct. 2007) ...................................8, 45

**Page**

*Gilbert v. Homar,*
520 U.S. 924 (1997) ........................................................................ 40

*Globe Newspaper Co. v. Superior Court of Norfolk County,*
457 U.S. 596 (1982) ........................................................................ 39

*Godfrey v. Chief of Police of Wellesley,*
35 Mass. App. Ct. 42, 616 N.E.2d 485 (1993) .................... 8, 33, 45, 46

*González-Droz v. González-Colón,*
660 F.3d 1 (1st Cir. 2011) .......................................................... passim

*Gun Owner's Action League, Inc. v. Swift,*
284 F.3d 198 (1st Cir.),
*cert. denied,* 537 U.S. 827 (2002) ...................................................... 25

*Hasenfus v. LaJeunesse,*
175 F.3d 68 (1st Cir. 1999) ............................................................. 48

*Heller v. District of Columbia,*
698 F.Supp.2d 179 (D.D.C. 2010), *aff'd on other grounds,*
2011 WL 4551558 (D.C. Cir. 2011) ("*Heller II*") ................... 20, 34, 35

*Hercules Chemical Co. v. Department of Envtl. Prot.,*
76 Mass. App. Ct. 639 925 N.E.2d 53 (2010) .............................. 30, 46

*Hodel v. Virginia Surface Min. and Reclamation Ass'n, Inc.,*
452 U.S. 264 (1981) .................................................................... 41, 43

*Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.,*
455 U.S. 489, 494 n.5 (1982) ........................................................... 29

*Howard v. Chief of Police of Wakefield,*
59 Mass. App. Ct. 901, 794 N.E.2d 604 (2003) ....................... 7, 29, 30

*In re Barach,*
540 F.3d 82 (1st Cir. 2008) ............................................................. 45

*In re FBI Distribution Corp.,*
330 F.3d 36 (1st Cir. 2003) ............................................................. 48

*Johnson v. Robison,*
415 U.S. 361 (1974) ........................................................................ 51

*Kachalsky v. Cacace,*
2011 WL 3962550 (S.D.N.Y. 2011) ................................................. 28

**Page**

*Kuck v. Danaher,*
2011 WL 4537976 (D.Conn. 2011) ("*Kuck II*") ................ 31, 32, 37, 39

*Kuck v. Danaher,*
600 F.3d 159 (2d Cir. 2010) ("*Kuck I*") ........................ 36, 42

*Kuperman v. Wrenn,*
645 F.3d 69 (1st Cir. 2011) ........................................ 49, 50

*Lavine v. Milne,*
424 U.S. 577 (1976) ................................................. 47

*Lizotte v. Chief of Police of Fitchburg,*
2006 WL 1075596 (Mass. Super. Ct. 2006) ................................ 30, 46

*Locke v. Davey,*
540 U.S. 712 (2004) ................................................. 50

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
485 U.S. 439 (1988) ................................................. 15

*MacDonald, Sommer & Frates v. Yolo County,*
477 U.S. 340 (1986) ................................................. 22

*Mackey v. Montrym,*
443 U.S. 1 (1979) ............................................... 41, 42, 44

*MacNutt v. Police Comm'r of Boston,*
30 Mass. App. Ct. 632, 572 N.E.2d 577,
*rev. denied*, 410 Mass. 1104, 577 N.E.2d 309 (1991) .................. 37, 51

*Martinez v. Cui,*
608 F.3d 54 (1st Cir. 2010) ............................................. 48

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ................................................. 41

*McCoy v. Massachusetts Inst. of Tech.,*
950 F.2d 13 (1st Cir. 1991) ............................................. 19

*McCullen v. Coakley,*
571 F.3d 167 (1st Cir. 2009) ........................................ 28, 36

*McDonald v. City of Chicago, Illinois,*
130 S.Ct. 3020 (2010) ................................... 16, 18, 27, 39

**Page**

*McGuire v. Reilly,*
   260 F.3d 36 (1st Cir. 2001) ............................................... 50

*Morrissey v. Brewer,*
   408 U.S. 471 (1972) .......................................................... 40

*New England Regional Council of Carpenters* v. *Kinton,*
   284 F.3d 9 (1st Cir. 2002) ................................................. 29

*Nordyke v. King,*
   644 F.3d 776, *reh'g en banc*
   *granted,* 664 F.3d 774 (9th Cir. 2011) ............................... 50

*Overseas Military Sales Corp. Ltd. v. Giralt-Armada,*
   503 F.3d 12 (1st Cir. 2007) ............................................... 24

*Pagán v. Calderón,*
   448 F.3d 16 (1st Cir. 2006) ............................................... 48

*Penn Central Transportation Co. v. New York City,*
   438 U.S. 104 (1978) .......................................................... 22

*Piszczatoski v. Filko,*
   2012 WL 104917 (D.N.J. 2012) ........................................ 28

*Police Comm'r of Boston v. Robinson,*
   47 Mass. App. Ct. 767, 716 N.E.2d 652 (1999) ................. 37

*Police Department of Chicago v. Mosley,*
   408 U.S. 92 (1972) ............................................................ 26

*Ramos v. Patnaude,*
   640 F.3d 485 (1st Cir. 2011) ............................................. 47

*Renne v. Geary,*
   501 U.S. 312 (1991) .......................................................... 25

*Richards v. County of Yolo,*
   2011 WL 1885641 (E.D.Cal. 2011) ................................... 28

*Robertson v. Baldwin,*
   165 U.S. 275 (1897) .......................................................... 19

*Roddy v. Leominster Dist. Ct.,*
   15 Mass. L. Rptr. 658, 2003 WL 734431 (Mass. Super. Ct. 2003),
   *aff'd,* 64 Mass. App. Ct. 1111, 835 N.E.2d 324 (2005) ...... 39

**Page**

*Rosenfeld v. Egy,*
346 F.3d 11 (1st Cir. 2003) .................................................. 34, 48, 50

*Ruggiero v. Police Comm'r of Boston,*
18 Mass. App. Ct. 256, 464 N.E.2d 104 (1984) ....................... 6, 30, 37

*Schaffer ex rel. Schaffer v. Weast,*
546 U.S. 49 (2005) ................................................................ 47

*Smith's Appeal from County Commissioners,*
65 Conn. 135, 31 A. 529 (1894) ............................................ 32

*Sony BMG Music Entertainment v. Tenenbaum,*
660 F.3d 487 (1st Cir. 2011) ................................................ 15

*Spinelli v. City of New York,*
579 F.3d 160 (2d Cir. 2009) ................................................. 42

*Stavis v. Carney,*
12 Mass. L. Rptr. 3,
2000 WL 1170090 (Mass. Super. Ct. 2000) ........................... 30

*Sullivan v. City of Augusta,*
511 F.3d 16 (1st Cir. 2007) .................................................. 28

*Tapalian v. Tusino,*
377 F.3d 1 (1st Cir. 2004) ................................................... 49

*Texas v. United States,*
523 U.S. 296 (1998) ............................................................. 22

*The Florida Star v. B.J.F.,*
491 U.S. 524 (1989) ............................................................. 39

*Thomas v. Chicago Park Dist.,*
534 U.S. 316 (2002) ....................................................... 30, 33

*Turner Broadcasting System, Inc. v. Federal Communications*
*Comm'n,* 520 U.S. 180 (1997) ............................................. 36

*United States v. $250,000 In U.S. Currency,*
808 F.2d 895 (1st Cir. 1987) ................................................ 47

*United States v. Barton,*
633 F.3d 168 (3d Cir. 2011) ................................................. 27

**Page**

*United States v. Bena,*
  664 F.3d 1180 (8th Cir. 2011) ..................................................... 26, 27

*United States v. Booker,*
  644 F.3d 12 (1st Cir.),
  *cert. petition filed*, No. 11-6765 (2011)............................. 34, 35, 38, 39

*United States v. Fincher,*
  538 F.3d 868 (8th Cir. 2008),
  *cert. denied*, 129 S.Ct. 1369 (2009) .................................................... 20

*United States v. Lanier,*
  520 U.S. 259 (1997) .......................................................................... 49

*United States v. Mahin,*
  668 F.3d 119 (4th Cir. 2012) ...................................................... 15, 34

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ......................................................... 35, 38

*United States v. Masciandaro,*
  638 F.3d 458 (4th Cir.),
  *cert. denied*, 132 S.Ct. 756 (2011) ................................... 15, 16, 17, 35

*United States v. Miller,*
  307 U.S. 174 (1939) .......................................................................... 19

*United States v. Parcel of Property,*
  337 F.3d 225 (2d Cir. 2003) ............................................................. 47

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010),
  *cert denied*, 131 S.Ct. 2476 (2011) .................................................... 34

*United States v. Rehlander,*
  666 F.3d 45 (1st Cir. 2012) .............................................................. 44

*United States v. Rene E.,*
  583 F.3d 8 (1st Cir. 2009),
  *cert. denied*, 130 S.Ct. 1109 (2010) ....................................... 18, 27, 28

*United States v. Salerno,*
  481 U.S. 739 (1987) .......................................................................... 27

**Page**

*United States v. Skoien*,
 614 F.3d 638 (7th Cir. 2010),
 *cert. denied*, 131 S.Ct. 1674 (2011) .................................................... 34

*United States v. Southern Union Co.*,
 630 F.3d 17 (1st Cir. 2010) ............................................................ 19

*United States v. Vongxay*,
 594 F.3d 1111 (9th Cir. 2010) ........................................................ 27

*United States v. Yancey*,
 621 F.3d 681 (7th Cir. 2010) .......................................................... 27

*Wall v. King*,
 206 F.2d 878 (1st Cir.), *cert. denied*, 349 U.S. 915 (1953) ................ 41

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ...................................................................... 36

*Wetherbee v. Costerus*,
 13 Mass. L. Rptr. 159,
 2001 WL 716915 (Mass. Super. Ct. 2001) ........................ 7, 29, 33, 42

*Wirzburger v. Galvin*,
 412 F.3d 271 (1st Cir. 2005), *cert. denied*, 546 U.S. 1150 (2006)...... 51

**Statutes**

18 U.S.C. § 922 .......................................................................... 44

Conn. Gen. Stat. § 29–28(b) ....................................................... 31

Conn. Gen. Stat. § 29–32b(b) ..................................................... 32

Mass. Gen. L. c. 140, § 121......................................................... 5

Mass. Gen. L. c. 140, § 129B ...................................................... 5

Mass. Gen. L. c. 140, § 129C ...................................................... 9

Mass. Gen. L. c. 140, § 131......................................................... passim

Mass. Gen. L. c. 140, § 131F ...................................................... 6

Mass. Gen. L. c. 140, § 131H...................................................... 6

Mass. Gen. L. c. 249, § 4............................................................ 8

Mass. Gen. L. c. 269, § 10.......................................................... 5

<u>**Page**</u>

**Rules**

District Court/Boston Municipal Court Joint Standing Order 2-04 .. 8, 45

Mass. R. App. P. 4 ................................................................... 8

**Other Authorities**

Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law &
  Contemp. Probs. 143 (1986) ............................................ 27

Saul Cornell, "Don't Know much About History": The Current
  Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657
  (2002) .......................................................................... 27

## Issues Presented.

The Boston Police Commissioner revoked Stacey Hightower's unrestricted license to carry concealed, large capacity firearms in public after finding that she lied on her renewal application while she was a Boston police officer and thus was no longer a suitable person to carry such weapons. Hightower did not seek judicial review and thus never challenged the finding of unsuitability. Nor did she reapply for a more restricted license, limited to weapons potentially covered by the Second Amendment to the United States Constitution, after she resigned from the police department.  Hightower's appeal raises these issues:

1. With respect to Hightower's Second Amendment claim—that the Massachusetts statute providing that only "suitable persons" may be licensed to carry firearms in public is unconstitutional on its face—were Defendants entitled to summary judgment because:

- ° this claim was not ripe, where the revoked license granted broad rights not protected by the Second Amendment and Hightower could have but never sought a narrower license; and

- ° if this claim were ripe, and assuming that the Second Amendment applies outside the home, the state law limiting firearms licenses to suitable persons who are sufficiently responsible to be entrusted with carrying a firearm would not violate the Second Amendment?

2. Were Hightower's procedural due process rights satisfied by the opportunity to seek judicial review in state court immediately after her license was revoked, even though Hightower chose not to do so?

3. Did Hightower waive her substantive due process and equal protection claims by not pressing them on appeal?

## Statement of the Case.

Boston Police Commissioner Edward Davis revoked Hightower's unrestricted Class A license to carry concealed, large-capacity firearms in public in August 2008.[1] The Commissioner did so because he found that Hightower had "completed the application form untruthfully" by asserting that there were no complaints or charges pending against her when in fact Hightower was still contesting Internal Affairs findings, in connection with an investigation into the beating of an arrestee, that she had committed several violations of police department rules.[2]

Hightower had a statutory right to challenge the Commissioner's decision to revoke her license in state court,[3] and could have done so immediately, but Hightower opted never to seek such judicial review.[4]

Instead, in November 2008 Hightower filed this action in the United States District Court seeking declaratory and injunctive relief against the City of Boston and Commissioner Davis in his official capacity.[5] Hightower asserted various claims under the Second and Fourteenth Amendments to the United States Constitution, including that the Massachusetts firearms licensing statutes are unconstitutional on their face and that the revocation of Hightower's license violated the requirements of procedural due process.[6]

---

[1]    Joint Appendix ("A.") 45 (¶ 23) (Hightower Decl.), A.81 (¶ 27) (Hightower's statement of facts).

[2]    A.112-13 (revocation notice), A.145-146 (Fong Aff.), A.158-172 (Hightower Dep.); 214-215 (IAD findings).

[3]    Mass. Gen. L. c. 140, § 131(f).

[4]    A.106 (Hightower Dep.), 121 (¶ 5).

[5]    A.3 (docket), 11-23 (complaint).

[6]    A.19-22.

Hightower moved for summary judgment in January 2011, claiming that: (1) on its face, the "suitable person" requirement in the Massachusetts firearms licensing statutes violates the Second Amendment; (2) the City's revocation of Hightower's license violated procedural due process requirements; (3) the revocation violated substantive due process; and (4) the "suitable person" requirement also violates the Equal Protection Clause of the Fourteenth Amendment, again on its face.[7] Hightower conceded that she has no constitutional right to carry a concealed weapon,[8] and asserted that she was not claiming any right to carry large-capacity firearms.[9] Nonetheless, the relief sought by Hightower was the return or restoration of her unrestricted Class A license,[10] which would allow her to carry concealed, large-capacity handguns, rifles, and shotguns in public.[11]

The Commonwealth intervened to defend the constitutionality of Mass. Gen. L. c. 140, § 131.[12] The Commonwealth and the Boston defendants filed separate cross-motions for summary judgment.[13]

The district court (Casper, J.) granted Defendants' motions for summary judgment, denied Hightower's motion, and entered final judgment for the Defendants.[14] The court held that Hightower's Second

---

[7]  A.6, 33-34, 48, 59-74.

[8]  A.61-63 (Hightower's initial S.J. Memo); A.234 (Opp. to City's S.J. Motion); A.307 (Opp. to Commonwealth's S.J. Motion).

[9]  Hightower's Addendum 29 (district court order); *accord* A.235 n.3 (Opp. to City's Motion); A.299 (Opp. to Commonwealth's Motion).

[10]  A.22 (complaint, prayer for relief), 74 (Hightower's S.J. Memo).

[11]  A.13, ¶ 15 (complaint); Mass. Gen. L. c. 140, § 131(a).

[12]  A.7; docket no. 32.

[13]  A.7-8.

[14]  A.9; Hightower's Addendum 11-52 (district court order).

Amendment claim is not ripe because Hightower's unrestricted Class A license conveyed rights to carry concealed, large-capacity weapons that are not protected by the Second Amendment, and Hightower failed to show it would be futile to apply for a narrower license that would allow Hightower to carry a regular-capacity firearm in public, either concealed or unconcealed.[15] It rejected Hightower's procedural due process claim, holding that Hightower's statutory right to seek post-revocation judicial review satisfied due process.[16] The court rejected Hightower's substantive due process claim as well, because the revocation of Hightower's firearms license does not shock the conscience.[17] And it held that the statutory "suitable person" standard is subject to and passes rational basis review under the Equal Protection Clause.[18]

The district court further held that the result would not change even if Hightower's Second Amendment claim were ripe. It held that the "suitable person" requirement has a substantial relationship to the Commonwealth's legitimate interest in protecting public safety by ensuring that only law-abiding, responsible citizens are allowed to bear arms, and thus would pass muster under the Second Amendment.[19] It also held that the post-deprivation judicial review that was available to Hightower would still satisfy procedural due process, that "a valid Second Amendment claim would preclude the Court from engaging in a substantive due process analysis," and that "the Court would compress

---

[15] Hightower's Addendum 27-34 (district court order).

[16] *Id*. 25-40.

[17] *Id*. 40-42.

[18] *Id*. 42-44.

[19] *Id*. 15, 20, 39, 45-50.

Hightower's equal protection claim into her Second Amendment claim."[20]

## Statement of Legal and Factual Background.

### (1) The Massachusetts Firearms Licensing Laws.

Massachusetts law establishes two categories of licenses to carry firearms in public. *See* Mass. Gen. L. c. 140, § 131(a) and (b). Unrestricted Class A licenses are much broader than Class B licenses. Holders of either license may possess and carry "firearms" (a defined term that includes handguns but not rifles or shotguns), "rifles," or "shotguns" in their home or in public.[21] *Id*. But the holder of a Class A license may (1) "carry or possess a loaded firearm in a *concealed* manner in any public place or way," or (2) obtain, possess, or carry any "*large capacity*" firearm; in contrast, a Class B licensee may not. *Id*. (emphasis added). "Large capacity" means a semi-automatic weapon that can hold, or that can accept a device capable of holding, more than ten rounds of ammunition or more than five shotgun shells. *Id*., § 121. Thus, a Class B license is sufficient to keep a regular capacity firearm, rifle, or shotgun in one's home or to carry it openly in public.[22]

---

[20] *Id*. 50-51.

[21] "Firearms" can discharge a bullet and have a barrel less than 16 inches, or can discharge shot and have a barrel less than 18 inches. A "rifle" has a rifled bore and a barrel length of at least 16 inches. A "shotgun" has a smooth bore, a barrel length of at least 18 inches, and an overall length of at least 26 inches. *See* Mass. Gen. L. c. 140, § 121.

[22] Massachusetts law also provides for a Firearm Identification Card. *See* Mass. Gen. L. c. 140, § 129B. An FID card allows the holder to possess a covered weapon "within the holder's residence or place of business, but not to carry it to or in any other place." *Commonwealth v. Powell*, 459 Mass. 572, 587-88, 946 N.E.2d 114, 127 (2011), *cert. denied*, No. 11-6580 (2012); *accord* Mass. Gen. L. c. 269, § 10(a).

Subject to several disqualifications not applicable here,[23] "[a]ny person residing or having a place of business" in Massachusetts may apply for a Class A or Class B license to their local police chief or the State Police colonel. *Id*. § 131(d).[24] Under either license, "the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper." *Id*. § 131(a) and (b). The licensing authority may also "limit any license granted under § 131 to a specified purpose." *Ruggiero v. Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 260, 464 N.E.2d 104, 107 (1984)).

A police chief may issue a license "if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason" to carry firearms.[25] *Id*. A "suitable person" is a person who is "sufficiently responsible ... to be entrusted with a license to carry firearms." *Wetherbee v. Costerus*, 13 Mass. L. Rptr. 159, 2001 WL

---

[23] The statutory scheme disqualifies certain categories of persons from obtaining a firearm license, including but not limited to persons: (i) convicted of a felony, a misdemeanor punishable by imprisonment for more than two years, or a violent crime; (ii) who have been hospitalized for mental illness and are still disabled by it; (iii) who have been treated or confined for drug addiction or habitual drunkenness, and are not yet cured; (iv) less than 21 years of age; (v) who are aliens; or (vi) currently the subject of an abuse prevention restraining order or an outstanding arrest warrant. *See* Mass. Gen. L. c. 140, § 131(d). Non-citizens may obtain a license to possess and carry a non-large capacity rifle or shotgun, but not a handgun. Mass. Gen. L. c. 140, § 131H.

[24] Nonresidents may apply for a renewable one-year Class A or Class B license to the Firearms Records Bureau, which has been authorized by the State Police colonel to issue such licenses in accord with Mass. Gen. L. c. 140, § 131F.

[25] The "good reason" provision is not at issue in this case. Hightower challenges only the "suitable person" requirement.

716915, *7 (Mass. Super. Ct. 2001); *accord Howard v. Chief of Police of Wakefield*, 59 Mass. App. Ct. 901, 901, 794 N.E.2d 604, 606 (2003).

The overwhelming majority of applications for licenses to carry are approved in Massachusetts.  During the three-year period ending December 31, 2010, there were 90,865 Class A and Class B licenses issued in the Commonwealth, and only 1900 license-to-carry applications (or two percent of the total) were denied.[26]  Half of those denials were due to a determination by the licensing authority that the applicant was not a suitable person; the others were because the applicant was categorically disqualified by statute.[27]

"A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license."  Mass. Gen. L. c. 140, § 131(f).  If a license holder becomes disqualified, the license must be revoked or suspended.  *Id.*

If a license is denied, revoked, or suspended, the applicant or license holder must be told the reasons why in writing.  Within 40 days of filing an application, the licensing authority must "approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing."  Mass. Gen. L. c. 140, § 131(e).  Similarly, "[a]ny revocation or suspension of a license shall be in writing and shall state the reasons therefor."  *Id.* § 131(f).

A license applicant or holder may "file a petition to obtain judicial review" in Massachusetts district court within "90 days after receiving notice of such denial, revocation or suspension."  Mass. Gen. L. c. 140, § 131(f).  The court may order that the license be issued or reinstated if,

---

[26]  Joint Appendix ("A.") 119 (¶ 7) (Guida Aff.).

[27]  *Id.*

- 7 -

"after a hearing," it "finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same." *Id.* "[T]he statute contemplates an evidentiary hearing" in the district court. *Godfrey v. Chief of Police of Wellesley*, 35 Mass. App. Ct. 42, 44-45, 616 N.E.2d 485, 487 (1993); *accord Gemme v. Ricciardi*, 25 Mass. L. Rptr. 65, 2008 WL 5505485, *3 (Mass. Super. Ct. 2007) (current version of statute). And the district court rules provide that a final decision must be made within four months after the applicant or licensee seeks judicial review. *See* District Court/Boston Municipal Court Joint Standing Order 2-04.

A party may seek further review of the state district court's decision in Massachusetts Superior Court, in an action in the nature of certiorari under Mass. Gen. L. c. 249, § 4. *Godfrey*, 35 Mass. App. Ct. at 46, 616 N.E.2d at 487. The Superior Court's final decision may be appealed as of right. *See* Mass. R. App. P. 4.

**(2)      After Hightower's License to Carry Concealed, Large Capacity Weapons in Public Was Revoked for Submitting an Untruthful Application, She Never Sought Judicial Review of that Decision.**

This lawsuit arises from the revocation of Hightower's unrestricted "Class A License to carry concealed, large capacity firearms."[28] Hightower applied to the Boston Police Commissioner to renew her license on July 9, 2008.[29] She did not seek a Class B license, a restricted Class A license that would not cover concealed or large capacity weapons, or a firearm identification card.[30]

---

[28]  A.13 (¶ 15) (complaint), 121 (¶ 1).
[29]  A.91-92, 96-98, 114-117, 121 (¶ 2).
[30]  A.101, 114-117, 121 (¶ 3).

Hightower had been a Boston police officer for ten years.[31]  Police officers do not need a license to carry a firearm, rifle, or shotgun "in the performance of their official duty or when duly authorized to possess them." Mass. Gen. L. c. 140, § 129C(o). But Hightower's Class A license allowed her to carry a personal weapon when she was off duty and, until revoked, allowed her to do so after she had resigned from the police department.

Sworn officers of the Boston Police Department who seek a license to carry a personal firearm (as distinguished from any department-issued firearm) must complete a "License to Carry Firearms Worksheet—BPD Sworn Only," also known as a G 13-S Form.[32]  The form requires sworn police officers to provide additional information not required from civilians.[33]  The form is reviewed by the Internal Affairs Division.[34] The Police Commissioner or his designee may approve the license with or without restrictions, or deny the license.[35]

One question on the form is "Are There Any Complaints Or Charges Pending Against You?"[36]  Hightower answered "No."[37] Based on the information submitted by Hightower, her application to renew her Class A license was approved.[38] On July 31, 2008, Hightower submitted notice that she was resigning from the Boston Police

---

[31]  A.12 (¶ 10), 42 (¶ 3), 77 (¶ 3).

[32]  A.35 (Hightower's completed G 13-S form), 44 (¶ 17) (Hightower Decl.), 141 (¶ 10) (Harrington Decl.), 178 (Hightower Dep.).

[33]  *Id.*

[34]  A.35 (Hightower's G 13-S form), 44 (¶ 20) (Hightower Decl.).

[35]  A.35 (Hightower's G 13-S form).

[36]  A.44 (¶ 18), 79 (¶ 19), 110-111.

[37]  *Id.*

[38]  A.26 (¶ 16), 79 (¶ 17).

Department effective August 15, 2008.[39] On August 18, 2008, Commissioner Davis determined that Hightower's resignation had been "presented with charges pending" against her.[40]

Two days later, the Commissioner revoked Hightower's license because she "completed the application form untruthfully" by stating that no charges were pending against her when in fact she was awaiting a hearing on disciplinary charges.[41] Hightower was aware when she completed this form that Internal Affairs investigators had found Hightower to be in violation of various police department rules, including not being truthful during an investigation into whether an arrestee had been punched in the face by another police officer.[42] Hightower was also aware that those charges had not yet been resolved, that she appealed these findings through her union representative, and that the appeal was still pending.[43]

Hightower never appealed the license revocation order.[44] Hightower says she received the revocation notice "[o]n or about August 20, 2008."[45] The limitations period for Hightower to seek judicial review expired 90 days later. *See* Mass. Gen. L. c. 140, § 131(f). Hightower filed this lawsuit on November 24, 2008, which was 96 days

---

[39] A.45 (¶ 22), 81 (¶ 24).

[40] A.45 (¶ 25) (Hightower Decl.), 81 (¶ 29) (Hightower's statement of facts), 108-109 (Boston Police Commissioner's personnel order).

[41] A.45 (¶ 23) (Hightower Decl.), 81 (¶ 27) (Hightower's statement of facts), 112-13 (revocation notice), 121 (¶ 4).

[42] A.158-162 (Hightower Dep.); 214-215 (IAD findings).

[43] A.145-146 (Fong Aff.), 163-172 (Hightower Dep.).

[44] A.106 (Hightower Dep.), 121 (¶ 5).

[45] A.45 (¶ 23) (Hightower Decl.), 121 (¶ 6).

after her license was revoked and thus after the limitations period for asserting any claim under § 131.[46]

### (3)    Hightower Never Applied for a Class B or restricted Class A License, Even After Resigning as a Police Officer.

Since resigning in August 2008, Hightower has not applied as a civilian for any kind of license to carry, including a Class B license or a Class A license restricted to non-large capacity firearms.[47]   Before her license was revoked, Hightower had owned and carried a five-shot, .38 caliber revolver.[48]

At her deposition, Hightower testified that she was only interested in obtaining an unrestricted Class A license, and for that reason never sought a more restrictive license even though she believes she may be able to obtain one.[49]   Hightower explained that she "would like to have my gun license and be able to carry it concealed," which is why she has not sought anything other than a "Class A unrestricted license."[50]

---

[46]   A.3 (docket sheet).

[47]   A.102, 106 (Hightower Dep.), 121 (¶ 7).

[48]   A.182, 207.

[49]   A.103-104.

[50]   Hightower testified as follows at her deposition (*see* A.103-104):
    "Q. So you believe that because they revoked your license you'll be denied if you reapply?
    A. It's not my belief that I would be necessarily denied to car[ry] a firearm.  It's my belief I would be denied a Class A.
    Q. Class A, unrestricted license to carry a concealed—
    A. That's right.
    Q. You don't want your gun license if you can't carry it concealed?
    A. That's not necessarily true.
    Q. Okay.
    A. I would like to have my gun license and be able to carry it concealed.  ... I've lived a very dangerous life and I've arrested some

Hightower took a different tack when arguing the cross-motions for summary judgment, however. Hightower argued "that all she wants to be able to do is carry her .38 caliber revolver, a regular-capacity firearm, either concealed or unconcealed, for self-defense purposes."[51]

But it is undisputed that Hightower "has never sought and has never been denied a narrower license, such as a restricted Class A license or a Class B license, that would allow her to do so."[52] The City pointed out that Hightower "could have applied for a Class B license in order to possess her personal five-round revolver because it does not qualify as a large capacity firearm under the Massachusetts firearm statute."[53] Hightower conceded this point in her response.[54]

### Summary of Argument.

I.A.    The Court can and should resolve Hightower's Second Amendment claim without deciding whether the Second Amendment applies outside the home.  *See* pages 14-17, below.

---

dangerous people, and I would feel a lot more comfortable if I could have a Class A unrestricted license."

[51] Hightower's Addendum 29 (district court order); *accord* A.299 (Hightower's Opp. to Commonwealth's S.J. Motion) (stating that "Hightower wants a permit that would allow her to carry a handgun—the one she had seized from her—for self-defense").

[52] Hightower's Addendum 29 (district court order); *accord* A.102, 106 (Hightower Dep.), 142 (Harrington Decl.).

[53] City's S.J. Memorandum (doc. no. 41) at 22 n.17.

[54] *See* A.235 n.3 (Hightower's Opp. to City's S.J. Motion) (stating that "Hightower's complaint seeks only the return of and right to carry her Class B revolver.  This litigation is unrelated to any Class A handguns."); *see also* A.298-301 (Hightower's Opp. to Commonwealth's S.J. Motion).

I.B. Hightower's Second Amendment claim is not ripe. The City of Boston revoked Hightower's unrestricted Class A license, which allowed her to carry a concealed, large capacity weapon in public. But the Second Amendment does not give Hightower any such right. Indeed, Hightower conceded below that she has no constitutional right to carry a concealed weapon, and she has waived any claim that the Second Amendment applies to large-capacity firearms. Pages 17-20. Hightower's claim that she was unlawfully barred from carrying a non-large capacity firearm openly outside her home is not yet ripe because Hightower never sought a more limited license to do only that. Pages 20-26.

I.C. Hightower's Second Amendment claim would fail even if it were ripe and even assuming the Second Amendment applies outside the home. Hightower's analogy to First Amendment "prior restraint" doctrine is misplaced. Pages 26-33. In any case, the statutory requirement that only "suitable persons" be licensed to carry firearms, after an individualized evaluation of suitability, would not be an unlawful prior restraint because it does not permit arbitrary license denial or revocation. Pages 29-34. If the Second Amendment were implicated, the Massachusetts licensing law would be subject at most to intermediate scrutiny of whether the "suitable person" requirement has a substantial relation to an important governmental objective. Pages 34-36. The challenged statute would pass muster because protecting public safety by keeping guns from irresponsible people is an important governmental objective, and the "suitable person" standard is substantially related to that significant public interest. Pages 36-40.

II. Hightower's procedural due process claim fares no better. Given the Commonwealth's paramount interest in protecting public

safety by keeping firearms from irresponsible people, due process is satisfied by the statutory right to seek judicial review immediately after a license to carry is revoked or suspended. Hightower's insistence that the revocation of her license was a mistake is not relevant to whether the post-deprivation process provided by statute was sufficient. Pages 40-44. The procedures for post-revocation judicial review available to Hightower satisfied the requirements of due process, even though Hightower chose not to use them. Pages 44-47.

III. Hightower waived her substantive due process and equal protection claims. Her brief mentions them in passing, but does not provide any developed argumentation regarding either of these claims. Page 47. In any case, Hightower's substantive due process claim fails because the revocation of her license does not shock the conscience (pages 48-49), and her equal protection claim fails both because Hightower could not show that a similarly situated person was allowed to keep her license and because the "suitable person" standard is subject to, and easily passes, rational basis review under the Equal Protection Clause (pages 49-51).

### Argument.

I.  HIGHTOWER'S SECOND AMENDMENT CLAIM IS NOT RIPE, AND WOULD HAVE NO MERIT IF IT WERE RIPE.

### A.   This Case Does Not Turn on Whether the Second Amendment Applies Outside the Home.

Although Hightower devotes much of her brief to her argument that the Court should extend the Supreme Court's new Second Amendment jurisprudence into public spaces outside the home, *see* Hightower's Br. 24-45, the Court need not address that question in

order to resolve this case. Hightower's Second Amendment claim would not be ripe, and in any case would fail on the merits, whether or not Hightower has some sort of constitutional right to carry a gun in public. *See* pages 17-40, below.

The Court therefore can and should resolve Hightower's appeal without deciding whether the Second Amendment to the United States Constitution applies to the carrying of firearms in public. *See United States v. Mahin*, 668 F.3d 119, 123-124 (4th Cir. 2012). "It is bedrock that the 'long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" *Sony BMG Music Entertainment v. Tenenbaum*, 660 F.3d 487, 511 (1st Cir. 2011) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)).

Although the Supreme Court has held that the Second Amendment forbids statutes that bar responsible, trustworthy citizens from keeping an operable handgun anywhere in their home for self-defense, the Court has not recognized any constitutional right to carry a weapon outside the home. *See United States v. Masciandaro*, 638 F.3d 458, 467, 474-476 (4th Cir.), *cert. denied*, 132 S.Ct. 756 (2011).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court held that a total "ban on handgun possession in the home violates the Second Amendment, as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. It ordered the District to allow Heller "to register his handgun and [to] issue him a license to carry it in the home."[55] *Id.*

---

[55] Although the Court construed the Second Amendment's use of the verb to "bear" arms as referring to a right to "carry" arms whether or

In *McDonald v. City of Chicago, Illinois*, 130 S.Ct. 3020 (2010), the Court extended *Heller* to the States. A four-member plurality ruled that the "right to possess a handgun in the home for the purpose of self-defense" is "fundamental from an American perspective" and thus is incorporated into the Due Process Clause of the Fourteenth Amendment. *Id*. at 3050 (plurality). The justice casting the deciding vote concluded that the right recognized in *Heller* "is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause." *Id*. at 3059 (Thomas, J., concurring). *McDonald*, like *Heller*, concerned a local ordinance that barred anyone from keeping a handgun in their home. *Id*. at 3026-27.

The Supreme Court has stressed that "'the need for defense of self, family, and property is most acute' in the home," *McDonald*, 130 S.Ct. at 3036 (majority) (quoting *Heller*, 554 U.S. at 628), and held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. "[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Masciandaro*, 638 F.3d at 470. The Court should hesitate to extend *Heller* and *McDonald* in the manner suggested by Hightower. As the Fourth Circuit warns:

---

not one is part of an organized militia, *Heller*, 554 U.S. at 584, the issue in that case was whether Heller had a constitutionally-protected "right to render a firearm operable and carry it about his home," *id*. at 576. Contrary to Hightower's assertion, the Court's interpretation of the verb to "bear" did not resolve whether the Second Amendment protects any rights outside one's home. *See* Hightower's Br. 17, 30-31.

> This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.

*Id.* at 475-476.

As shown below, however, Hightower's Second Amendment claim is not ripe, and would fail as a matter of law if it were, even assuming that some right to bear arms applies outside the home.

### B.  The Second Amendment Claim Is Not Ripe.

#### 1.  The Second Amendment Does Not Protect Carrying Concealed or Large Capacity Firearms.

Hightower does not contest the district court's holdings that Hightower has no Second Amendment right to carry either concealed weapons or guns capable of holding more than ten rounds of ammunition.[56]  Hightower conceded below, and again in her appellate brief, that she has no constitutional right to carry a concealed weapon.[57] Although she argued below that the Second Amendment applies to large-capacity weapons, while contending that the issue was irrelevant because all she wants is a permit that would allow her to carry a five-shot revolver, Hightower does not press this point on appeal; she again asserts that the issue "is irrelevant," but makes no argument in her appellate brief that she has a constitutional right to carry large-

---

[56]  *See* Hightower's Addendum 19, 29-32, 46 (district court order).

[57]  Hightower's Br. 36, 40; A.234 (Hightower's Opp. to City's S.J. Motion) ("the concealed carrying of handguns may be banned."); A.307 (Hightower's Opp. to Commonwealth's S.J. Motion) ("states are allowed to ban … concealed carrying").

capacity guns capable of holding more than ten rounds of ammunition.[58] Hightower has therefore waived this claim. *See, e.g., Dialysis Access Ctr. LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 374 n.7 (1st Cir. 2011).

The district court's holdings that the Second Amendment does not protect the carrying of concealed or large-capacity weapons are consistent with *Heller* and *McDonald*. "The *Heller* Court was careful to note that the rights guaranteed by the Second Amendment were 'not unlimited.'" *United States v. Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009), *cert. denied*, 130 S.Ct. 1109 (2010) (quoting *Heller*, 554 U.S. at 626). "[T]he right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald*, 130 S.Ct. at 3047 (plurality) (quoting *Heller*, 554 U.S. at 626). "As examples of 'longstanding' restrictions that were [and are] 'presumptively lawful' under the Second Amendment, the Court listed: (1) laws prohibiting the carrying of **concealed weapons**, (2) laws prohibiting the possession of firearms by felons and the mentally ill, (3) laws prohibiting the carrying of firearms 'in sensitive places such as schools and government buildings,' (4) laws imposing conditions and qualifications on the commercial sale of arms, and (5) laws prohibiting the carrying of '**dangerous and unusual weapons**.'" *Rene E.*, 583 F.3d at 12 (quoting *Heller*, 554 U.S. at 626-27 & n.26) (emphasis added). This "list does not purport to be exhaustive." *Id*. (quoting *Heller*, n.26). *McDonald* "repeat[ed] those assurances" and stressed that applying the Second Amendment to the States "does not imperil every law regulating firearms." *McDonald*, 130 S.Ct. at 3047 (plurality).

---

[58] *See* Hightower's Br. 23.

The Court "must give this language great weight," even though these statements in *Heller* and *McDonald* were dicta. *See United States v. Southern Union Co.*, 630 F.3d 17, 34 (1st Cir. 2010). The Court is "bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when ... a dictum is of recent vintage and not enfeebled by any subsequent statement." *Id.* (quoting *McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991)) (internal quotation marks omitted).

Hightower is right to concede that she has no constitutional right to carry a concealed weapon. *See Heller*, 554 U.S. at 626 (noting with approval that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"); *Robertson v. Baldwin*, 165 U.S. 275, 281-282 (1897) ("[T]he right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." (dictum)).

Nor does the Second Amendment allow Hightower to possess and carry firearms that can hold, or accept a device capable of holding, more than ten rounds of ammunition. One "important limitation on the right to keep and carry arms" is that the Second Amendment only protects the carrying of "the sorts of weapons protected ... 'in common use at the time'" the amendment was enacted. *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). "[D]angerous and unusual" weapons like an M-16 rifle and other high-capacity weapons "may be banned" without violating the Second Amendment. *Id.* Furthermore, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.*

at 625. Because firearms with "large capacity ammunition feeding devices" were not in common use in the eighteenth century, are unusually dangerous, and are typically not needed for lawful purposes, the Second Amendment does not protect possession or carrying of such weapons.[59]  *Heller v. District of Columbia*, 698 F.Supp.2d 179, 193-95 (D.D.C. 2010), *aff'd on other grounds*, 2011 WL 4551558, *12-*16 (D.C. Cir. 2011) ("*Heller II*") (upholding new District of Columbia firearm licensing ordinance passed after Supreme Court decision); *accord United States v. Fincher*, 538 F.3d 868, 873-874 (8th Cir. 2008), *cert. denied*, 129 S.Ct. 1369 (2009) (same for machine guns).  Alternatively, state laws prohibiting such weapons are permitted under the Second Amendment because there is a "substantial relationship" between such a law "and the objectives of protecting police officers and controlling crime." *Heller II*, 2011 WL 4551558 at *16 (D.C. Cir.).  Firearms outfitted with "large-capacity magazines tend to pose a danger to innocent people and particularly to police officers," whether they are used by "mass shooters" like the gunman who attacked Congresswoman Giffords and others in Tucson, Arizona, in January 2011, used to commit other kinds of crimes, or used "in self-defense situations."  *Id.*

## 2. Hightower Never Sought and Was Never Denied a License to Carry an Unconcealed, Regular Capacity Firearm.

Although Hightower's unrestricted Class A license to carry concealed, large-capacity weapons in public was revoked, she never sought "the issuance of a new license tailored to the limits of the Second

---

[59] The Commonwealth does not argue that "only those arms in existence in the 18th century are protected by the Second Amendment." *See Heller*, 554 U.S. at 582.

Amendment."[60] Instead, she filed this lawsuit and asked the district court to order the restoration of Hightower's unrestricted Class A license,[61] which would allow her "to carry concealed, large-capacity" handguns, rifles, and shotguns in public.[62]

Commissioner Davis revoked Hightower's license because she responded untruthfully on a form that applies only to police officers. Now that Hightower is a civilian with no departmental disciplinary charges pending, the City may find that she is a suitable person to obtain either a Class B license or a Class A license restricted to exclude large-capacity weapons. Hightower conceded that was possible at her deposition.[63] And the Boston defendants[64] told the district court that Hightower would probably be issued a license as a civilian if she reapplies, truthfully completes the application form, and is not subject to any statutory disqualification.[65]

Because Hightower has not definitively been denied any right protected by the Second Amendment, her claims under that provision are not ripe. In another context, denial of a permit to develop property does not give rise to a claim that the government has made a regulatory taking of the property in the absence of a "final, definitive" decision that

---

[60]  Hightower's Addendum 33 (district court order).

[61]  A.22 (complaint, prayer for relief), 74 (Hightower's S.J. Memo).

[62]  A.13, ¶ 15 (complaint); *accord* Mass. Gen. L. c. 140, § 131(a).

[63]  A.103-104.

[64]  Hightower's brief frequently uses the term "Defendants" to refer to the City of Boston and Police Commissioner Davis but not the Commonwealth.  This can be confusing, since the Commonwealth was allowed to intervene as a defendant.  *Cf.* Hightower's Br. 5-6, 8, 15, 16, 22, 23, 24, 40, 51, 52, 53, 62, 65-66.

[65]  A.27, ¶ 37.

deprives the owner of economically viable use of the property; no takings claim is ripe where the owner is denied approval of a relatively "grandiose" plan, but never seeks approval of a "less ambitious" one. *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 347, 351-53 & n.9 (1986); *accord Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 136-137 & n.34 (1978).  Hightower's Second Amendment claims are not ripe for much the same reason.

"A 'claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Fall River v. Federal Energy Regulatory Comm'n*, 507 F.3d 1, 6-7 (1st Cir. 2007) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Ripeness doctrine "avoid[s] unnecessary constitutional decisions," protects against "premature adjudication," keeps courts "from entangling themselves in abstract disagreements," and ensures that courts will not decide a case until it "is fully developed" and the issues have been "sharpened by particular facts." *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003).

Other claims arising from the revocation of Hightower's license— including her procedural due process claim and the state law claim she could have brought for judicial review—were ripe because they did not turn on future contingencies.  But Hightower's Second Amendment claim is not ripe unless and until the City denies an application by Hightower for a Class B license or a restricted Class A license to carry a non-large capacity firearm.[66]

Hightower incorrectly asserts that an unrestricted Class A license was "[t]he only license available" for "carry[ing] a gun in public for self-

---

[66] *Id.* 27-34.

defense."[67] She argues that the City revoked "[t]he only sort of license" available "to publicly carry, openly or concealed, any sort of handgun," and thus her Second Amendment claim must be ripe because she could not have obtained a narrower license.[68] But that premise is incorrect.

In fact, under Massachusetts law Hightower could reapply for a Class B license (which would allow her openly to carry a non-large capacity handgun) or for a Class A license restricted to non-large capacity firearms (which would allow her to carry a concealed handgun in public).  *See* Mass. Gen. L. c. 140, § 131. She chose not to do so. Hightower is incorrect when she asserts that, as a matter of law, "a 'restricted' license to 'carry' is, essentially, a license to possess a firearm in one's home or business, or to use a gun at a range."[69]  The Boston Police Commissioner, like all licensing authorities in Massachusetts, has the power to restrict a Class A license not only by location (e.g., to one's home, business, or a target range) but also in other ways, such as by excluding large-capacity weapons or the carrying of a concealed firearm. *See* Mass. Gen. L. c. 140, § 131(a) (Class A license may be issued "subject to such restrictions relative to the possession, use or carrying of firearms"—or of "large capacity rifles and shotguns"—as the licensing authority "deems proper").

Hightower misrepresents the record when she asserts that the Boston defendants have a policy or practice under which the only license Hightower could obtain would be a Class A license restricted to

---

[67] Hightower's Br. 20.
[68] *Id.* at 24.
[69] *Id.* at 8.

carrying a handgun at sporting clubs or at home.[70]  What Lieutenant Detective Harrington actually said in his affidavit is that if Hightower were to "reappl[y] for a Class A license to carry a ***large-capacity*** firearm, she would receive a Class A restricted license to carry for sport and target and for home protection," unless Hightower could demonstrate some need to carry in public a firearm capable of holding, or of accepting a device that can hold, more than ten rounds of ammunition.[71]  But Hightower has told the Court that she does not want such a license, because she only wants to carry a revolver and does not seek to carry a large-capacity firearm.[72]  There is no record evidence demonstrating or even suggesting that it would be futile for Hightower to apply for a Class A license restricted to carrying regular capacity firearms in an open or concealed manner, or a Class B license that would allow her to carry a non-large-capacity firearm openly.[73]

Hightower's further assertion that if she has standing then her claims must be ripe is also incorrect.[74] If standing is the "who" of justiciability, ripeness is the "when." *See Overseas Military Sales Corp. Ltd. v. Giralt-Armada*, 503 F.3d 12, 17 n.5 (1st Cir. 2007). "Although related to standing, the question of ripeness for review requires a discrete inquiry." *Action Alliance of Senior Citizens of Greater*

---

[70]  *See* Hightower's Br. 16.

[71]  A.142, ¶ 19 (emphasis added).

[72]  Hightower's Br. 23.

[73]  Lt. Det. Harrington noted that Hightower has never applied for a restricted Class A license, a Class B license, or a firearms identification card; perhaps for that reason he did not speculate how the Boston defendants would treat such an application if Hightower were ever to submit one.  *See* A.142, ¶ 18.

[74]  *See* Hightower's Br. 20-21.

*Philadelphia v. Heckler*, 789 F.2d 931, 940-41 (D.C. Cir. 1986); *accord Renne v. Geary*, 501 U.S. 312, 320 (1991).

Finally, Hightower cannot avoid the requirement of ripeness merely by couching her Second Amendment claim as a challenge to the facial validity of the Massachusetts firearms licensing statutes.[75]  *See Gun Owner's Action League, Inc. v. Swift*, 284 F.3d 198, 205-209 (1st Cir.), *cert. denied*, 537 U.S. 827 (2002) (plaintiffs' vagueness challenge to licensing law defining a "large capacity weapon" was not ripe because plaintiffs had not sought a license).

Because Hightower makes no claim that she should be able to carry a revolver in public without first having to obtain a license, the case law she cites regarding claims that the First Amendment allows one to engage in certain kinds of speech activities without a license is irrelevant.[76]  Hightower concedes that the Second Amendment allows the States to require individuals to obtain a license before they may carry or possess a firearm:  she acknowledges that "Defendants have an interest in regulating firearms in the interest of public safety" and "does not question the state's ability to license the possession and carrying of firearms."[77]  As the Court has "long held," "all owners of firearms are on notice that they are subject to regulation, including licensing." *Gun Owner's Action League*, 284 F.3d at 207.

---

[75]  *Cf.* Hightower's Br. 21-22.

[76]  *Cf.* Hightower's Br. at 21-22.

[77]  Hightower's Br. 4.

**C.    Even If the Second Amendment Were Implicated, It Would Not Forbid the Commonwealth's Firearm Licensing Requirements.**

**1.    Rules that Only Permit Responsible Persons To Carry Guns Are Not Unconstitutional "Prior Restraints."**

**a.    The First Amendment Prior Restraint Doctrine Does Not Apply.**

Guns are not speech.  Hightower is wrong when she asserts that the Second Amendment right to keep and bear arms is governed by constitutional limitations on prior restraints on speech.[78] The prior restraint doctrine reflects the principle that, under the First Amendment, "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Advocates for Arts v. Thomson*, 532 F.2d 792, 795 (1st Cir. 1976) (quoting *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

Under the Second Amendment, in contrast, the state and federal governments may restrict gun possession to "law-abiding, responsible citizens" and take steps to ensure that other persons do not have guns. *Heller*, 554 U.S. at 635; *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("Scholarship suggests historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible."). Indeed, Hightower concedes that the Second Amendment allows the Commonwealth to put in place firearms licensing requirements that are intended "to ensure that only law-abiding, responsible people have and carry guns."[79]

---

[78]  Hightower's Br. 45-51.

[79]  Hightower's Br. 60; *accord id.* at 4 ("Hightower does not question the state's ability to license the possession and carrying of firearms.").

"Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (quoting Saul Cornell, "Don't Know Much About History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 679 (2002)). "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010), and Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law & Contemp. Probs. 143, 146 (1986)); *accord Bena*, 664 F.3d at 1183-84; *Rene E.*, 583 F.3d at 15. Neither *Heller* nor *McDonald* "cast doubt" on rules barring irresponsible persons from possessing or carrying firearms. *McDonald*, 130 S.Ct. at 3047.

Hightower cannot cite a single case that has applied the First Amendment prior restraint doctrine to firearms claims under the Second Amendment. Just as the Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment," *United States v. Salerno*, 481 U.S. 739, 745 (1987), so its "prior restraint" doctrine regarding laws or orders barring speech has little relevance to the Second Amendment. *Cf. United States v. Barton*, 633 F.3d 168, 172 n.3 (3d Cir. 2011) (declining to recognize overbreadth claim under Second Amendment). Quite simply, "[t]he prior restraint doctrine does not apply in the Second Amendment context." *Piszczatoski*

*v. Filko*, 2012 WL 104917, *1 (D.N.J. 2012); *accord Kachalsky v. Cacace*, 2011 WL 3962550, *25 n.32 (S.D.N.Y. 2011); *Richards v. County of Yolo*, 2011 WL 1885641, *4-*5 (E.D.Cal. 2011).

Requiring a license to carry a firearm is not an unconstitutional prior restraint. *Commonwealth v. Loadholt*, 460 Mass. 723, 726, 954 N.E.2d 1128, 1130 (2011). The many restrictions on gun ownership that the Supreme Court has said are presumptively constitutional would be unenforceable if one could possess or carry a gun without first obtaining a license or permit. *Cf. Rene E.*, 583 F.3d at 12.

Even in the First Amendment context, legislatures may require permits that restrict the time, place, or manner of speech in order to protect the public health, safety, or convenience. *E.g., Cox v. New Hampshire*, 312 U.S. 569, 576 (1941) (upholding parade permit requirement). Such a law "is not to be reviewed as a 'prior restraint'" but instead is evaluated under the much more deferential "time-place-manner" doctrine. *E.g., Sullivan v. City of Augusta*, 511 F.3d 16, 32 (1st Cir. 2007). That is because, even in public fora, the freedom of speech must "be balanced against the government's legitimate interests in protecting public health and safety." *McCullen v. Coakley*, 571 F.3d 167, 175 (1st Cir. 2009), *cert. denied*, 130 S.Ct. 1881 (2010) (upholding 35-foot buffer zone around entrances to reproductive health care facilities). As shown at pages 36-40 below, the Massachusetts firearms licensing statutes help protect public safety by keeping guns away from unsuitable, irresponsible persons, and would pass muster under the Second Amendment.

### b.    The Suitable Person Standard Does Not Create "Unbridled Discretion."

If the prior restraint framework developed under the First Amendment were to apply here, which it does not, the Massachusetts firearms licensing laws would still pass constitutional muster. Hightower argues that the statutory "suitable person" standard is an unconstitutional prior restraint because it gives Massachusetts officials "unbridled," "unfettered," and otherwise "uncontrolled" discretion to deny or revoke a firearms license.[80] But Hightower wrongly ignores Massachusetts court rulings that make clear that this standard does **not** give licensing authorities unlimited discretion. "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982). Indeed, the Court must credit any "plausible" limiting construction in determining whether a licensing scheme gives the licensing authority too much discretion. *New England Regional Council of Carpenters* v. *Kinton*, 284 F.3d 9, 26 (1st Cir. 2002).

Massachusetts courts have construed Mass. Gen. L. c. 140, § 131, to mean that a "suitable person" is a person who is "sufficiently responsible . . . to be entrusted with a license to carry firearms." *Wetherbee*, 2001 WL 716915, *7; *accord Howard*, 59 Mass. App. Ct. at 901 (affirming denial of firearm license where abuse prevention restraining orders showed applicant could "not ... be safely entrusted with firearms" and thus was not a "suitable person"). Although the Legislature did not define "suitable persons," Massachusetts courts

---

[80] Hightower's Br. 45-46.

have held that this standard "must be interpreted in accordance with the intent of the legislature … 'to limit access to deadly weapons by irresponsible persons.' " *Stavis v. Carney*, 12 Mass. L. Rptr. 3, 2000 WL 1170090, \*4 (Mass. Super. Ct. 2000) (quoting *Ruggiero*, 18 Mass. App. Ct. at 258, 464 N.E.2d at 106).

Furthermore, if an applicant or license holder is found to be unsuitable, the licensing authority must explain why in writing. Mass. Gen. L. c. 140, § 131(e) & (f). And if a police chief cannot show that she had "reasonable grounds" for revoking a firearms license, the revocation will be reversed. *See Lizotte v. Chief of Police of Fitchburg*, 2006 WL 1075596, \*2 (Mass. Super. Ct. 2006) (reversing license suspension as arbitrary because police chief provided no evidence to support his decision); *see also* Mass. Gen. L. c. 140, § 131(f). A license revocation or denial has no reasonable grounds if it "was arbitrary, capricious, or an abuse of discretion." *Howard*, 59 Mass. App. Ct. at 902; *Chief of Police of Shelburne* v. *Moyer*, 16 Mass. App. Ct. 543, 546, 453 N.E.2d 461, 464 (1983). Under Massachusetts law, "[a] decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support." *Hercules Chemical Co. v. Department of Envtl. Prot.*, 76 Mass. App. Ct. 639, 643, 925 N.E.2d 53, 56 (2010) (quoting *City of Cambridge v. Civil Serv. Comm'n*, 43 Mass. App. Ct. 300, 303, 682 N.E.2d 923, 925, *rev. denied*, 426 Mass. 1102, 687 N.E.2d 642 (1997)).

Such a combination of an objectively reasonable standard, a requirement that the reason for any denial or revocation be put in writing, and the availability of prompt judicial review sufficiently limits a licensing official's discretion to satisfy any First Amendment concerns. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324-325 (2002). Thus,

if the Second Amendment somehow incorporated the same standards, the Massachusetts licensing scheme would still pass muster.

A federal district court recently upheld an almost identical Connecticut law—with the same "suitable person" requirement for obtaining a firearms license—against a very similar Second Amendment challenge. *See Kuck v. Danaher*, 2011 WL 4537976, *7-*12 (D.Conn. 2011) ("*Kuck II*"). Hightower concedes that *Kuck II* was correctly decided, but argues that it is distinguishable because the Connecticut statutory scheme "differs markedly" from the Massachusetts licensing laws.[81]

Hightower's attempt to distinguish the Connecticut laws is unavailing. Both states disqualify certain categories of persons from obtaining a firearms license.[82] In Connecticut, just as in Massachusetts, anyone not disqualified must prove they are a "suitable person" in order to obtain a license. Conn. Gen. Stat. § 29–28(b); *see also Kuck II*, 2011 WL 4537976 at *2. Although the statute does not define "suitable person," Connecticut courts have construed it as intending "to protect the safety of the general public from individuals whose conduct has shown them to be lacking the essential character or temperament necessary to be entrusted with a weapon." *Kuck II* at *11 (quoting *Dwyer v. Farrell*, 193 Conn. 7, 12, 475 A.2d 257, 260 (1984)). Under Connecticut law:

---

[81] Hightower's Br. 52.

[82] Both states disqualify, for example, felons, persons found as juveniles to be delinquent based on a serious offense, and persons with a relevant history of mental illness. *Compare* Conn. Gen. Stat. § 29–28(b) *with* Mass. Gen. L. c. 140, § 131(d)

A person is suitable who, by reason of his character—his reputation in the community, his previous conduct as a licensee—is shown to be suited or adapted to the orderly conduct of a business which the law regards as so dangerous to public welfare that its transaction by any other than a carefully selected person duly licensed is made a criminal offense. It is patent that the adaptability of any person to such a business depends upon facts and circumstances that may be indicated but cannot be fully defined by law, whose probative force will differ in different cases, and must in each case depend largely upon the sound judgment of the selecting tribunal.

*Commissioner of Public Safety v. Board of Firearms Permit Examiners*, 129 Conn. App. 414, 423, 21 A.3d 847, 852, cert. denied, 302 Conn. 918, 27 A.3d 369 (2011) (quoting *Smith's Appeal from County Commissioners*, 65 Conn. 135, 138, 31 A. 529, 530 (1894)); *accord Kuck II*, 2011 WL 4537976, *10-*11. The denial or revocation of a Connecticut firearms permit is "subject to de novo review by the Board [of Firearms Permit Examiners] to determine whether, based upon all of the facts, there was 'just and proper cause' for the denial or revocation." *Id*. *12; accord Conn. Gen. Stat. § 29–32b(b). The Board's decision as to whether a permit holder or applicant is a "suitable person" is subject to judicial review for abuse of discretion, just as in Massachusetts. *Commissioner of Public Safety*, 129 Conn. App. at 422-424, 21 A.3d at 852-853. In sum, the Connecticut courts construe "suitable person" in a manner quite similar to the Massachusetts case law, and the procedural safeguards provided by Connecticut law are very similar to those in Massachusetts.

If the Connecticut permitting standards are sufficiently definite to guard against arbitrary exercise of discretion, as Hightower concedes,

then the Massachusetts statutory scheme must pass constitutional muster as well.

Nor was it arbitrary for Commissioner Davis to conclude that Hightower's capacity for veracity had a bearing on whether she could be trusted to carry a firearm in public. The Supreme Court has held that where an ordinance allows a permitting authority to deny a request to use a municipal park for a large-scale event because the application "contains a material falsehood or misrepresentation," that is a "reasonably specific and objective" ground for denying the permit. *Thomas*, 534 U.S. at 324. The same is true here. It is at least as important, and no more arbitrary, to ensure that applicants for a firearms license do not include material falsehoods in their applications. *See Wetherbee*, 2001 WL 716915, *7 ("failure to provide accurate and complete responses to all questions on the application form" may demonstrate unsuitability for firearms license, whether applicant had "intended to conceal, or merely misunderstood the application form"); *cf. Coletti v. Department of State Police*, 64 Mass. App. Ct. 222, 224-27, 832 N.E.2d 8, 10-12, *rev. denied*, 445 Mass. 1103, 835 N.E.2d 254 (2005) (affirming revocation of private detective license; misrepresentation on firearms license application helped show lack of "good moral character"). "[C]haracter is a necessary qualification" for being a suitable person who can be trusted with carrying a firearm. *DeLuca v. Chief of Police of Newton*, 415 Mass. 155, 159-60, 612 N.E.2d 628, 630 (1993); *see also Godfrey*, 35 Mass. App. Ct. at 43, 47-48, 616 N.E.2d at 486, 488 (affirming revocation on ground that licensee who refused to cooperate with investigation into gunshots fired into a school, a residence, and an automobile was no longer a "suitable person").

Hightower does not and cannot claim that revocation of her unrestricted Class A license violated Mass. Gen. L. c. 140, § 131. If Hightower "wants to argue that [s]he is, in fact, a 'suitable person'" under that statute, her "proper recourse is with the state courts." *Rosenfeld v. Egy*, 346 F.3d 11, 18 n.4 (1st Cir. 2003). But any such claim is now time-barred.[83]

### 2.    At Most, Intermediate Scrutiny Would Apply If the Second Amendment Were Implicated.

The Court has held that "a categorical ban on gun ownership by a class of individuals" is permitted under the Second Amendment so long as there is "a substantial relationship between the restriction and an important governmental objective." *United States v. Booker*, 644 F.3d 12, 25 (1st Cir.), *cert. petition filed*, No. 11-6765 (2011) (upholding federal law barring anyone convicted of a domestic violence misdemeanor from possessing a gun). In the equal protection context, this standard of review is called "intermediate scrutiny." *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) (applying Equal Protection Clause). Other circuits agree that this is the proper standard to apply when evaluating whether a statutory restriction on gun possession or ownership violates the Second Amendment. *See, e.g., Mahin*, 668 F.3d at 124 (4th Cir.); *Heller II*, 2011 WL 4551558, *14-*15 (D.C. Cir.); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010), *cert denied*, 131 S.Ct. 2476 (2011); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010), *cert. denied*, 131 S.Ct. 1674 (2011).

---

[83] Hightower received the revocation notice "[o]n or about August 20, 2008." A.45 (¶ 23). She had to appeal within 90 days of receiving that notice, *see* Mass. Gen. L. c. 140, § 131(f), but did not file this lawsuit until 96 days later, on November 24, 2008. A.3.

If the Second Amendment applied to some extent outside the home, and if Hightower were seeking a permit to carry an unconcealed, non-large capacity firearm, the "substantial relationship" standard of intermediate scrutiny should apply here too. *See Masciandaro*, 638 F.3d at 469-470 (4th Cir.) (applying intermediate scrutiny to firearm regulations that apply to law-abiding citizens); *United States v. Marzzarella*, 614 F.3d 85, 97-98 (3d Cir. 2010) (applying intermediate scrutiny to statute barring possession of unmarked firearm, even in one's home). Hightower is wrong to invoke the "compelling interest" standard of strict scrutiny.[84]

"[A] strict scrutiny standard of review would not square with the [Supreme Court's] references to 'presumptively lawful regulatory measures' such as laws prohibiting firearms possession by felons and the mentally ill. . . ." *Heller II*, 698 F.Supp.2d at 187. The kind of categorical disqualifications that the Supreme Court cites approvingly in *Heller* and *McDonald* apply with equal force inside the home, and laws barring felons, mentally ill persons, and other irresponsible persons from keeping a handgun in their home are not subject to strict scrutiny under the Second Amendment. *Booker*, 644 F.3d at 25.

Under First Amendment doctrine, intermediate scrutiny of a time-place-manner restriction also requires a showing that a statute is "narrowly tailored." *E.g., Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 15-16 (1st Cir. 2007). But that does not mean the Legislature must adopt "the least restrictive or least intrusive means of accomplishing the statute's legitimate governmental interest." *Id.* at 16. "Rather, narrow tailoring is satisfied so long as the

---

[84] Hightower's Br. 55-58.

regulation promotes a substantial government interest that would be achieved less effectively without it." *Id*. In determining whether a statute is narrowly tailored to further substantial governmental interests, the Court is "not at liberty to substitute [its] judgment for the reasonable conclusion of a legislative body." *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 520 U.S. 180, 212 (1997). Intermediate scrutiny does not make State laws subject to "a judge's agreement . . . concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *McCullen*, 571 F.3d at 179 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989)).

### 3. The Suitable Person Standard Furthers the Strong Public Interest In Keeping Irresponsible Persons From Carrying Firearms.

Like all states, Massachusetts "has a strong and compelling interest in ensuring that firearm permits are not issued to those 'lacking the essential character or temperament necessary to be entrusted with a weapon.'" *Kuck v. Danaher*, 600 F.3d 159, 166 (2d Cir. 2010) ("*Kuck I*") (quoting *Dwyer*, 193 Conn. at 12, 475 A.2d at 260). As discussed above, the Second Amendment only protects "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Hightower concedes this point,[85] and that the Commonwealth may impose licensing requirements designed to "ensure that only law-abiding, responsible

---

[85]  *See* Hightower's Br. 25 (Second Amendment protects rights of "responsible, law-abiding Americans"), 55 ("the Right of Law Abiding, Responsible Individuals to Bear Arms"), 58 ("rights of responsible, law-abiding citizens"), 59 (rights of "Law-Abiding, Responsible Americans").

people have and carry guns" without violating the Second Amendment.[86]

"[T]he public interest at issue is one of the utmost importance, as the statute governing who may lawfully carry a firearm directly affects the physical safety of the citizenry." *Dupont v. Chief of Police of Pepperell*, 57 Mass. App. Ct. 690, 693, 786 N.E.2d 396, 399 (2003). "The goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons. Among the principal measures adopted in furtherance of that goal are the provisions of G.L. c. 140, § 131, governing the licensing of persons to carry firearms." *MacNutt v. Police Comm'r of Boston*, 30 Mass. App. Ct. 632, 635, 572 N.E.2d 577, 579, *rev. denied*, 410 Mass. 1104, 577 N.E.2d 309 (1991) (quoting *Ruggiero*, 18 Mass. App. Ct. at 258, 464 N.E.2d at 106). "[A]n erroneous reinstatement of a firearms license to an unsuitable person" would undermine this important goal. *Police Comm'r of Boston v. Robinson*, 47 Mass. App. Ct. 767, 771, 716 N.E.2d 652, 655 (1999). As Hightower concedes, "Defendants have a compelling governmental interest in regulating firearms in the interest of public safety."[87]

The "suitable person" standard would satisfy intermediate scrutiny because it is substantially related to the Commonwealth's significant interest in keeping firearms out of the hands of irresponsible persons. *See Kuck II*, 2011 WL 4537976 at *12 ("suitable person" standard in Connecticut permitting statute "is substantially related to Connecticut's compelling interest in protecting the public from persons who could potentially pose a danger if entrusted with a firearm," and

---

[86]  Hightower's Br. 60.
[87]  Hightower's Br. 59.

thus does not violate any Second Amendment right); *see also Booker*, 644 F.3d at 25-26 (federal law barring possession while under domestic violence protection order passes intermediate scrutiny because it is substantially related to important government objective of preventing armed domestic abuse); *Marzzarella*, 614 F.3d at 98 (federal law barring possession of firearm with altered or missing serial number passes intermediate scrutiny because it furthers "substantial or important interest" in keeping firearms out of the hands of "potentially irresponsible" persons).

The "suitable person" standard is applied in an individualized manner by police chiefs with expertise in recognizing and analyzing the risk that an individual might not handle a deadly weapon with appropriate care, or even use it to engage in unlawful, violent acts. It was permissible for the Massachusetts Legislature to determine that categorical limitations on eligibility for firearms licenses cannot screen out all irresponsible persons. For example, although Massachusetts categorically disqualifies persons who are currently the subject of a domestic violence restraining order, *see* Mass. Gen. L. c. 140, § 131(d)(vi), someone who abuses his or her spouse or partner or child may remain unsuitable to be trusted with a firearm even if "the criminal charges and the restraining orders were subsequently dropped." *Ford v. Cristadoro*, 13 Mass. L. Rptr. 102, 2001 WL 543194, *3 (Mass. Super. Ct. 2001) (affirming revocation of firearm license on this ground). Similarly, persons convicted of a violent crime involving use or possession of a deadly weapon are categorically disqualified, *see* Mass. Gen. L. c. 140, § 131(d)(i), but others who commit violent acts may also not be a suitable person to be trusted with carrying a firearm.

*Roddy v. Leominster Dist. Ct.*, 15 Mass. L. Rptr. 658, 2003 WL 734431 (Mass. Super. Ct. 2003), *aff'd*, 64 Mass. App. Ct. 1111, 835 N.E.2d 324 (2005) (affirming denial of firearm license renewal where charge against applicant of assault with a deadly weapon was continued without a finding).

As these examples demonstrate, "it is impossible for the legislature to conceive in advance each and every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm." *Kuck II*, 2011 WL 4537976 at *11. Statutory categories are not always better than individualized decisions. Indeed, in some contexts the Constitution requires individualized determinations. *Cf. The Florida Star v. B.J.F.*, 491 U.S. 524, 539-40 (1989) (though "categorical prohibitions" on publishing victims' names will violate First Amendment, orders based on "[m]ore individualized adjudication" are permissible); *Globe Newspaper Co. v. Superior Court of Norfolk County*, 457 U.S. 596, 607-608 (1982) (same for limiting media access to trials about sex offenses on victims younger than age 18).

It is true that "the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill, *see Heller*, 554 U.S. at 626—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23. But nothing in the Second Amendment forbids States from requiring individualized determinations of whether someone is a responsible, law-abiding person who can be trusted to possess or carry a firearm. "[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 130 S.Ct. at 3046.

## II. THE POST-DEPRIVATION JUDICIAL REVIEW AVAILABLE TO HIGHTOWER SATISFIES PROCEDURAL DUE PROCESS.

Hightower's claim that she had a constitutional right to a hearing before her firearms license was revoked, and that the availability of immediate post-deprivation judicial review was constitutionally inadequate, is incorrect.[88] The Massachusetts statutory scheme, "which allows the [Boston Police Department] Commissioner to revoke pending appeal the … gun license of an individual who appears to be unsuitable to handle guns—as opposed to a scheme where an individual deemed to be unsuitable would be allowed to keep their gun pending appeal—is wholly consonant with the state's paramount interest in public safety and combating gun violence."[89] Hightower could have sought judicial review in state court immediately after her license was revoked.  *See* Mass. Gen. L. c. 140, § 131(f).  She chose not to exercise that right.[90]  But the availability of prompt post-deprivation judicial review, including an evidentiary hearing, satisfies due process.

Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)) (state employee not entitled to notice and hearing before being suspended without pay due to arrest on drug charges).  Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "In order to determine both when a pre-deprivation hearing is compulsory and what process is due, an

---

[88]  *Cf.* Hightower's Br. 62-68.

[89]  Hightower's Addendum 40 (district court order).

[90]  A.186.

inquiring court must balance a myriad of factors, including the private and public interests involved, the risk of an erroneous deprivation inherent in the procedures employed by the state, and the likely benefit that might accrue from additional procedural protections." *González-Droz v. González-Colón*, 660 F.3d 1, 13 (1st Cir. 2011); *accord Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

### A. Hightower Had No Constitutional Right to a Pre-Revocation Hearing.

"[D]ue process does not invariably require a hearing before the state can interfere with a protected property interest." *González-Droz*, 660 F.3d at 14; *accord Mackey v. Montrym*, 443 U.S. 1, 17 (1979) (upholding Massachusetts law mandating driver's license revocation for refusing breathalyzer, with opportunity for post-revocation hearing).

"Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action" with no prior hearing. *Hodel v. Virginia Surface Min. and Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) (upholding federal law permitting mining cessation orders without prior hearing); *accord Wall v. King*, 206 F.2d 878, 883 (1st Cir.), *cert. denied*, 349 U.S. 915 (1953) (Massachusetts law allowing registrar to revoke driver's license from motorist believed to be "an improper or incompetent person to operate motor vehicles," without prior hearing but with opportunity for post-revocation hearing, did not violate due process because "the interest of safeguarding lives and property from highway accidents" outweighed "[t]he incidental hardship upon an individual motorist, in having his license suspended pending investigation and review").

The government interest here is preserving public safety by keeping firearms away from persons found not to be "sufficiently responsible ... to be entrusted with a license to carry firearms," *Wetherbee*, 2001 WL 716915, at *7. As noted above, this interest "is one of the utmost importance," as it "directly affects the physical safety of the citizenry." *Dupont*, 57 Mass. App. Ct. at 693, 786 N.E.2d at 399.

Given the public safety interest at stake in gun-licensing decisions, procedural due process requires only "a meaningful opportunity to be heard ***after*** a denial or revocation." *Kuck I*, 600 F.3d at 165 (emphasis added) (denial of permit to carry firearm); *see also Spinelli v. City of New York*, 579 F.3d 160, 170 (2d Cir. 2009) (same for revocation of license to sell firearms). Because the Commonwealth has a "paramount interest" in "protecting the safety of its people" by keeping firearms away from irresponsible persons, the availability of post-deprivation relief satisfies the requirements of due process. *See Mackey*, 443 U.S. at 17-19.

Hightower's interest in keeping her unrestricted Class A license is not as strong as the Commonwealth's paramount interest in making sure that irresponsible persons are not carrying firearms in public. Hightower's "stake in the firearm license ... is not directly tied to [her] economic livelihood" and thus does not have "the same urgency" as a license to practice medicine or engage in some other profession. *Kuck I*, 600 F.3d at 164. And yet even a professional license may be suspended or revoked with only a post-deprivation hearing "in cases involving public health and safety." *González-Droz*, 660 F.3d at 14 (upholding suspension of physician's license to practice medicine).

With respect to risk of error, "Hightower does not identify a structural problem in the statutory scheme or administrative process at issue that would lead to systematic error; her only argument is that she herself [allegedly] suffered an erroneous deprivation[.]"[91] The district court correctly found that, especially in light of the undisputed fact that only about one percent of firearms license applications "are denied on the basis of unsuitability, … the risk of erroneously classifying a suitable applicant as unsuitable appears quite low, and it is difficult to fathom what errors of this kind a pre-revocation hearing would prevent that the written application process and course of judicial review under Mass. Gen. L. c. 140, § 131(f) would not."[92]

Hightower's insistence that Commissioner Davis erred in revoking her license has no bearing on whether the statutory scheme violates procedural due process.[93] *See González-Droz*, 660 F.3d at 13; *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990). "The relevant inquiry is not whether a [revocation] order should have been issued in a particular case, but whether the statutory procedure itself is incapable of affording due process." *Hodel*, 452 U.S. at 302. "Discretion of any official may be abused.  Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised." *Id.* (quoting *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599 (1950)).

"The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations," or "that the procedures used" before

---

[91] Hightower's Addendum at 38 (district court order).

[92] *Id*. at 39 (citing A.119, ¶ 7 (Guida Aff.)).

[93] *Cf.* Hightower's Br. at 65-66.

a license is suspended are "so comprehensive as to preclude any possibility of error." *Mackey*, 443 U.S. at 13. "In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly. Quick action may turn out to be wrongful action, but due process requires only a postdeprivation opportunity to establish the error." *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1220 (10th Cir. 2006) (restaurant closure for health code violations).

There is no "tension" between the Massachusetts firearms licensing statutes and *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012).[94] *Rehlander* held that the federal statute criminalizing firearms possession by a person "committed to a mental institution," 18 U.S.C. § 922(g)(4), should be construed not to apply to someone who was involuntarily hospitalized following *ex parte* procedures with no opportunity for the individual to be heard. The Court reasoned that Congress could not have intended permanently to withdraw the right to possess arms from someone who never had any opportunity to challenge the basis for that action through "an adjudicatory hearing." *Rehlander*, 666 F.3d at 48. Here, in contrast, Hightower had a statutory right to challenge the revocation of her firearms license in a state court adjudicatory proceeding, but chose not to do so.

## B. The Evidentiary Hearing Available to Hightower in State Court Was More Than Adequate.

The post-deprivation hearing available to Hightower "sufficed to meet the demands of due process" because Hightower "had notice, an opportunity to be heard" in state court, "the opportunity to engage counsel," and "a right to present evidence." *See González-Droz*, 660 F.3d

---

[94] *Cf.* Hightower's Br. 67-68.

at 16.  "[T]he Due Process Clause imposes a floor below which a state cannot descend, not a level of perfection that a state must achieve."  *In re Barach*, 540 F.3d 82, 85 (1st Cir. 2008) (upholding suspension of license to practice law).

Hightower never challenged the adequacy of the notice she was given.[95]  By statute, "[a]ny revocation or suspension of a [firearms] license shall be in writing and shall state the reasons therefor."  Mass. Gen. L. c. 140, § 131(f).   The Boston Police Commissioner notified Hightower in writing that her unrestricted Class A license was being revoked because she "completed the application form untruthfully;" the notice urged Hightower to contact the police department if she had "any questions"  about  it.[96]    In addition, the written notice informed Hightower that she had "the right to appeal this decision within 90 days to the [state] District Court with appropriate jurisdiction."[97]

Hightower could have immediately challenged the revocation of her license in state district court. Mass. Gen. L. c. 140, § 131(f). And she would have obtained a final decision within four months after filing her claim.  *See* District Court/Boston Municipal Court Joint Standing Order 2-04. Hightower would have been given an evidentiary hearing where she could have been represented by counsel. *Godfrey*, 35 Mass. App. Ct. at 44-45, 616 N.E.2d at 487 (1993); *Gemme*, 2008 WL 5505485, *3. The Boston Police Commissioner would have had the burden of presenting some evidence that he had reasonable grounds for revoking Hightower's license. Without  such  evidence,  the  revocation  would  have  been

---

[95]  *Cf*. A.19-20 (complaint, due process claim).

[96]  A.39, 45.

[97]  A.39.

reversed as arbitrary and capricious. *Lizotte*, 2006 WL 1075596, *2 (reversing license suspension where stated ground for suspension was that licensee made suicide threats, licensee denied making such threats, and police chief presented no evidence indicating that plaintiff was no longer a suitable person to carry a firearm); *see generally Hercules Chemical*, 76 Mass. App. Ct. at 643, 925 N.E.2d at 56 ("[a] decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support." (quoting *City of Cambridge*, 43 Mass. App. Ct. at 303, 682 N.E.2d at 925)). If the Commissioner presented evidence that he had reasonable grounds for revoking Hightower's license, then the burden would have been on Hightower to show that she remained a suitable person to carry concealed, large-capacity weapons and that the grounds for revocation were not reasonable. *Godfrey*, 35 Mass. App. Ct. at 47-48, 616 N.E.2d at 488. Such judicial review is more than sufficient to satisfy due process in these circumstances.

Although Hightower asserts in a single sentence that it violates due process to put the burden on the licensee to prove that revocation of her firearms license was improper, she does not develop this argument and cites no legal authority in support.[98] Hightower has therefore waived this claim. *Ahmed v. Holder*, 611 F.3d 90, 98 (1st Cir. 2010) ("appellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived").

In any case, this assertion is incorrect. A legislature "may alter the traditional allocation of the burden of proof" for civil proceedings, and require a party challenging government action to prove that it was

---

[98] Hightower's Br. 66.

not warranted, "without infringing upon the litigant's due process rights." *United States v. $250,000 In U.S. Currency*, 808 F.2d 895, 900 (1st Cir. 1987) (upholding drug forfeiture laws that require claimant to "prove by a preponderance of the evidence that the claimed property was not derived from illegal drug transactions," once government has presented evidence it had "reasonable ground" to believe that property was connected with illegal drug transactions); *accord, e.g., United States v. Parcel of Property*, 337 F.3d 225, 233 (2d Cir. 2003). "Outside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) (quoting *Lavine v. Milne*, 424 U.S. 577, 585 (1976)).

## III. HIGHTOWER WAIVED HER SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION CLAIMS.

Hightower did not address her substantive due process and equal protection claims in her brief to this Court, and thus waived both claims. *Ramos v. Patnaude*, 640 F.3d 485, 489 (1st Cir. 2011). Although she makes "fleeting references" to these claims,[99] that is insufficient. *Ahmed*, 611 F.3d at 98. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 537 n.5

---

[99] Hightower asserts that "Defendants' discretionary licensing implicates the Equal Protection Clause," and says that "Because Hightower challenges Defendants' discretionary classification as violating her right to equal protection, means-ends scrutiny is relevant." Hightower's Br. 17, 53-54. She also asserts that her Second Amendment claim "encompasse[s]" a claim that the Boston defendants "violated her substantive due process liberty interest." *Id*. 18 n.6.

(1st Cir. 2011) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).  Hightower cannot press these claims in her reply brief.  *See In re FBI Distribution Corp.*, 330 F.3d 36, 41 n.6 (1st Cir. 2003) ("a party forfeits a claim on appeal where she failed to raise it with some effort at developed argumentation in her opening brief, and instead raised it for the first time in her reply brief").

Even if these claims had not been waived, however, the district court's judgment in favor of Defendants should be affirmed.

## A.    Substantive Due Process.

The district court correctly held that Hightower's substantive due process claim fails because Hightower could not meet her "burden of showing that" the revocation of her firearm license was "so egregious as to shock the conscience."[100] *González-Droz*, 660 F.3d at 16 (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)) (suspension of license to practice medicine did not violate substantive due process). "To sink to this level, the challenged conduct must be 'truly outrageous, uncivilized, and intolerable.'" *Id*. (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)). "The conscience-shocking test is now an essential part of any substantive due process claim against a government actor." *Martinez v. Cui*, 608 F.3d 54, 65 (1st Cir. 2010).

A decision by a local police chief to deny an application by a police officer to renew her firearm license, because there are questions about whether the officer is still sufficiently responsible to be a suitable person to carry a firearm, does not "shock the conscience" as a matter of law. *Rosenfeld*, 346 F.3d at 12 & 15 (affirming summary judgment for

---

[100] *See* Hightower's Addendum 40-42 (district court order).

police chief of Millis, Massachusetts, on this ground). The denial or revocation of a license or permit, "even if arbitrary" or based on "animus," is not "the kind of conscience-shocking abuse of governmental power required for showing a substantive due process violation." *Collins v. Nuzzo*, 244 F.3d 246, 250-251 (1st Cir. 2001).

In addition, the district court correctly held that, if it were ripe, "the presence of a valid Second Amendment claim would preclude the Court from engaging in substantive due process analysis."[101]　"[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

## B.　Equal Protection.

The district court also correctly held that Hightower could not make out any claim under the Equal Protection Clause, because "she has neither alleged nor shown that there is a similarly situated person or type of person who has received treatment differently than Hightower[.]"[102]　"Equal protection means that 'similarly situated persons are to receive substantially similar treatment from their government.'" *Kuperman v. Wrenn*, 645 F.3d 69, 77 (1st Cir. 2011) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)).　Because Hightower failed to show that she was treated differently than similarly situated holders of unrestricted Class A licenses, Defendants were

---

[101] Hightower's Addendum 50-51 (district court order).
[102] Hightower's Addendum 42 (district court order).

entitled to summary judgment on the equal protection claim. *Kuperman*, 645 F.3d at 78; *Rosenfeld*, 346 F.3d at 15.

To the extent that Hightower was claiming that the statutory "suitable person" standard violates equal protection on its face, the district court correctly held that the standard is subject to and "certainly survives rational basis review."[103] If Hightower's Second Amendment claim were ripe, and assuming the Second Amendment protects rights to carry guns outside one's home, ***that*** claim would require that the Massachusetts licensing statute be subject to some form of intermediate scrutiny. See pages 34-36 above. Her separate claim under the Equal Protection Clause, however, does not subject the statute to anything more stringent than rational basis review. *See Nordyke v. King*, 644 F.3d 776, 794, *reh'g en banc granted*, 664 F.3d 774 (9th Cir. 2011).

Where a provision of the Bill of Rights is incorporated into the Fourteenth Amendment, the Equal Protection Clause does not "erect a separate and distinct framework for analyzing claims" that the right protected by the Bill of Rights has been violated. *Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 354 (1st Cir. 2004). To the contrary, the scope of the constitutional right is determined by the Bill of Rights provision, and "rational basis scrutiny applies to any further equal protection inquiry." *Id.* (rejecting claim that Equal Protection Clause protects free exercise of religion more broadly than does the Free Exercise Clause of the First Amendment); *accord, e.g., Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (same); *McGuire v. Reilly*, 260 F.3d 36, 49-50 (1st Cir. 2001) (same re free speech claim). That a constitutional

---

[103] Hightower's Addendum 33-34, 51 (district court order).

right is deemed sufficiently important to be incorporated into the Fourteenth Amendment's Due Process Clause does not mean that a classification alleged to infringe that right is subject to "a standard of scrutiny stricter than the traditional rational-basis test" under the Equal Protection Clause. *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) (free exercise claim); *accord Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005), *cert. denied*, 546 U.S. 1150 (2006) (same).

The Commonwealth has a rational basis for wanting "to limit access to deadly weapons by irresponsible persons," which is the aim of the suitable person standard in Mass. Gen. L. c. 140, § 131. *See MacNutt*, 30 Mass. App. Ct. at 635. "Rational basis review requires only that the state could rationally have concluded that the challenged classification *might* advance its legitimate interests." *González-Droz*, 660 F.3d at 10 (emphasis in original). Section 131 passes that test.

## Conclusion.

Hightower's Second Amendment and procedural due process claims fail as a matter of law. The Second Amendment claim is not ripe: the revoked license gave Hightower rights to carry concealed, large capacity weapons in public that are not protected by the Second Amendment, and Hightower never sought a narrower license after she resigned from the Boston police department. In any case, under Massachusetts law, the "suitable person" standard does not give licensing authorities unbridled discretion to revoke or deny a firearms license. It furthers the important public interest in making sure that only responsible, law-abiding citizens are entrusted with carrying deadly weapons. Furthermore, the availability of judicial review of the decision to revoke Hightower's unrestricted Class A license was an

adequate post-deprivation remedy that satisfied any requirements of procedural due process. Hightower waived her substantive due process and equal protection claims, which in any case have no merit. For these reasons, the judgment in favor of the Defendants should be affirmed.

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

_____/s/ Kenneth W. Salinger_____
Kenneth W. Salinger, *Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, MA  02108
617.963.2075
ken.salinger@state.ma.us
First Circuit Bar No. 24380

April 11, 2012

Certificate of Compliance with FRAP 32(a)

I hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 14,000 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.  This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word in Microsoft Office Professional Plus 2010.

_____/s/ Kenneth W. Salinger_____

## Certificate of Filing and Service

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system on April 11, 2012, and thus copies will be sent electronically by that system to counsel for all parties in the case, as follows:  (a) Alan Gura, Gura & Possessky, PLLC, 101 N. Columbus Street, Suite 405, Alexandria, VA 22314; alan@gurapossessky.com; and (b) Lisa Skehill Maki, Assistant Corporation Counsel, City of Boston Law Department, One City Hall Plaza, Room 615, Boston, MA 02201; lisa.maki@cityofboston.gov.

    /s/ Kenneth W. Salinger

# Addendum.

Mass. Gen. L. c. 140, § 131....................................................Addendum 1

## Mass. Gen. L. c. 140, § 131

All licenses to carry firearms shall be designated Class A or Class B, and the issuance and possession of any such license shall be subject to the following conditions and restrictions:

(a) A Class A license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper. A violation of a restriction imposed by the licensing authority under the provisions of this paragraph shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

The colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery, which club is incorporated under the laws of the commonwealth for the possession, storage and use of large capacity weapons, ammunition therefor and large capacity feeding devices for use with such weapons on the premises of such club; provided, however, that not less than one shareholder of such club shall be qualified and suitable to be issued such license; and provided further, that such large capacity weapons and ammunition feeding devices may be used under such Class A club license only by such members that possess a valid firearm identification card issued under section 129B or a valid Class A or Class B license to carry firearms, or by such other persons that the club permits while under the direct supervision of a certified firearms safety instructor or club member who, in the case of a large capacity firearm, possesses a valid Class A license to carry firearms or, in the case of a large capacity rifle or shotgun, possesses a valid Class A or Class B license to carry firearms. Such club shall not permit shooting at targets that depict

human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties.

No large capacity weapon or large capacity feeding device shall be removed from the premises except for the purposes of: (i) transferring such firearm or feeding device to a licensed dealer; (ii) transporting such firearm or feeding device to a licensed gunsmith for repair; (iii) target, trap or skeet shooting on the premises of another club incorporated under the laws of the commonwealth and for transporting thereto; (iv) attending an exhibition or educational project or event that is sponsored by, conducted under the supervision of or approved by a public law enforcement agency or a nationally or state recognized entity that promotes proficiency in or education about semiautomatic weapons and for transporting thereto and therefrom; (v) hunting in accordance with the provisions of chapter 131; or (vi) surrendering such firearm or feeding device under the provisions of section 129D. Any large capacity weapon or large capacity feeding device kept on the premises of a lawfully incorporated shooting club shall, when not in use, be secured in a locked container, and shall be unloaded during any lawful transport. The clerk or other corporate officer of such club shall annually file a report with the colonel of state police and the commissioner of the department of criminal justice information services listing all large capacity weapons and large capacity feeding devices owned or possessed under such license. The colonel of state police or his designee, shall have the right to inspect all firearms owned or possessed by such club upon request during regular business hours and said colonel may revoke or suspend a club license for a violation of any provision of this chapter or chapter 269 relative to the ownership, use or possession of large capacity weapons or large capacity feeding devices.

(b) A Class B license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper; provided, however, that a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place; and provided further, that a Class B license shall not

entitle the holder thereof to possess a large capacity firearm, except under a Class A club license issued under this section or under the direct supervision of a holder of a valid Class A license at an incorporated shooting club or licensed shooting range; and (ii) rifles and shotguns, including large capacity rifles and shotguns, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as he deems proper. A violation of a restriction provided under this paragraph, or a restriction imposed by the licensing authority under the provisions of this paragraph, shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

A Class B license shall not be a valid license for the purpose of complying with any provision under this chapter governing the purchase, sale, lease, rental or transfer of any weapon or ammunition feeding device if such weapon is a large capacity firearm or if such ammunition feeding device is a large capacity feeding device for use with a large capacity firearm, both as defined in section 121.

(c) Either a Class A or Class B license shall be valid for the purpose of owning, possessing, purchasing and transferring non-large capacity rifles and shotguns, and for purchasing and possessing chemical mace, pepper spray or other similarly propelled liquid, gas or powder designed to temporarily incapacitate, consistent with the entitlements conferred by a firearm identification card issued under section 129B.

(d) Any person residing or having a place of business within the jurisdiction of the licensing authority or any law enforcement officer employed by the licensing authority or any person residing in an area of exclusive federal jurisdiction located within a city or town may submit to such licensing authority or the colonel of state police, an application for a Class A or Class B license to carry firearms, or renewal of the same, which such licensing authority or said colonel may issue if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or

property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section, unless the applicant:

(i) has, in any state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (a) a felony; (b) a misdemeanor punishable by imprisonment for more than two years; (c) a violent crime as defined in section 121; (d) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; or (e) a violation of any law regulating the use, possession or sale of controlled substances as defined in section 1 of chapter 94C;

(ii) has been confined to any hospital or institution for mental illness, unless the applicant submits with his application an affidavit of a registered physician attesting that such physician is familiar with the applicant's mental illness and that in such physician's opinion the applicant is not disabled by such an illness in a manner that should prevent such applicant from possessing a firearm;

(iii) is or has been under treatment for or confinement for drug addiction or habitual drunkenness, unless such applicant is deemed to be cured of such condition by a licensed physician, and such applicant may make application for such license after the expiration of five years from the date of such confinement or treatment and upon presentment of an affidavit issued by such physician stating that such physician knows the applicant's history of treatment and that in such physician's opinion the applicant is deemed cured;

(iv) is at the time of the application less than 21 years of age;

(v) is an alien;

(vi) is currently subject to: (A) an order for suspension or surrender issued pursuant to section 3B or 3C of chapter 209A or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to chapter 209A or a similar order issued by another jurisdiction; or

(vii) is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction.

(e) Within seven days of the receipt of a completed application for a license to carry or possess firearms, or renewal of same, the licensing authority shall forward one copy of the application and one copy of the applicant's fingerprints to the colonel of state police, who shall within 30 days advise the licensing authority, in writing, of any disqualifying criminal record of the applicant arising from within or without the commonwealth and whether there is reason to believe that the applicant is disqualified for any of the foregoing reasons from possessing a license to carry or possess firearms. In searching for any disqualifying history of the applicant, the colonel shall utilize, or cause to be utilized, files maintained by the department of probation and statewide and nationwide criminal justice, warrant and protection order information systems and files including, but not limited to, the National Instant Criminal Background Check System. The colonel shall inquire of the commissioner of the department of mental health relative to whether the applicant is disqualified from being so licensed. If the information available to the colonel does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law, he shall certify such fact, in writing, to the licensing authority within said 30 day period.

The licensing authority may also make inquiries concerning the applicant to: (i) the commissioner of the department of criminal justice information services relative to any disqualifying condition and records of purchases, sales, rentals, leases and transfers of weapons or ammunition concerning the applicant; (ii) the commissioner of probation relative to any record contained within the department of probation or the statewide domestic violence record keeping system concerning the applicant; and (iii) the commissioner of the department of mental health relative to whether the applicant is a suitable person to possess firearms or is not a suitable person to possess firearms. The director or commissioner to whom the licensing authority makes such inquiry shall provide prompt and full cooperation for that purpose in any investigation of the applicant.

The licensing authority shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing; provided, however, that no such license shall be issued unless the colonel has certified, in writing, that the information available to him does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law.

(f) A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or suspension of a license shall be in writing and shall state the reasons therefor. Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension. Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system. A revoked or suspended license may be reinstated only upon the termination of all disqualifying conditions, if any.

Any applicant or holder aggrieved by a denial, revocation or suspension of a license, unless a hearing has previously been held pursuant to chapter 209A, may, within either 90 days after receiving notice of such denial, revocation or suspension or within 90 days after the expiration of the time limit during which the licensing authority is required to respond to the applicant, file a petition to obtain judicial review in the district court having jurisdiction in the city or town wherein the applicant filed for, or was issued, such license. A justice of such court, after a hearing, may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same.

(g) A license shall be in a standard form provided by the executive director of the criminal history systems board in a size and shape equivalent to that of a license to operate motor vehicles issued by the registry of motor vehicles pursuant to section 8 of chapter 90 and shall contain a license number which shall clearly indicate whether such number identifies a Class A or Class B license, the name, address, photograph, fingerprint, place and date of birth, height, weight, hair color, eye color and signature of the licensee. Such license shall be marked "License to Carry Firearms" and shall clearly indicate whether the license is Class A or Class B. The application for such license shall be made in a standard form provided by the executive director of the criminal history systems board, which form shall require the applicant to affirmatively state under the pains and penalties of perjury that such applicant is not disqualified on any of the grounds enumerated above from being issued such license.

(h) Any person who knowingly files an application containing false information shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a house of correction, or by both such fine and imprisonment.

(i) A license to carry or possess firearms shall be valid, unless revoked or suspended, for a period of not more than 6 years from the date of issue and shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years but not more than 6 years from the date of issue, except that if the licensee applied for renewal before the license expired, the license shall remain valid for a period of 90 days beyond the stated expiration date on the license, unless the application for renewal is denied if [FN1] the licensee is on active duty with the armed forces of the United States on the expiration date of his license, the license shall remain valid until the licensee is released from active duty and for a period of not less than 90 days following such release. Any renewal thereof shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years but not more than 6 years from the effective date of such license. Any license issued to an applicant born on February 29 shall expire on March 1. The fee for the application shall be $100, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing

authority shall retain $25 of the fee; $50 of the fee shall be deposited into the general fund of the commonwealth and not less than $50,000 of the funds deposited into the General Fund shall be allocated to the Firearm Licensing Review Board, established in section 130B, for its operations and that any funds not expended by said board for its operations shall revert back to the General Fund; and $25 of the fee shall be deposited in the Firearms Fingerprint Identity Verification Trust Fund. For law enforcement officials, or local, state, or federal government entities acting on their behalf, the fee for the application shall be set at $25, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $12.50 of the fee, and $12.50 of the fee shall be deposited into the general fund of the commonwealth. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit such portion of the license application fee into the Firearms Record Keeping Fund quarterly, not later than January 1, April 1, July 1 and October 1 of each year. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit quarterly such portion of the license application fee as is to be deposited into the General Fund, not later than January 1, April 1, July 1 and October 1 of each year. For the purposes of section 10 of chapter 269, an expired license to carry firearms shall be deemed to be valid for a period not to exceed 90 days beyond the stated date of expiration, unless such license to carry firearms has been revoked.

Any person over the age of 70 and any law enforcement officer applying for a license to carry firearms through his employing agency shall be exempt from the requirement of paying a renewal fee for a Class A or Class B license to carry.

(j)(1) No license shall be required for the carrying or possession of a firearm known as a detonator and commonly used on vehicles as a signaling and marking device, when carried or possessed for such signaling or marking purposes.

(2) No license to carry shall be required for the possession of an unloaded large capacity rifle or shotgun or an unloaded feeding device therefor by a veteran's organization chartered by the Congress of the United States, chartered by the commonwealth or recognized as a

nonprofit tax-exempt organization by the Internal Revenue Service, or by the members of any such organization when on official parade duty or during ceremonial occasions. For purposes of this subparagraph, an "unloaded large capacity rifle or shotgun" and an "unloaded feeding device therefor" shall include any large capacity rifle, shotgun or feeding device therefor loaded with a blank cartridge or blank cartridges, so-called, which contain no projectile within such blank or blanks or within the bore or chamber of such large capacity rifle or shotgun.

(k) Whoever knowingly issues a license in violation of this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a jail or house of correction, or by both such fine and imprisonment.

> <[ Paragraph (l) effective until April 11, 2011. For text effective April 11, 2011, see below.]>

(l) The executive director of the criminal history systems board shall send by first class mail to the holder of each such license to carry firearms, a notice of the expiration of such license not less than 90 days prior to such expiration and shall enclose therein a form for the renewal of such license. The taking of fingerprints shall not be required in issuing the renewal of a license if the renewal applicant's fingerprints are on file with the department of the state police. Any licensee shall notify, in writing, the licensing authority who issued said license, the chief of police into whose jurisdiction the licensee moves and the executive director of the criminal history systems board of any change of address. Such notification shall be made by certified mail within 30 days of its occurrence. Failure to so notify shall be cause for revocation or suspension of said license.

> <[ Paragraph (l) as amended by 2011, 9, Secs. 16 and 17 effective April 11, 2011. For text effective until April 11, 2011, see above.]>

(l) The executive director of the criminal history systems board shall send electronically or by first class mail to the holder of each such license to carry firearms, a notice of the expiration of such license not less than 90 days prior to such expiration and shall enclose therein a

form for the renewal of such license. The taking of fingerprints shall not be required in issuing the renewal of a license if the renewal applicant's fingerprints are on file with the department of the state police. Any licensee shall notify, in writing, the licensing authority who issued said license, the chief of police into whose jurisdiction the licensee moves and the executive director of the criminal history systems board of any change of address. Such notification shall be made by certified mail within 30 days of its occurrence. Failure to so notify shall be cause for revocation or suspension of said license. The commissioner of criminal justice information services shall provide electronic notice of expiration only upon the request of a cardholder. A request for electronic notice of expiration shall be forwarded to the department on a form furnished by the commissioner. Any electronic address maintained by the department for the purpose of providing electronic notice of expiration shall be considered a firearms record and shall not be disclosed except as provided in section 10 of chapter 66.

(m) Notwithstanding the provisions of section 10 of chapter 269, any person in possession of a firearm, rifle or shotgun whose license issued under this section is invalid for the sole reason that it has expired, meaning after 90 days beyond the stated expiration date on the license, but who shall not be disqualified from renewal upon application therefor under this section, shall be subject to a civil fine of not less than $500 nor more than $5,000 and the provisions of section 10 of chapter 269 shall not apply; provided, however, that the exemption from the provisions of said section 10 of said chapter 269 provided herein shall not apply if: (i) such license has been revoked or suspended, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; (ii) revocation or suspension of such license is pending, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; or (iii) an application for renewal of such license has been denied. Any law enforcement officer who discovers a person to be in possession of a firearm, rifle or shotgun after such person's license has expired, meaning after 90 days beyond the stated expiration date on the license, has been revoked or suspended, solely for failure to give notice of a change of address, shall confiscate such firearm, rifle or shotgun and the expired or suspended license then in possession and such officer, shall forward such license to

the licensing authority by whom it was issued as soon as practicable. The officer shall, at the time of confiscation, provide to the person whose firearm, rifle or shotgun has been confiscated, a written inventory and receipt for all firearms, rifles or shotguns confiscated and the officer and his employer shall exercise due care in the handling, holding and storage of these items. Any confiscated weapon shall be returned to the owner upon the renewal or reinstatement of such expired or suspended license within one year of such confiscation or may be otherwise disposed of in accordance with the provisions of section 129D. The provisions of this paragraph shall not apply if such person has a valid license to carry firearms issued under section 131F.

(n) Upon issuance of a license to carry or possess firearms under this section, the licensing authority shall forward a copy of such approved application and license to the executive director of the criminal history systems board, who shall inform the licensing authority forthwith of the existence of any disqualifying condition discovered or occurring subsequent to the issuance of a license under this section.

(o) No person shall be issued a license to carry or possess a machine gun in the commonwealth, except that a licensing authority or the colonel of state police may issue a machine gun license to:

(i) a firearm instructor certified by the municipal police training committee for the sole purpose of firearm instruction to police personnel;

(ii) a bona fide collector of firearms upon application or upon application for renewal of such license.

(p) The executive director of the criminal history systems board shall promulgate regulations in accordance with chapter 30A to establish criteria for persons who shall be classified as bona fide collectors of firearms.

(q) Nothing in this section shall authorize the purchase, possession or transfer of any weapon, ammunition or feeding device that is, or in such manner that is, prohibited by state or federal law.

(r) The secretary of the executive office of public safety or his designee may promulgate regulations to carry out the purposes of this section.